UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 17-CR-094 |
| | ) | |
| Juan Manuel Abouzaid El Bayeh, | ) | |
| also known as | ) | **FILED** |
| "El Escorpion," "El Hermano," | ) | |
| "Nene," and "El Arabe," | ) | AUG 1 5 2024 |
| | ) | Clerk, U.S. District & Bankruptcy |
| | ) | Courts for the District of Columbia |
| Defendant. | ) | |

## JOINT STATEMENT OF STIPULATED FACTS

The statement of facts does not purport to include all of the Defendant's illegal conduct during the course of his charged offense. Nor does it purport to be an inclusive recitation of all that the Defendant heard, knew, or witnessed concerning the illegal activities of himself or those of his conspirators. It represents sufficient information for the Court to find a factual basis for accepting the Defendant's guilty plea in the above-captioned matter and is not intended to represent all of the Defendant's relevant conduct for sentencing purposes. Had the Defendant proceeded to trial, the Defendant agrees that the Government's evidence would show the following beyond a reasonable doubt:

1.      From at least in or about 2012 and continuing thereafter up to and including May 10, 2017, within the countries of Mexico, the United States, and elsewhere, the Defendant, JUAN MANUEL ABOUZAID EL BAYEH, did unlawfully, knowingly, willfully, and intentionally combine, conspire, confederate and agree with other conspirators, both known and unknown, to commit the following offense against the United States, to wit: to distribute at least four hundred fifty (450) kilograms or more of cocaine, a Schedule II controlled substance, intending and

knowing that it would unlawfully be imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960(a)(3), 960(b)(1)(B)(ii), and 963.

2.      During the course and in furtherance of the conspiracy, the Defendant was involved in cocaine shipments within Mexico, destined for importation into the United States, totaling at least 526 kilograms of cocaine.

3.      The Defendant personally arranged or attempted to arrange the sale of at least 74 kilograms of cocaine within Mexico for importation to the United States.  The Defendant successfully negotiated the trade of six kilograms of cocaine between his brother-in-law and Abigael Gonzalez Valencia, a leader of the Los Cuinis drug trafficking organization, in order to satisfy a debt owed by his brother-in-law for property purchased from Gonzalez Valencia.

4.      The Defendant assisted other drug traffickers with negotiating and transporting cocaine shipments, including assisting one trafficker who was attempting to recover 392 kilograms of cocaine that had been stolen and putting another trafficker in contact with someone who could transport 60 kilograms of cocaine in a car with a hidden compartment.

5.      The Defendant also arranged or attempted to arrange the sale or trade of methamphetamine and the chemicals used to manufacture methamphetamine, including attempting to arrange the trade of a house for $90,000 worth of methamphetamine. The Defendant acknowledges that $90,000 worth of methamphetamine in Mexico, at the time, would have been more than 45 kilograms of methamphetamine.

6.      The Defendant also assisted Gonzalez Valencia and others with purchasing property, aircraft, and cars with the proceeds of drug trafficking.

7.      The Defendant used the screenname "El Escorpion" to communicate on Blackberry Messenger with co-conspirators.

8.      The Defendant admits that the total amount of cocaine involved in this conspiracy for which he had actual knowledge and involvement was over 450 kilograms and the total amount of methamphetamine involved in this conspiracy for which he had actual knowledge and involvement was over 45 kilograms.

9.      The Defendant admits that he was aware that more than 450 kilograms of the cocaine and 45 kilograms of methamphetamine was going to be illegally imported into the United States for further distribution.

10.     The Defendant agrees venue and jurisdiction lie with this Court pursuant to 18 U.S.C. § 3238.

11.     The Defendant also agrees that his participation as a conspirator in the above-described acts were in all respects knowing, intentional, and willful, reflecting an intention and deliberation to do something the law forbids, and were not in any way the product of any accident, mistake of law or fact, duress, entrapment, or public authority.

12.     With his signature below and that of his counsel, the Defendant agrees that he has fully adopted this statement of facts as his own statement.  The Defendant is adopting this statement of facts because it is a true and correct summary of the Defendant's own conduct.

13.     The Defendant is pleading guilty because the Defendant is in fact guilty.

Respectfully submitted,

MARLON COBAR
Chief
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice

Date: 8/8/2024          By:     _____

KATE NASEEF
JONATHAN HORNOK
Trial Attorneys

Approved by:

Date: 8/8/2024          By:     _____

KAITLIN J SAHNI
Acting Deputy Chief of Litigation

4

## DEFENDANT'S ACKNOWLEDGMENT

I have reviewed this Statement of Facts with the assistance of an English-Spanish interpreter, and have discussed it at length with my attorney, Erik Sunde, Esq., who speaks fluent Spanish. This Statement of Facts has been translated into Spanish for me. I understand that the English version controls. I fully understand this Statement of Facts and agree to it without reservation. I do this voluntarily and of my own free will, intending to be legally bound. No threats have been made to me, nor am I under the influence of anything that could impede my ability to understand this Statement of Facts fully.

I reaffirm that absolutely no promises, agreements, understandings, or conditions have been made or entered into in connection with my decision to plead guilty except those set forth in the accompanying Plea Agreement dated August 8, 2024. I am satisfied with the legal services provided by my attorney in connection with this Statement of Facts, the accompanying Plea Agreement, and all matters related to it.

_____     8/14/24
JUAN MANUEL ABOUZAID EL BAYEH          Date
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I am the Defendant's attorney. I have fully explained to the Defendant, through an English-Spanish interpreter, the Defendant's rights and the applicable provisions of the Sentencing Guidelines. I have carefully reviewed every part of this Statement of Facts with the Defendant. The Defendant is agreeing to this Statement of Facts voluntarily, intelligently, and with full knowledge of all consequences of the Defendant's plea of guilty.

_____     8/14/24
ERIK SUNDE, ESQ.                       Date
Attorney for Defendant

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO. 17-CR-094 (BAH)** |
| **v.** | |
| **JUAN MANUEL ABOUZAID EL BAYEH,** | |
| **also known as "El Escorpion," "El Hermano," "Nene," and "El Arabe,"** | |
| **Defendant.** | |

## CONSENT MOTION FOR CONVERTING SENTENCING HEARING TO EVIDENTIARY HEARING

The United States of America ("the Government"), by and through its undersigned counsel, and with the Defendant's consent, hereby requests that the Court schedule an evidentiary hearing on contested and unresolved issues relevant to the Defendant's sentencing, specifically, the issue of determining the appropriate guidelines calculation based on the Defendant's role in the offense, U.S. Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 3B1.1, and obstruction, U.S.S.G. § 2D1.1(b)(16)(D). Evidence presented at an evidentiary hearing would inform the Court's sentencing decision. Accordingly, the Government requests that the Court schedule an evidentiary hearing and reset the filing deadlines for sentencing memoranda and for the sentencing to a later date. The parties defer to the Court's schedule, but are available on July 18, 2025, the date this matter is currently scheduled for sentencing.

### I.   Background

On May 10, 2017, a federal grand jury returned a one count Indictment charging the Defendant with conspiracy to distribute five kilograms or more of cocaine and five hundred grams or more of methamphetamine, knowing and intending that the cocaine and methamphetamine

would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960 (a)(3), 960(b)(1)(B), (H), 963, and 18 U.S.C. § 2.  ECF No. 1.

On April 29, 2024, the Defendant made an initial appearance in the U.S. District Court for the District of Columbia and was arraigned on the Indictment. On August 15, 2024, the Defendant pleaded guilty to Count one of the Indictment, ███████████████████████ ECF No. 22 ("PA").[1]

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████ ███████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████

II.    <u>Request for Evidentiary Hearing</u>

████████████████████████████████

████████████████████████████████

██████████████████████ The Government ███

█████████████████ will argue for increasing the offense level

---

[1] The United States agreed not to proceed on the methamphetamine portion of this charge in the extradition package that was submitted to Mexico. At the plea hearing, the Court, on a motion from the Government, struck the methamphetamine language from the indictment.  Transcript of Plea Colloquy at 19:10-22.
█████████████████████████████████

based on his aggravating role pursuant to U.S.S.G. § 3B1.1, and the specific offense characteristic of obstruction pursuant to U.S.S.G. § 2D1.1(b)(16)(D).

An evidentiary hearing is necessary to allow the Government to present evidence that is not yet in the record for the Court to consider. "When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor." U.S.S.G. § 6A1.3(a). If there are sentencing factors in dispute, a sentencing hearing is appropriate. U.S.S.G. § 6A1.3(b). Consistent with the local rules, "[a] hearing shall be held more than 7 days prior to the date of sentencing to resolve any disputed issues of fact, and to gather any other information the Court finds to be relevant to the sentencing guideline calculation." L.Cr.R. 32.2(d).

The Government seeks a pre-sentencing hearing to present evidence that would inform the Court regarding the appropriate Guidelines calculation. There is limited evidence before the Court to engage in a comprehensive fact-finding regarding Defendant's role in this offense. It is the Government's burden to demonstrate that the Defendant had an aggravating role when seeking this adjustment. *United States v. Keleta*, 552 F.3d 861,866 (D.C. Cir. 2009).   Additionally, if the court determines that the defendant had an aggravating role in the offense, there is a 2-level enhancement, pursuant to U.S.S.G. § 2D1.1(a)(16)(D), if the offense involved "the defendant engag[ing] in witness intimidation, tamper[ing] with or destroy[ing] evidence, or otherwise obstruct[ing] justice in connection with the investigation or prosecution of the offense[.]" In the absence of the aggravating role enhancement, U.S.S.G. § 3C1.1 applies if the Court finds obstructive conduct.

There is relevant evidence about the Defendant's role in the offense and obstruction, not yet before the Court, therefore an evidentiary hearing is necessary to present testimony and other

evidence to inform the Court's decision. The Government anticipates calling at least one witness at the evidentiary hearing.

Accordingly, for the reasons stated above, the Government requests that the Court vacate the current sentencing date and associated filing deadlines, set the evidentiary hearing on July 18, 2025, or a date that is convenient for the Court, reset the filing deadlines, and reschedule the sentencing for a later date.

Dated: May 29, 2025

Respectfully submitted,

MARLON COBAR, Chief
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice

By:    / s / *Colleen King*
Colleen King
Lernik Begian
Doug Meisel
Trial Attorneys
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
Washington, D.C. 20530
Telephone: (202) 616-2200

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of this motion has been sent via email to counsel for the Defendant, this 29th day of May 2025.

By:    _/s/    Colleen King_
Colleen King
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO. 17-CR-094 (BAH)** |
| **v.** | |
| **JUAN MANUEL ABOUZAID EL BAYEH,** | ███████████ |
| **also known as "El Escorpion," "El Hermano," "Nene," and "El Arabe,"** | |
| **Defendant.** | |

### JOINT STATUS REPORT

The United States of America ("the Government") and Defendant Juan Manuel Abouzaid El Bayeh, through the undersigned counsel, respectfully submit this joint report pursuant to the Court's May 29, 2025, Minute Order ("Minute Order") directing the parties to submit a joint report "summarizing the number of witnesses each side anticipates calling at the hearing, the purpose of each witness testimony in terms of the sentencing issue to be addressed that the parties dispute, and the anticipated length of each anticipated witness testimony."

The Government will call one witness, Drug Enforcement Administration Special Agent Brent Pickard, who will offer testimony relevant to the methamphetamine enhancement, pursuant to the U.S. Sentencing Guidelines ("U.S.S.G.") §2D1.1(b)(5), and the role in the offense enhancement, pursuant to U.S.S.G. § 3B1.1. The Government will not present evidence related to the enhancement for obstruction, pursuant to U.S.S.G. § 2D1.1(b)(16)(D), and does not intend to pursue this enhancement at the sentencing hearing. The Government estimates the direct for this witness to be three to four hours.

Undersigned defense counsel advise this Court that were only recently able to access and review certain Blackberry messages which the prosecution intends to rely upon at the contested

sentencing hearing. Defense counsel will advise the Court and the Government not later than Tuesday, July 15, 2025 if the defense will be presenting any witnesses. The defense reserves its right to challenge the prospective testimony of SA Pickard or the admissibility and/or relevance of the identified Blackberry messages and may possibly seek to introduce other intercepted messages and/or additional documents from the wiretap at the hearing.

      Dated: July 9, 2025

Respectfully submitted,

| | |
|---|---|
| Law Office of Robert Feitel, P.L.L.C. | MARLON COBAR,<br>Chief<br>Narcotic and Dangerous Drug Section |
| _/s/ Robert Feitel_<br>Robert Feitel<br>Counsel for Defendant | Criminal Division<br>United States Department of Justice |
| 1300 Pennsylvania Avenue, N.W., #1505<br>Washington, D.C. 20008<br>RF@RFeitelLaw.com<br>(202) 255-6637 | _/s/ Colleen King_<br>Colleen King<br>Lernik Begian<br>Doug Meisel<br>Trial Attorneys |
| Sandi S. Rhee Law Office | Narcotic and Dangerous Drug Section<br>Criminal Division |
| _/s/ Sandi S. Rhee_<br>Sandi S. Rhee<br>Counsel for Defendant | United States Department of Justice<br>145 N Street, Northeast<br>East Wing, Second Floor |
| 10001 Georgetown Pike, #63<br>Great Falls, VA 22066<br>sandirheelaw@gmail.com<br>(202) 255-6637 | Washington, D.C. 20530<br>(202) 598-2493 |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of this motion has been sent via email to counsel for the Defendant, this 9th day of July 2025.

By:    _/s/   Colleen King_____

Colleen King
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. 17-CR-094 (BAH)** |
| **JUAN MANUEL ABOUZAID EL BAYEH,** | ██████████ |
| **also known as "El Escorpion," "El Hermano," "Nene," and "El Arabe,"** | |
| **Defendant.** | |

## THE GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO STRIKE METHAMPHETAMINE ENHANCEMENT FROM PLEA AGREEMENT BASED UPON THE RULE OF SPECIALTY

The Government respectfully submits this opposition to the Defendant's Motion to Strike Methamphetamine Enhancement from Plea Agreement Based upon the Rule of Specialty. Dkt. No. 44 ("Def. Mot."). The Defendant argues that the Rule of Specialty prohibits the Government from applying the methamphetamine enhancement because the defendant's extradition was based only on the cocaine charge in the indictment. *Id*. at 1-2.

The Defendant does not have the standing to challenge a perceived violation of the Rule of Specialty, and even if he does, the Rule of Specialty is not violated here because it is appropriate to consider relevant conduct that is not charged in determining the applicability of sentencing enhancements, consistent with the United States Sentencing Guidelines ("U.S.S.G." or "the Sentencing Guidelines") § 1B1.3.

## I.    PROCEDURAL BACKGROUND

On May 10, 2017, a federal grand jury returned a one count Indictment charging the Defendant with conspiracy to distribute five kilograms or more of cocaine and five hundred grams or more of methamphetamine, knowing and intending that the cocaine and methamphetamine

would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960

(a)(3), 960(b)(1)(B), (H), 963, and 18 U.S.C. § 2. Dkt. No. 1.

In July 2019, the Government made an extradition request to the Government of Mexico

based solely on the cocaine charge in the indictment. Mexico granted the Government's extradition

request on April 26, 2024. On April 29, 2024, the Defendant made an initial appearance in the U.S.

District Court for the District of Columbia and was arraigned on the Indictment. On August 15,

2024, the Defendant pleaded guilty to Count one of the Indictment, ████████████████████

████████ Dkt. No. 22.[1]

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

The Government notified the Court, through the filing of a Joint Status Report on July 9,

2025, that the Government intended to present evidence on the Defendant's aggravating role and

the methamphetamine importation enhancement pursuant to U.S.S.G. § 2D1.1(b)(5).

## II.    ARGUMENT

### A.    Rule of Specialty Does Not Apply to Uncharged Relevant Conduct Considered at Sentencing

The Mexico-United States extradition treaty incorporates the Rule of Specialty in Article

17, which provides that "[a] person extradited under the present treaty shall not be detained, tried,

or punished in the territory of the requesting party for an *offense* other than that for which the

---

[1] At the plea hearing, the Court, on a motion from the Government, struck the methamphetamine language from the indictment.  Plea Hr'g Tr. at 19:10-22.
████████████████████████████████████████

extradition has been granted…" *United States v. Apodaca*, 275 F.Supp.3d 123, 140 (D.D.C. 2017) (emphasis in original) (citing Extradition Treaty Between the United States of America and the United Mexican States, art. 17, Feb 6, 1980, 31 U.S.T. 5059). This Circuit has twice recognized, without resolving, the "conflicting authority as to whether a criminal defendant—as opposed to the extraditing state—has standing to assert to doctrine of specialty." *United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 206 (D.C. Cir. 2013) (citing *United States v. Sensi*, 879 F.2d 888, 892 n.1 (D.C. Cir. 1989). The Government submits that the Defendant has no standing to assert a Rule of Specialty claim. But this Court need not resolve that issue because it is appropriate for the Court to consider relevant conduct, including uncharged conduct, when applying enhancements under the Sentencing Guidelines.

The Sentencing Guidelines provide that, in determining the specific offense characteristics, a court may consider relevant conduct, which includes "all acts and commissions committed, aided, abetted, counseled, commanded, inducted, procured, or willfully caused by the defendant … that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[.]" U.S.S.G. § 1B1.3(a)(1)(A). Relevant here, the Sentencing Guidelines provide for a 2-level increase "if (A) the offense involved the importation of amphetamine or methamphetamine or the manufacture of amphetamine or methamphetamine from listed chemicals that the defendant knew were imported unlawfully, and (B) the defendant is not subject to an adjustment under §3B1.2 (Mitigating Role)[.]" U.S.S.G. § 2D1.1(b)(5).

The D.C. Circuit has not directly addressed this issue, but multiple other Circuits have concluded that the Rule of Specialty is not violated when a trial court applies enhancements at

sentencing for conduct other than that for which the defendant was extradited.  The same analysis should apply here.

For example, the Sixth Circuit found no Rule of Specialty violation where the defendant was extradited on child pornography charges and government introduced evidence at sentencing related to victims of uncharged criminal activities. *United States v. Fontana*, 869 F.3d 464, 465 (6th Cir. 2017). The court held that "the district court's consideration of Fontana's uncharged but related conduct did not constitute 'punishment' within the meaning of the U.S.-Canada extradition treaty, but only an appropriate consideration in determining the sentence for the crimes for which Fontana was properly extradited." *Id*. at 471. The court particularly noted the Eighth Circuit's analysis of the issue in connection with the extradition treaty between the United States and Mexico:

> [A] sentencing enhancement for uncharged crimes did not violate the rule of specialty in that case because traditions and procedures of the receiving nation's courts were relevant for determining the intent of the treaty parties in drafting the extradition treaty, and that 'given the long-standing practice of United States courts of considering relevant, uncharged evidence at sentencing' it would be difficult to conclude that Mexico did not intend for an extradited defendant to face sentencing enhancements for uncharged crimes.

*Id*. at 471 (quoting *United States v. Lomeli*, 596 F.3d 496, 503 (8th Cir. 2010)).

Similarly, the Ninth Circuit found no Rule of Specialty violation in *United States v. Lazarevich*, 147 F.3d 1061 (9th Cir. 1998). In that case, the defendant was extradited on charges for making false statements on the passport applications of his two children, but the Netherlands refused extradition on charges of child abduction. *Id*. at 1062. The defendant was convicted for making false statements on passports and the court departed upward from the Guidelines based on the aggravating circumstance that he committed the offense to facilitate child abduction. *Id*. at 1063. In denying the defendant's Rule of Specialty claim, the court pointed to the Supreme Court

holding in *Witte v. United States*, which established that "the use of evidence of related criminal conduct to enhance a defendant's sentence for a separate crime within the authorized statutory limits does not constitute punishment." *Id.* at 1063-64 (quoting *Witte v. United States*, 515 U.S. 389, 399 (1995)).

Other courts have reached the same conclusion, that the Rule of Specialty does not bar the consideration of conduct beyond that for which extradition has been granted. *See generally United States v. Garcia*, 208 F.3d 1258, 1261–62 (11th Cir. 2000) (finding no specialty violation, where court sentencing defendant for conspiracy to distribute marijuana and carrying a firearm in connection with the conspiracy, in departing upward from sentencing guidelines, considered defendant's other marijuana dealings and murdering his distributor), *granting certiorari, vacating and remanding for reconsideration in light of Apprendi v. New Jersey*, 530 U.S. 466 (2001), *affirmed on remand*, 251 F.3d 160 (11th Cir. 2001); *United States v. Mangarella*, 489 Fed.Appx. 648, 652 (4th Cir. 2012) (finding the district court's application of sentencing enhancements based on uncharged conduct not included in the extradition documents did not violate the Rule of Specialty).

Although not in the context of sentencing enhancements, this Circuit has examined the Rule of Specialty in the context of other crimes evidence presented during trial and determined "the doctrine of specialty governs prosecutions, not evidence." *Lopesierra-Gutierrez*, 708 F.3d at 206. In *Lopesierra-Gutierrez*, the defendant challenged the admission of his cocaine trafficking activities that occurred prior to the start of the charged conspiracy. *Id.* at 205. The court admitted this evidence "for the limited purpose of showing knowledge and intent" and found that "[b]ecause he was never prosecuted for any crime stemming from the [] incident, the doctrine of specialty has no bearing here." *Id.* at 206. The same reasoning applies here: the Defendant "was never

prosecuted for any crime stemming from" his methamphetamine trafficking activities, "the doctrine of specialty has no bearing here"; and this court should exercise "the long-standing practice of United States courts of considering relevant, uncharged evidence at sentencing[.]" *See Lomeli*, 596 F.3d at 503.

The Defendant's reliance on a single, non-D.D.C. district court case, *United States v. Moss*, 344 F. Supp.2d 1142 (W.D. Tenn. 2004), is misplaced. *Moss* has nothing to do with the applicability of the specialty doctrine in the context of considering relevant conduct during sentencing. In *Moss*, the defendant was charged in an 89-count indictment with violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), RICO conspiracy, money laundering, and mail fraud. *Id*. at 1144. Costa Rican authorities granted the request for extradition, but the extradition resolution entered by the Costa Rican appellate court held that the defendant could not be tried in the United States for crimes of money laundering. *Id*. The U.S. government provided assurances to the Costa Rican government that "the [d]efendant would not be detained, tried or punished in the United States for offenses other than those for which extradition was granted." *Id*. at 1146. Enforcing the Rule of Specialty, the court dismissed the money laundering counts while expressly allowing the government to proceed on RICO charges relying on money laundering as a predicate. *Id.* at 1147-48. In the present case, the Government represented to the Government of Mexico that "the United States does not intend to proceed on [the] Count as it relates to the substance of methamphetamine," ECF. No. 44, Def. Ex. 1, at 3., and has honored this representation by dismissing the methamphetamine count from the indictment. The Defendant cites *Moss* to establish that the consequence for a Rule of Specialty violation is dismissal of those charges, however there are no charges for this Court to dismiss.

For these reasons, the Defendant's attempt to preclude the Court from considering his methamphetamine trafficking activities as relevant conduct at sentencing should be rejected.

### B.     There is Sufficient Evidence to Support the Methamphetamine Importation Enhancement

The Defendant's assertion that the Government "withdrew the extradition request for the methamphetamine prong of Count One of the indictment because it was not supported by sufficient evidence" is inaccurate. Dkt. No. 44 at 8. The Government amended the extradition request by Diplomatic Note wherein the Government assured the government of Mexico, that we did "not intend to proceed on this Count as it relates to the substance of methamphetamine[,]" thus seeking extradition on the Count as it related to the substance of cocaine. Dkt. No. 44, Def. Ex. 1, at 2.

Indeed, the Government "made the tactical decision not to proceed on the methamphetamine count and risk Mexico's denial of the extradition request." Dkt. No. 44 at 8. But contrary to the Defendant's factual assertions, *see id.* at 6, there is ample evidence to support that the conduct involved methamphetamine importation, which the Government will present at the evidentiary hearing scheduled on July 18, 2025. The investigation has revealed that at the time of the conspiracy for which the Defendant was charged, CJNG was engaged in manufacturing and trafficking methamphetamine in Mexico that was destined for the United States. The Government intercepted messages from the Defendant, through judicially authorized intercepts, in which the Defendant discussed methamphetamine production and trafficking. ██████████████
████████████████████████████████████████████
████████████████████████████████████████████

███████████████████████████████████

██████████

## III.    CONCLUSION

The Defendant is being punished only for the offense that he was extradited for – conspiracy of cocaine trafficking. There can be no Rule of Specialty violation when the Court exercises the long-standing practice of U.S. judicial system by considering relevant conducts that were not part of the charged and convicted crime at sentencing. The Court should deny the Defendant's Motion.

Dated: July 17, 2025

<div style="margin-left:40%">

Respectfully submitted,

MARLON COBAR, Chief
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice


By:    / s / *Colleen King*_____
     Colleen King
     Douglas Meisel
     Trial Attorneys
     Narcotic and Dangerous Drug Section
     Criminal Division
     U.S. Department of Justice
     Washington, D.C. 20530
     Telephone: (202) 616-2200

</div>



## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of this motion has been sent via email to counsel for the Defendant, this 17th day of July 2025.

By:    <u> /s/   *Colleen King*             </u>
                Colleen King
                Trial Attorney
                Narcotic and Dangerous Drug Section
                Criminal Division
                U.S. Department of Justice

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO. 17-CR-094 (BAH)** |
| **v.** | ███████ |
| **JUAN MANUEL ABOUZAID EL BAYEH,**<br>**also known as "El Escorpion," "El**<br>**Hermano," "Nene," and "El Arabe,"** | |
| **Defendant.** | |

**GOVERNMENT'S SUPPLEMENTAL MEMORANDUM**
**ON THE APPLICATION OF THE U.S. SENTENCING GUIDELINES**

The United States, by and through its undersigned counsel, respectfully submits this supplemental briefing in the above captioned matter. On August 15, 2024, Juan Manuel Abouzaid El Bayeh, also known as "El Escorpion," "El Hermano," "Nene," and "El Arabe," (the "Defendant") pled guilty to conspiring to knowingly and intentionally distribute (5) kilograms or more of a mixture and substance containing a detectable amount of cocaine, knowing and intending that such substances would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960(a)(3), 960(b)(1)(B)(ii), and 963.

On July 18, 2025, the Court presided over a pre-sentencing evidentiary hearing, during which the Government presented evidence and testimony of one witness, Special Agent Brent Pickard ("SA Pickard") of the Drug Enforcement Administration (DEA). Following the hearing the Court requested supplemental briefing on the application of the Sentencing Guidelines. ██

███████████████████████████████████████████████████████████

███████████████████████████████████████████████ As such and based on the evidence introduced at the pre-sentencing evidentiary hearing, the Government

1

recommends a two-level enhancement for aggravating role in the offense, which was not contemplated in the Plea Agreement, nor included in the Guidelines Calculation in the Presentence Investigation Report ("PSR"), consistent with the legal authority explained in this memorandum.

## I.    BACKGROUND

### A.    Procedural History

On May 10, 2017, a federal grand jury returned a one count Indictment charging the Defendant with conspiracy to distribute five kilograms or more of cocaine and five hundred grams or more of methamphetamine, knowing and intending that the cocaine and methamphetamine would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960 (a)(3), 960(b)(1)(B), 960(b)(1)(H), 963, and 18 U.S.C. § 2. ECF No. 1.

On April 29, 2024, the Defendant made an initial appearance in the U.S. District Court for the District of Columbia and was arraigned on the Indictment. On August 15, 2024, the Defendant pleaded guilty to Count one of the Indictment, pursuant to a Plea Agreement. ECF No. 22 ("PA").[1] On July 18, 2025, the Court presided over a pre-sentencing evidentiary hearing.

### B.    Offense Conduct in the Plea Agreement Statement of Facts

From at least in or about 2012 and continuing thereafter up to and including May 10, 2017, within the countries of Mexico, the United States, and elsewhere, the Defendant did unlawfully, knowingly, willfully, and intentionally combine, conspire, confederate and agree with other conspirators, both known and unknown, to distribute at least four hundred fifty (450) kilograms or more of cocaine, a Schedule II controlled substance, intending and knowing that it would

---

[1] The United States agreed not to proceed on the methamphetamine portion of this charge in the extradition package that was submitted to Mexico. At the plea hearing, the Court, on a motion from the Government, struck the methamphetamine language from the indictment. Plea Hr'g Tr. at 19:10-22.

2

unlawfully be imported into the United States. ECF No. 23, Statement of Facts ("SOF"), ¶¶ 1, 8-9, 11. The Defendant is aware that more than 450 kilograms of cocaine and 45 kilograms of methamphetamine was going to be illegally imported into the United States for further distribution. *Id.* ¶ 9.

During and in furtherance of the conspiracy, the Defendant was involved in cocaine shipments within Mexico, destined for importation into the United States, totaling at least 526 kilograms. *Id.* ¶ 2. In addition, the Defendant personally arranged or attempted to arrange the sale of at least 74 kilograms of cocaine within Mexico for importation to the United States. *Id.* ¶ 3. For example, the Defendant successfully negotiated the trade of six kilograms of cocaine between his brother-in-law and Abigael Gonzalez Valencia, a leader of the Los Cuinis drug trafficking organization, in order to satisfy a debt owed by his brother-in-law for property purchased from Gonzalez Valencia. *Id.* The Defendant also assisted others with negotiating and transporting cocaine shipments. *Id.* ¶ 4. For instance, the Defendant assisted one trafficker who was attempting to recover 392 kilograms of cocaine that had been stolen and put another trafficker in contact with someone who could transport 60 kilograms of cocaine in a car with a hidden compartment. *Id.*

In addition to cocaine, the Defendant also arranged or attempted to arrange the sale or trade of methamphetamine and the chemicals used to manufacture methamphetamine in Mexico, which he knew was going to be illegally imported into the United States. *Id.* ¶¶ 5, 8. For example, the Defendant attempted to arrange the trade of a house for $90,000 worth of methamphetamine, which would have been more than 45 kilograms of methamphetamine. *Id.* ¶ 5. In addition to trafficking cocaine and methamphetamine, the Defendant assisted Abigael Gonzalez Valencia and others with purchasing property, aircraft, and cars with proceeds of drug trafficking. *Id.* ¶ 6.

In conducting his drug-trafficking activities, the Defendant communicated with his co-conspirators using Blackberry Messenger (BBM), with the screenname "El Escorpion." *Id.* ¶ 7.

### C.    Additional Evidence Presented

In addition to the information contained in the PSR and the SOF that the Defendant stipulated to as part of his Plea Agreement, the Government will also rely on evidence that the Government introduced at the evidentiary hearing in its sentencing recommendation.

### 1.    The Defendant used BBM screen name "El Escorpion"

The core of the evidence introduced at the hearing consists of BBM messages sent by and to the Defendant, who used screen name "El Escorpion." In or around 2013, the DEA started its long-term investigation into a number of high-level targets within the Cartel Jalisco Nueva Generacion ("CJNG") and Los Cuinis, including the Defendant. Evid. Hr'g Tr. at 17-18.[2] CJNG and Los Cuinis worked hand-in-hand, and Los Cuinis served as the financier of both cartels. *Id.* at 17. During the course of the investigation, DEA conducted a wiretap operation on 39 BBM accounts (target devices), one of which was identified as "Target Device #5". *Id.* at 19, 20. Target Device #5 was associated with the screen name "El Escorpion." *Id.* at 23. In addition to the Defendant's own admission that he utilized that screenname, *see* SOF ¶ 7, DEA identified the Defendant as "El Escorpion" and the user of Target Device #5 through the content of the intercepted conversations, including identifying information such as a picture of the Defendant and his birthday. Evid. Hr'g Tr. at 23:2-11.

The messages intercepted from the Defendant's BBM account revealed that he was in frequent communication with several top leaders within CJNG and Los Cuinis, conducting

---

[2] The transcript of the evidentiary hearing held on July 18, 2025, is attached as Exhibit A.

conversations that would only be fitting if the Defendant himself had a leadership role within these criminal organizations.

2. The Defendant's communications with top cartel leader: Abigael Gonzalez Valencia

The Defendant was in contact with Gonzalez Valencia, the leader of Los Cuinis, on a weekly, and at times daily, basis. *Id.* at 27. Gonzalez Valencia was using the BBM screenname "Boss" during this time. *Id.* The conversations between Gonzalez Valencia and the Defendant were casual and friendly. *Id.* at 79.

For example, in June 2013, the Defendant and Gonzalez Valencia communicated about a debt that the Defendant's brother-in-law owed to Gonzalez Valencia for a real estate transaction and the Defendant acted as a "middleman" between them. *Id.* at 28 and 34. Several conversations related to the past-due payment of the debt. *Id.* at 30. In one conversation Gonzalez Valencia said to the Defendant, "Yes brother but look where we are dude he said Thursday[;]" the Defendant responded, "Yes I'm pressuring him to deposit everyday because it all has to be there in full by the 25th." *Id.* at 30; Gov't Ex. 5. Despite Gonzalez Valencia noting that the deadline had already expired, he nevertheless extended the deadline to the 25th of June. Evid. Hr'g Tr. at 30-31; Gov't Ex. 5. The debt remained unpaid after the deadline and was ultimately paid in approximately July or August 2013 when the Defendant's brother-in-law, through coordination with the Defendant, provided Gonzalez Valencia six kilograms of cocaine. Evid. Hr'g Tr. at 32, 34, 36; Gov't Exs. 6-7.

The Defendant also spoke to other leaders in CJNG and Los Cuinis about his relationship with Gonzalez Valencia. Evid. Hr'g Tr. at 36. In an intercepted conversation with Victor Manuel Rodriguez Cobain, a commander within the CJNG using the screenname "Leo," the Defendant and Rodriguez Cobain discussed the importance of recognizing individuals when they did good

5

work for the cartel. *Id.* at 40. In that conversation, the Defendant told Rodriguez Cobain, "I was talking to the boss and like I told you I told him brother honestly if it were not for La Chata there and how fucking good he is at pressuring and moving stuff that wouldn't go out." *Id.* at 41; Gov't Ex. 8, line 5. The Defendant went on to state, "And honestly commander that is the truth like I told him you have to acknowledge when anyone does something well he knows that and he agrees 100% he said to me yes brother and negro did a really [g]ood job too." Evid. Hr'g Tr. at 41; Gov't Ex. 8, line 8. The Defendant referenced Gonzalez Valencia as "boss" in the above conversation, Evid. Hr'g Tr. at 42, which indicates that the Defendant had a direct and advisory relationship to Gonzalez Valencia.

Additionally, intercepted messages showed an individual using the screenname "Pamurod" sending a message to the Defendant seeking a meeting with Gonzalez Valencia. Evid. Hr'g Tr. at 42; Gov't Ex. 9, line 1 ("Can I ask you a favor. Tell the boss I'm in the city and I need to talk to him please, when and at what time could I see him?"). The Defendant responded that he and Gonzalez Valencia ("the boss") were both out of town and suggested "Pamurod" speak to someone else. Evid. Hr'g Tr. at 42-43; Gov't Ex. 9, line 2 ("… I'm out of town I'll be back tomorrow night the boss is not here he's out of town he'll be back in a month I think why don't you talk to gygo").

Lastly, in a conversation between the Defendant and Ruben Oseguera Gonzalez, also known as Menchito (hereinafter "Menchito"), who was CJNG's second-in-command, the Defendant told Menchito that he was "with cui doing an errand." Evid. Hr'g Tr. at 57; Gov't Ex. 19, line 6. "Cui" is a known alias of Gonzalez Valencia, *id.* at 58, and the conversation again indicates a close working relationship between the Defendant and the top leader of Los Cuinis.

3. <u>The Defendant's communications with top cartel leader: Jose Gonzalez Valencia</u>

The Defendant was also in direct communication with Jose Gonzalez Valencia, who was utilizing the screenname "Santy," (hereinafter "Chepa") to discuss drug trafficking activities. Evid. Hr'g Tr. at 43.

Chepa, Gonzalez Valencia's brother, is another top leader in the Los Cuinis cartel. *Id.* at 27. In a conversation discussing "squares," a codename for kilograms of cocaine, Chepa told the Defendant that he would provide him the "squares" for "17[,]300" and that it was "up to you how much you ask for them." *Id.* at 44; Gov't Ex. 10, line 4. The Defendant responded, "Well I'll put them at 17[,]500 that's fine the important thing is that it gets done a small profit is perfect brother if you raise it too much nothing gets done okay[.]" Evid. Hr'g Tr. at 44; Gov't Ex. 10, line 5. The numbers in the conversation are consistent with the price of a kilogram of cocaine at the U.S.-Mexico border area in 2013. Evid. Hr'g Tr. at 45. Cocaine in kilogram quantities is for distribution rather than personal use. Evid. Hr'g Tr. at 45.

4. <u>The Defendant's communications with top cartel leader: Ruben Oseguera Gonzalez</u>

The Defendant was also in direct contact with Menchito, who used the BBM screennames "Billy the Kid" and "Ice man." *Id.* at 46. Before his arrest in 2015, Menchito was CJNG's second highest ranking member. *Id.* at 27.

In July 2013, the Defendant discussed precursor chemicals in intercepted messages with Menchito. *Id.* at 57. They exchanged messages about the Defendant "looking at two burlap bags" and asking Menchito to sell him "2 laminates." *Id.* at 57-58; Gov't Ex. 19, line 8. "Burlap bags" refers to packaging material used to package precursor chemicals and "laminate" is a codeword for precursor chemicals. Evid. Hr'g Tr. at 58.

On October 19, 2013, the Defendant reached out to Menchito in an attempt to locate someone named Salvador, whom the Defendant thought had been kidnapped. *Id.* at 47. After learning that Menchito had Salvador in his custody, the Defendant advocated for his release. *Id.* at 47-48. In this conversation, Menchito stated to the Defendant, "I need to talk to you in person so you know the truth." *Id.* at 48; Gov't Ex. 12, line 14. The Defendant replied, "Yes my brother where can I see you but leave them alone for a bit for me so there's no mistake please[.]" Evid. Hr'g Tr. at 48; Gov't Ex. 12, line 15.

The two continued discussing the matter on October 21, 2013, Evid. Hr'g Tr. at 49; Gov't Ex. 13, and Menchito eventually released Salvador as the Defendant suggested. Evid. Hr'g Tr. at 49. Following Salvador's release, the Defendant texted Menchito, "[S]alvador tells me that he's all set and at your service so we can do the little oxyco[n]tin project large scale…" and also told Menchito what Salvador would need to begin working. *Id.* at 50; Gov't Ex. 14, line 1. Menchito replied by telling the Defendant to "[g]et everything situated and tell him that we're here for him and from now on no one will bother him anymore because now he is set up with me." Evid. Hr'g Tr. at 50; Gov't Ex. 14, line 2. The Defendant passed that message on to Salvador and provided his response to Menchito, "He's telling me tell the man to give us just a few days for him and the guys to recover from the beating and that some of them are in the hospital recovering from [broken] ribs and such so the whole team can be together." Evid. Hr'g Tr. at 50; Gov't Ex. 14, line 3. The conversations between the Defendant and Menchito shown in the intercepted messages were casual and friendly, often addressing each other as "brother," indicating a close working relationship between the two. Evid. Hr'g Tr. at 79.

### 5. Additional relevant communications

The Defendant also exchanged messages with other individuals about drug trafficking activities. On one occasion, the Defendant told someone with the screenname "Mime": "Yes he is going to give you some papers for you to bring them to josan don't forget to ask him for them before you come." *Id.* at 46, Gov't Ex. 11. "Papers" is a codeword for money. Evid. Hr'g Tr. at 46. The day prior, the Defendant had sent the same user two messages containing the names of two chemicals, which are primarily used to make methamphetamine. *Id.* 56, Gov't Ex. 18.

In another intercepted conversation between the Defendant and a user identified as "T.M.," they spoke about "deodorants," a code word for methamphetamine precursor chemicals. *Id.* at 52; Gov't Ex. 16, line 1. In this conversation, the Defendant was told that the "deodorant came out short," meaning they didn't have enough precursor chemicals to produce the expected amount of methamphetamine. Evid. Hr'g Tr. at 53; Gov't Ex. 16, line 1-5. At the end of this conversation, the Defendant told T.M., "I wanted to mention to you my brother the guy with the ride is set to leave tomorrow or the day after in case you need room there's a way?" Evid. Hr'g Tr. at 55; Gov't Ex. 16, line 7. "Ride" is a codeword for transportation of drugs. Evid. Hr'g Tr. at 55. These communications reveal the extent to which the Defendant was aware of and involved in the production and movement of methamphetamine throughout Mexico with other members of the CJNG.







███████████████████████████████████████████████

## III.    THE DEFENDANT'S SENTENCING GUIDELINES RANGE

On June 26, 2025, the Probation Office issued a final PSR. ECF No. 42. The Probation Office determined the Defendant's estimated Sentencing Guidelines range is 135 to 168 months, which mirrors the parties' calculation as stated in the Plea Agreement. PSR ¶¶ 6-7, PA ¶ 3.

████████████████████████████████████████

███████████████. As the evidence introduced at the hearing has established, the Defendant served a unique leadership role by being a trusted confidant and advisor to multiple top leaders of CJNG and Los Cuinis. As such, the Defendant should receive a two-level increase for his aggravating role in the offense pursuant to U.S.S.G. § 3B1.1(c), which would render the Defendant ineligible for the two-level reduction as a Zero-Point offender pursuant to U.S.S.G. § 4C1.1, and the two-level reduction pursuant to U.S.S.G. § 2D1.1(b)(18). The Defendant's resulting total offense level is 39.

### A.    The Defendant Should Receive a Two-Level Adjustment to the Base Offense Level for Aggravating Role

"The government bears the burden of proof in seeking sentencing enhancements under the Guidelines," satisfying a preponderance of the evidence standard. *United States v. Keleta*, 552 F.3d 861, 866 (D.C. Cir. 2009); *see also* U.S.S.G. § 6A1.3, comment ("The Commission believes that the use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding the application of the guidelines to the facts of the case.").

The Sentencing Guidelines provide for an increase in the offense level if a defendant has an aggravating role in the offense. U.S.S.G. § 3B1.1. Specifically, there is a four-level increase "[i]f the defendant was an organizer or leader a criminal activity that involved five or more participants or was otherwise extensive." *Id* at § 3B1.1(a). There is a three-level increase "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive[.]" *Id*. at § 3B1.1(b). Finally, the Guidelines provide for a two-level increase if the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b)[.]" *Id*. at § 3B1.1(c). When evaluating whether a defendant had an aggravating role in the offense, the Sentencing Guidelines instruct the court to consider a non-exhaustive list of factors:

> [1] the exercise of decision-making authority, [2] the nature of participation in the commission of the offense, [3] the recruitment of accomplices, [4] the claimed right to a larger share of the fruits of the crime, [5] the degree of participation in planning or organizing the offense, [6] the nature and scope of the illegal activity, and [7] the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, comment (n.4). The Guidelines clarify that "there can … be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy." *Id*. This determination is not based solely on elements and acts of the charged conduct, but "is to be made on the basis of all conduct within the scope of U.S.S.G. § 1B1.3 (Relevant Conduct)." U.S.S.G. Ch. 3 Pt. B, Introductory Comment. "No single factor is dipositive, but all defendants receiving the enhancement must exercise some control over others." *United States v. Bikundi*, 926 F.3d 761, 801 (D.C. Cir. 2019) (internal quotation marks omitted); *United States v. Wilson*, 605 F.3d 985, 1039 (D.C. Cir. 2010). In considering this enhancement, "not being at the bottom rung of a conspiracy is merely a necessity but not a sufficient condition to justify an enhancement under § 3B1.1(b)." *United States v. Graham*, 162 F.3d 1180, 1184 (D.C. Cir. 1998).

1.  <u>The Defendant was hierarchically superior in comparison to others</u>

Inherent in this analysis is that "the notion of 'management' or 'supervision,' [] connote[s] some sort of hierarchical relationship, in the sense that an employer is hierarchically superior to his employee." *United States v. Johnson*, 64 F.4th 1348, 1352 (D.C. Cir. 2023) (citing *United States v. Quigley*, 373 F.3d 133, 140 (D.C. Cir. 2004)). The D.C. Circuit in *Johnson* evaluated the application of a three-level increase in the offense level where the district court determined that the defendant "managed or supervised five people: his wife [], three codefendants, and a potential buyer." *Id.* at 1352. Johonson was identified as a supplier to a middleman and one other individual during an investigation into drug trafficking and a related shooting in southeast Washington, D.C. *Id.* at 1350. At sentencing, the government argued that Johnson managed or supervised his wife by directing her to pick up a gun, funnels, and gasoline fuel treatment to dilute the PCP. *Id.* at 1350, 1352-53. In determining that Johnson was not a "commander" with "authority to direct" his wife, the court focused on the spousal relationship and the extended give-and-take which ultimately resulted in his wife's acquiescence. *Id.* at 1353. The court also found that Johnson did not exercise management or supervision over buyers by setting terms of a sale to a buyer. *Id.* (citing *United States v. Slade*, 631 F.3d 185, 191 (4th Cir. 2011)).

*Johnson* is distinguishable from the facts of this case. First, the Government is not asking the court to apply a three-level enhancement, but instead a two-level enhancement, in recognition of the levels of leadership and relative responsibility within the organization and for the specific conduct being considered by the Court at sentencing. The *Johnson* court was not presented with facts to examine the defendant's relative responsibility compared to other leaders within the organization, as Johnson's position was the highest one considered by the court. *See Johnson* at 1350.

Second, the Defendant exercised some level of "control or authority" in respect to the conspiracy for which he pled guilty. Specifically, the Defendant admitted that he coordinated with multiple individuals to distribute cocaine. *See* SOF ¶ 4. Unlike *Johnson*, the Defendant was not merely setting the terms of a sale to a buyer in these interactions, but "negotiating and transporting cocaine shipments." *Id*. Additionally, the transactions admitted to in the SOF and the evidence presented show that unlike *Johnson*, the Defendant was dealing not with unrelated buyers, but others occupying varying roles within the same drug trafficking organization.

Further and probably most tellingly, the evidence presented established that the Defendant acted as a trusted advisor to the most senior leaders of Los Cuinis and CJNG. For example, he advised Abigael Gonzalez Valencia on giving sufficient credit to individuals who contributed to cartel activities and discussed that advice with an adjacent "commander" within the organization. *See* Evid. Hr'g Tr. at 41, Gov't Ex. 8. The Defendant persuaded Menchito, the second in command of the CJNG, to release an individual that Menchito abducted *See* Evid. Hr'g Tr. at 49; Gov't Ex. 13, line 1. In other words, the Defendant was not merely providing advice to these cartel leaders, he was influencing their decision-making. The Ninth Circuit has applied this two-level enhancement under similar circumstances, focusing on "organizational authority[,]" to "defendants who have the ability and influence necessary to coordinate the activity of others." *United States v. Vinge*, 85 F.4th 1285, 1288 (9th Cir. 2023).

In addition, the Defendant's own admissions when pleading guilty outlined the nature of his participation in the commission of the offense and the degree of participation in planning and organizing the offense: he negotiated the repayment of his brother-in-law's debt to Gonzalez Valencia with 6 kilograms of cocaine; he helped one trafficker recover 392 kilograms of stolen cocaine; and he put another trafficker in contact with someone who could transport over 60

kilograms of cocaine in a car with a hidden compartment. *See* SOF ¶¶ 3, 4. The Defendant also sent a message directing an individual to pick up money within a day of providing the same individual with names of precursor chemicals used to make methamphetamine. *See* Gov't Exs. 11 and 18. The Defendant further attempted to arrange the trade of a house for $90,000 worth of methamphetamine and assisting Gonzalez Valencia and others with purchasing property, aircraft, and cars with proceeds of drug trafficking. *See* SOF ¶¶ 5, 6.

Collectively, such evidence consistently reflects the Defendant's unique position within the hierarchy of CJNG and Los Cuinis: he had direct contact with the top leaders and was superior to other members who relied on the Defendant's access to leadership and ability to coordinate the drug trafficking activity.

2.    The Defendant's relative responsibility within the organization warrants a two-level enhancement under the Sentencing Guidelines

When applying an enhancement under § 3B1.1, the court evaluates "relative responsibility." *United States v. Graham*, 162 F.3d at 1185. In *Graham*, the D.C. Circuit found that "neither the district court nor the government [] cited any evidence to dispel [the] view of [the defendant] as simply a barnacle clinging to the outer hull of middle management." *Id.* at 1184. Terrence Terrell, one of three co-defendants in *Graham*, appealed the application of a three-level enhancement for serving as a manager or supervisor within the conspiracy. *Id.* at 1181. The court noted a lack of foundation for finding that Terrell "played a managerial role in the conspiracy" based on witness testimony "that Terrell was essentially a 'wannabe' who liked hanging out with his drug dealing relatives ... but who would not be trusted with operational control over the enterprise." *Id.* at 1181, 1184. The court also noted testimony from another co-conspirator stating that Terrell wasn't ready to be supplied with drugs and that the lieutenant who intervened on Terrell's behalf was forced to pay that co-conspirator when Terrell "messed up." *Id.* at 1184. The

court concluded that the record only showed that "Terrell sold drugs and worked closely with others who sold drugs while occasionally assisting with drug sales by runners and pipeheads … [which] does not justify a three-level upward adjustment." *Id.*

In concluding that an enhancement for leadership was not appropriate in *Graham*, the D.C. Circuit pointed to the lack of evidence that the defendant "received extra compensation for serving as a manager, disciplined any lower ranking members of the conspiracy, altered the conspiracy's polices or procedures in any respect, provided guidance to senior managers or subordinates, issued orders on behalf of the conspiracy, or otherwise held himself out as a link in the chain of command." The court particularly noted that "§ 3B1.1 [] creates three relevant tiers for conspiracies that are 'extensive': a tier for leaders and organizers, a tier for managers and supervisors, and tier for everyone else." *Id.* at 1185 (citing U.S.S.G. § 3B1.1 and application notes). Application of this enhancement calls for more than "a hollow exercise in spatial geometry" and the court must "distinguish between defendants based on 'relative responsibility'" and the Sentencing Guidelines have "provided substantive factors to assist courts in applying the guideline." *Id.*

In this case, the Defendant was not merely a "barnacle" clinging to leaders of CJNG; he was a part of the hierarchical structure of the organization and took actions consistent with his position. Unlike Terrell, the Defendant was not operating at the street level close to the final sale of the cocaine, but at a distribution level. Additionally, this Court heard testimony that at least one person sought out access to the leader of Los Cuinis, Abigael Gonzalez Valencia, through the Defendant. *See, e.g.,* Gov't Ex. 9. This shows that, unlike the defendant in *Graham*, other people who did not have the same access to top leaders approached the Defendant in order to gain that access. *Id*. In responding to the request, the Defendant directed this individual to another person

because Gozalez Valencia was not available. *Id*. This shows the Defendant's connections and relative position within the cartel, occupying status as a "link in the chain of command." As already addressed, in addition to being a gatekeeper to a senior cartel leader, the Defendant provided counsel and was able to influence their decision-making. Indeed, his direct and casual engagement with senior leaders demonstrates the Defendant's status within the cartels—he was much more than a mere underling, he was part of the nerve center.

The Sentencing Guidelines offer a range of enhancements for an aggravating role the offense so as to not limit the enhancement to masterminds or kingpins of criminal conspiracies and under U.S.S.G. § 3B1.1(c) "lower-tier managers and supervisors can still qualify for the enhancement[.]" *United States v. Day*, 117 F.4th 662 (5th Cir. 2024). The Seventh Circuit has addressed how the two-level enhancement applies to "middle managers." *United States v. Figueroa*, 682 F.3d 694 (7th Cir. 2012). Although the defendant in *Figueroa* argued that he had no discretion and received instruction from another individual who was one of "the people that are actually running [the] drug operation[,]" the court still found it appropriate to apply the two-level enhancement because "supervision often consists of transmitting directives from above"; even when "low-level supervisors are themselves closely supervised and thus have little discretion." *Id.*

Similarly, the Second Circuit has found that a two-level enhancement is warranted when a defendant helped negotiate prices, arranged payment and delivery details, helped recruit certain co-conspirators, and helped direct the activity of the co-conspirators to some degree. *United States. v. Horton*, 381 Fed. Appx. 7 (2d Cir. 2010). As another example, the Ninth Circuit has found a basis for applying the two-level enhancement where a defendant did not retain a supervisory role but did organize others in the commission of criminal activity, reflecting "the greater level of culpability of the participant who arranges the transaction" *United States v. Lopez-Salas*, 254 Fed.

Appx. 621, 624 (9th Cir. 2007). In doing so, the Ninth Circuit recognized that the defendant dispatched runners, made decisions regarding pricing, made decisions regarding where and when the runners would deliver the drugs, and was the person contacted when someone came to collect receipts of the operation. *Id.* at 624.

Here, the Government has presented sufficient evidence for the Court to find that the two-level enhancement for an aggravating role under U.S.S.G. § 3B1.1(c) applies to the Defendant. The Defendant is a member of a sprawling criminal organization and while not a kingpin, he had close ties and access to its most senior leaders and acted with corresponding responsibility within the cartels to merit a two-level aggravating role enhancement. The Defendant's own statements to another CJNG "commander" about his own advice and counsel to top-level leaders of the organization shows his position within the "middle management" of the cartel. He exerted influence over Menchito, CJNG's second in command, who asked for and followed the Defendant's advice and released Salvador. Gov't Exs. 12-13. Following Salvador's release, the Defendant was trusted by Menchito to deliver instructions to Salvador. Gov't Ex. 14. Additionally, the Defendant's communications with Chepa demonstrate that he engaged in setting the price of distribution quantities of cocaine and claiming a share of the profits for himself. Gov't Ex. 10. The intercepted messages show that the Defendant understood the nature and scope of the illegal activity of CJNG and Los Cuinis. He engaged in conversations about various aspects of the drug trafficking activities with several top leaders, including the production of methamphetamine from precursor chemicals, the transportation of controlled substances, and the distribution of cocaine.

Accordingly, the Government has established, by a preponderance of the evidence, that the Defendant meets the standard set out in the Sentencing Guidelines and related caselaw for a two-level enhancement under U.S.S.G. § 3B1.1(c).

**B.      Adjustment to the Base Offense Level for Importation of Methamphetamine[5]**

Pursuant to U.S.S.G. § 2D1.1(b)(5), the base offense level should be increased by two levels "[i]f (A) the offense involved the importation of amphetamine or methamphetamine or the manufacture of amphetamine or methamphetamine from listed chemicals that the defendant knew were imported unlawfully, and (B) the defendant is not subject to an adjustment under § 3B1.2[.]" The Sentencing Guidelines provide that, in determining the specific offense characteristics, a court may consider relevant conduct, which includes "all acts and commissions committed, aided, abetted, counseled, commanded, inducted, procured, or willfully caused by the defendant . . . that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense[.]" U.S.S.G. § 1B1.3(a)(1)(A). The Government is only required to establish the sentencing enhancement related to methamphetamine pursuant to U.S.S.G. § 2D1.1(b)(5) by a preponderance of the evidence, which does not require the Government to present evidence of a seizure of methamphetamine. *See* U.S.S.G. § 6A1.3, comment.

When the Defendant pled guilty, he admitted to arranging or attempting to arrange the sale or trade of methamphetamine and the chemicals used to manufacture methamphetamine in Mexico, which he knew was going to be illegally imported into the United States. *See* SOF ¶¶ 3, 5, 8. Additionally, the Defendant discussed methamphetamine production with Menchito and others, using codewords such as "burlap bags," "laminate," and "deodorants." *See* Gov't Exs. 16,

---

[5] As noted, *infra*, the Defendant filed a Motion to Strike Methamphetamine Enhancement from Plea Agreement Based Upon the Rule of Specialty. The Government relies on its opposition filed under seal on July 17, 2025, as to the legal basis for determining that the Rule of Specialty does not bar the consideration of relevant conduct related to methamphetamine at sentencing. As of the filing of this brief, the Court has not ruled on the Motion to Strike, therefore the Government has offered evidence for the Court to consider in determining the applicability of the methamphetamine enhancement.

19; Evid. Hr'g Tr. at 52-53, 57. In addition, the Defendant sent the names of two methamphetamine precursor chemicals to "Mime." Evid. Hr'g Tr. at 56; Gov't Ex. 18. Finally, the Defendant specifically agreed to a two-level adjustment to the base offense level for methamphetamine importation in the Plea Agreement. PA ¶ 3.

Accordingly, the Government has established, by a preponderance of the evidence, that it is appropriate for the Court to apply a two-level enhancement under U.S.S.G. § 2D1.1(b)(5) at sentencing.

## IV.    CONCLUSION

For the reasons set forth above, the United States respectfully requests that this Court find that there is sufficient evidence in the record to establish by a preponderance of evidence that the Defendant had an aggravating role in the offense which supports a two-level increase in the base offense level under U.S.S.G. § 3B1.1(c), notwithstanding the Sentencing Guidelines calculation in the Plea Agreement, and the two-level increase in the base offense level for methamphetamine importation under U.S.S.G. § 2D1.1(b)(5).

Dated: September 5, 2025

Respectfully submitted,

SOPHIA SUAREZ
Acting Chief
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice

By:    / s / *Colleen King*
Colleen King
Douglas Meisel
Lernik Begian
Trial Attorneys
Narcotic and Dangerous Drug Section

Criminal Division
U.S. Department of Justice
Washington, D.C. 20530
Telephone: (202) 616-2200

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of this motion has been sent via email to counsel for the Defendant, this 5th day of September 2025.

By:    <u>/s/    *Colleen King*</u>
          Colleen King
          Trial Attorney
          Narcotic and Dangerous Drug Section
          Criminal Division
          U.S. Department of Justice

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        FOR THE DISTRICT OF COLUMBIA
 2         - - - - - - - - - - - - - - - x
           THE UNITED STATES OF AMERICA,
 3                                              Criminal Action No.
                        Plaintiff,             1:17-cr-00094-BAH-1
 4                                              Friday, July 18, 2025
           v.                                   9:40 a.m.
 5
           JUAN MANUEL ABOUZAID EL BAYEH,
 6
                        Defendant.             ███████████
 7         - - - - - - - - - - - - - - - x
 8         ─────────────────────────────────────────────────
                       TRANSCRIPT OF EVIDENTIARY HEARING
 9           HELD BEFORE THE HONORABLE BERYL A. HOWELL
                       UNITED STATES DISTRICT JUDGE
10         ─────────────────────────────────────────────────
           APPEARANCES:
11         For the United States:     COLLEEN KING, ESQ.
                                       DOUGLAS SPENCER MEISEL, ESQ.
12                                     DOJ-CRM
                                       145 N Street NE, Suite 2300
13                                     Washington, DC 20530
                                       (202) 598-2281
14                                     colleen.king@usdoj.gov
                                       douglas.meisel@usdoj.gov
15
           For the Defendant:         ROBERT A. FEITEL, ESQ.
16                                     LAW OFFICE OF ROBERT FEITEL
                                       1300 Pennsylvania Avenue NW #1505
17                                     Washington, DC 20008
                                       (202) 255-6637
18                                     rf@rfeitellaw.com
19                                     SANDI S. RHEE, ESQ.
                                       LAW OFFICE OF SANDI RHEE
20                                     10001 Georgetown Pike, Suite 63
                                       Great Falls, VA 22066
21                                     (202) 285-8366
                                       sandirheelaw@gmail.com
22
           Court Reporter:            Lisa A. Moreira, RDR, CRR
23                                     Official Court Reporter
                                       U.S. Courthouse, Room 6718
24                                     333 Constitution Avenue, NW
                                       Washington, DC  20001
25                                     (202) 354-3187
```

```
1                      I N D E X

2

3  WITNESS                                        PAGE

   DEA SPECIAL AGENT BRENT PICKARD
4       (By Ms. King)...................................15
        (By Mr. Feitel).................................59
5       (By Ms. King)...................................78

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2            THE COURTROOM DEPUTY:  Your Honor, this is
 3   Criminal Case 17-094, United States of America v. Juan
 4   Manuel Abouzaid El Bayeh.
 5            Will parties, please -- also, Your Honor,
 6   Interpreters Gustavo Mercado and Teresa Roman have been
 7   sworn for this matter.
 8            Will parties please come forward to this lectern
 9   and identify yourselves for the record this morning.  We'll
10   start with government counsel first.
11            MS. KING:  Good morning, Your Honor; Colleen King
12   on behalf of the United States, joined by my co-counsel at
13   the table, Doug Meisel.
14            MR. MEISEL:  Good morning.
15            THE COURT:  Good morning.  And who else is with
16   you at counsel table?
17            MS. KING:  Also Special Agent Brent Pickard at
18   counsel table and our paralegal, Angela Ancalle.
19            THE COURT:  All right.  Thank you.
20            MS. RHEE:  Good morning, Your Honor, Sandi Rhee
21   for defendant, Mr. Juan Manuel Abouzaid El Bayeh, and I'm
22   here with co-counsel, Mr. Robert Feitel.
23            THE COURT:  All right.  Good morning.
24            And, Mr. El Bayeh, if at any time you have
25   difficult hearing, just raise your hand and let us know so
```

1    we can make sure you can understand everything that's going

2    on here this morning.  Do you understand?

3            THE DEFENDANT:  Of course, Your Honor.  Thank you

4    very much.

5            THE COURT:  Okay.  So we're here for an

6    evidentiary hearing before proceeding to a sentencing

7    hearing which hasn't yet been scheduled, so we'll do that

8    before we depart from each other this morning.

9            I wanted to start with making sure I understand

10   the lay of the land here before we go into sentencing, and

11   then the parties can tell me what's in dispute, what's not

12   in dispute, and so on, and whether the parties want

13   supplemental briefing after the hearing or not.  I'm

14   presuming you do, but I want to make the record clear on

15   that.

16

17

18

19

20

21

22

23

24

25



```
 1                    THE COURT:  Okay.  So that's clear.

 2              I also didn't see a dispute by either side as to

 3       what the presentence investigation report and the plea

 4       agreement both provide as the base offense level applicable

 5       here under the guidelines, under 2D1.1, and that that base

 6       offense level is 38.

 7              Is that -- I mean, so that the only thing we're

 8       disputing is enhancements starting from a base offense level

 9       of 38.

10              Is that correct, Ms. King?

11              MS. KING:  Yes, Your Honor.

12              THE COURT:  And Mr. Feitel or Ms. Rhee?

13              MR. FEITEL:  Yes, we are in agreement.

14              THE COURT:  Okay.  And you understand that, based

15       on the PSR, that base offense level is predicated on a

16       converted drug weight, both cocaine and meth.

17              Mr. Feitel?

18              MR. FEITEL:  Yes, but even independent of the

19       methamphetamine, the cocaine weight is, at Level 38,

20       independent of any argument about the methamphetamine.

21              THE COURT:  Okay.

22              All right.  So then, as I understand it, the

23       disputes about which we're going to have an evidentiary

24       hearing today are, one, that both the government and the PSR

25       recommend the plus two enhancement under 2D1.1(b)(5)(A) for
```

1    importation of methamphetamine, which was in the plea

2    agreement, and that is what the defendant is disputing now,

3    not as an evidentiary matter but as a matter of violating

4    the restriction on the extradition agreement.

5          Do I understand that correctly, Mr. Feitel?

6          MR. FEITEL:  Yes, Your Honor.  We are not

7    objecting to it as a matter of fact.  We were objecting to

8    it on a very narrow, I hope clearly defined, legal issue in

9    our pleading.  That's the only objection we have.

10          THE COURT:  Okay.  And so with that clarification

11    that the defense provided by notice yesterday -- I don't

12    know.  There's been a flurry of paper that's been filed in

13    the case, so I can't -- but sometime this week, is that,

14    from the government's perspective, going to reduce the

15    amount of testimony you have to elicit about

16    methamphetamine?

17          MS. KING:  No, Your Honor.  We still plan on

18    producing -- eliciting our testimony regarding the

19    methamphetamine, the factual basis for the charge as noted

20    in defendant's motion.  While Rule of Specialty is a legal

21    argument, it is premised on the factual assertion that there

22    is insufficient evidence in the record, in the case file, to

23    support the enhancement.

24          THE COURT:  Well, quite frankly, no matter what

25    the email traffic did -- no matter what the email traffic

1    provided indicates about the government's perspective on the

2    sufficiency of the methamphetamine evidence, which is what

3    was seized on initially by the defense, from where I sit the

4    defendant admitted this at the plea hearing.  So, you know,

5    the defendant admitted that the BlackBerry communication

6    about the transaction involving methamphetamine and real

7    estate was something he admitted to that showed he was

8    involved somewhat in methamphetamine trafficking.

9          There was an admission.  That's pretty strong

10   evidence.  So I think that's perhaps part of the reason why

11   Mr. Feitel says I'm not going to fight the evidentiary

12   standard given the admissions I have from the defendant

13   about this methamphetamine trafficking.

14         So I'm not sure we need to go into a lot of detail

15   about methamphetamine trafficking unless it also pertains to

16   the role adjustment.

17         MS. KING:  Yes, Your Honor.

18         THE COURT:  So could you think that through with

19   your team?

20         MS. KING:  Yes, Your Honor.

21         THE COURT:  Okay.  Because a three- to four-hour

22   evidentiary hearing about evidence involving methamphetamine

23   trafficking when I have a defense admission at the plea

24   hearing has raised some question in my mind about whether we

25   needed a full four hours or maybe just an hour, I don't

```
 1    know, for role adjustment.

 2            Okay.  Because from the defense side, they're not

 3    questioning the sufficiency of the evidence regarding

 4    methamphetamine trafficking.  To the extent they raised that

 5    objection, it's withdrawn.

 6            Correct me, Mr. Feitel, Ms. Rhee, if I'm wrong.

 7            They're only focused on the legal issue involving

 8    the extradition treaty.

 9            Am I right on that?

10            MR. FEITEL:  Yes, Your Honor.

11            THE COURT:  Okay.  So then what we're really

12    focused on here is the role in the offense enhancement under

13    the guideline at 3B1.1.  Both the plea agreement and the

14    presentence investigation report did not recommend a role

15    adjustment for the defendant here, and of course if a role

16    adjustment enhancement applies, not only does his offense

17    level go up because of the role enhancement but he would no

18    longer be entitled to the safety valve reduction.  So it has

19    a dual effect on the calculation of the -- and determination

20    of the guidelines here.  So as I understand it, that is,

21    from where I sit, the main focus of this evidentiary

22    hearing.

23            Does the government agree?

24            MS. KING:  Yes, Your Honor.

25            THE COURT:  And Mr. Feitel?
```

1             MR. FEITEL:  Yes, Your Honor.

2             THE COURT:  Okay.

3             Okay.  So I think we're -- I now understand where

4    we're going.  So with that, Ms. King or Mr. Meisel, whoever

5    is going to be calling witnesses -- and I understand you

6    only have one witness.

7             MS. KING:  Yes, Your Honor.

8             THE COURT:  Okay.  Are you ready to call your

9    witness?

10            MS. KING:  Yes, Your Honor.

11            THE COURT:  Do see, please.

12            MS. KING:  Good morning, Your Honor.  As an

13   initial matter, I would like to request that the Court take

14   judicial notice of the plea agreement, Docket No. 22, the

15   statement of facts, Docket No. 23, and the transcript of the

16   plea colloquy held before this --

17            THE COURT:  Oh, hold on just one second.

18            THE INTERPRETER:  It was interpreter error, Your

19   Honor.

20            THE COURT:  Could you just start over again?  Yes,

21   she is going to repeat.

22            Start all over again, Ms. King.

23            MS. KING:  As an initial matter, I would like to

24   request that the Court take judicial notice of the plea

25   agreement, Docket No. 22, the statement of facts, Docket No.

1    23, and the transcript of the plea colloquy held before this

2    Court on August 15, 2024.

3                THE COURT:  Any objection?

4                MR. FEITEL:  Without objection.

5                THE COURT:  Okay.  That will be admitted for

6    purposes of the evidentiary hearing as well.

7                MS. KING:  Okay.  Thank you, Your Honor.

8                I also have 20 marked exhibits.  I would like them

9    to be received in evidence.  We've discussed these with

10   defense counsel beforehand, and I understand that there is

11   no objection.

12               THE COURT:  Any objection?

13               MR. FEITEL:  I'm going to just say I know what

14   Ms. King said because we discussed this beforehand, but I'm

15   having a hard time hearing her.

16               THE COURT:  Okay.  Ms. King, use your litigating

17   voice.  You represent the United States government.  Use

18   that microphone and speak loudly.

19               MS. KING:  Yes, Your Honor.

20               THE COURT:  You are the 800-pound gorilla in this

21   room, so act like it.

22               MS. KING:  Yes, Your Honor.

23               THE COURT:  The microphone's not moved towards

24   you.  You just need to repeat that so Mr. Feitel can hear.

25               MS. KING:  Okay.  I have here 20 marked exhibits

1    from the government.  I would like them to be received into

2    evidence.  We've discussed this with defense counsel in

3    advance, and I understand there is no objection from defense

4    to receiving these in evidence.

5              THE COURT:  Better.

6              MR. FEITEL:  Your Honor, we agreed that the

7    documents were authentic.

8              With respect to admissibility, I do object to the

9    admissibility of two of the documents.  They are marked as

10   Government's Exhibit 2 and Government's Exhibit 3.  When we

11   get to that point I can be more clear, but as a preview I

12   believe they are inadmissible hearsay, and they were

13   documents that were prepared in furtherance of litigation,

14   and I don't think the government can offer them in their own

15   case-in-chief.  They are wiretap documents.

16             THE COURT:  All right.  Well, I'll hear more

17   argument on that, but otherwise the other 18 exhibits will

18   be admitted at the evidentiary hearing, and if you get to 2

19   and 3, if you still see a need to use them, I'll hear

20   further argument.

21             MS. KING:  Thank you, Your Honor.

22             THE COURT:  And do you want to give me those

23   exhibits?

24             MS. KING:  Yes.  Permission to approach?

25             THE COURT:  Yes, you may approach.

```
 1              THE COURTROOM DEPUTY:  There you go, Your Honor.
 2              THE COURT:  Thank you.    Could you explain what
 3    Government Exhibit 1 is.
 4              MS. KING:  Yes, Government Exhibit 1 is a hard
 5    drive containing the native format of the BlackBerry
 6    messages prior to transcription and translation.
 7              THE COURT:  Okay.
 8              MR. FEITEL:  I'm sure that it's because I listened
 9    to very loud music as a child and my hearing is gone, but I
10    cannot quite make out what Ms. King is saying in court
11    today.
12              THE COURT:  You need to use your litigator's
13    voice.  Speak up.
14              MS. KING:  Government Exhibit 1 is a hard drive
15    containing the native version of the BlackBerry messages
16    that are the messages that have been transcripted and
17    translated on the exhibits marked 4 through 20 or 4 through
18    19.
19              THE COURT:  Okay.  I'm going to take Government
20    Exhibit 1.  I'm going to give it back to you because there
21    is no way I am ever going to open that or use it and do not
22    want custody of it.
23              MS. KING:  Thank you, Your Honor.
24              THE COURT:  Okay.  Now are you going to call your
25    witness?
```

```
 1              MS. KING:  Yes.  The government would like to call
 2    Special Agent Brent Pickard to the stand.
 3              THE COURT:  Okay.   Good morning.
 4              THE WITNESS:  Good morning.
 5              THE COURT:  All right.  And, Agent, just make sure
 6    that microphone is up close.
 7              Okay.  Good.  Thank you.
 8              You may proceed, Ms. King.
 9          FBI SPECIAL AGENT BRENT PICKARD, Sworn
10                    DIRECT EXAMINATION
11    BY MS. KING:
12    Q.  Can you please state your name for the record.
13    A.  My name is Brent Pickard; B-R-E-N-T, last name P-I-C-K-
14    A-R-D.
15    Q.  And by whom are you employed?
16    A.  By the Drug Enforcement Administration.
17    Q.  And when did you start your employment with DEA?
18    A.  June 2023.
19    Q.  And where are you currently assigned?
20    A.  Los Angeles field division.
21    Q.  What is your current title and position?
22    A.  I'm a special agent criminal investigator.
23    Q.  And what type of offenses do you investigate?
24    A.  Title 21 drug offenses.
25    Q.  And can you briefly describe for us your career with DEA
```

```
 1   from the time you completed your initial training to your
 2   current position.
 3   A.   I've been part of international cases consisting of the
 4   distribution of narcotics from Colombia to Mexico to the
 5   United States.  I understand -- I've debriefed many co-
 6   defendants, confidential informants.  I've written numerous
 7   comprehensive reports regarding the information to these
 8   types of cases.  I understand the type of investigation of a
 9   wiretap, T3 investigations, and also communications that's
10   received and documented as evidence.
11              THE COURT:  Agent, you said you've debriefed many
12   co-defendants.  Do you mean just defendants?  Because this
13   defendant has no co-defendants.
14              THE WITNESS:  I mean defendants.  Defendants,
15   ma'am, sorry.
16              THE COURT:  Okay.
17   BY MS. KING:
18   Q.   And have you been involved in investigations related to
19   drug trafficking in Mexico where the substances are bound
20   for the United States?
21   A.   Yes.
22   Q.   And as a DEA agent, have you reviewed, intercepted, and
23   consensually recorded communications?
24   A.   Yes.
25   Q.   And through your training and review of these
```

1   communications, have you become familiar with common

2   terminology used by members of Mexican drug trafficking

3   organizations?

4   A.   Yes.

5   Q.   And are you assigned to the investigation of the

6   defendant, Juan Manuel Abouzaid El Bayeh?

7   A.   Yes.

8   Q.   And are you familiar with the investigative efforts and

9   techniques used during this investigation?

10  A.   Yes, I am.

11  Q.   Have you had a chance to review the investigation files

12  including the indictment and other court documents related

13  to this case?

14  A.   Yes.

15  Q.   And can you just briefly tell us, when did the

16  investigation into Cartel Jalisco Nueva Generacion, also

17  known as CJNG, also known as Los Cuinis start?

18  A.   It started approximately 2013.

19  Q.   Okay.  And can you just very briefly explain to us the

20  relationship between CJNG and Los Cuinis?

21  A.   So the CJNG cartel and the Los Cuinis cartel are two

22  cartels that work hand in hand.  The Los Cuinis cartel is

23  the financier cartel of both organizations.  The CJNG, their

24  main priority is to traffic narcotics and to traffic

25  narcotics from Mexico to the United States and even to other

1    parts of the world.

2    Q.  And has the investigation into CJNG and Los Cuinis

3    resulted in the indictment and prosecution of high-ranking

4    members of CJNG?

5    A.  Yes, correct, it has.

6    Q.  Approximately how many?

7    A.  Approximately 15 to 20 members.

8    Q.  And as part of the investigation, has DEA had the

9    opportunity to conduct interviews with any of those

10    defendants?

11    A.  Yes.

12    Q.  Approximately how many of those defendants?

13    A.  Six to eight.

14    Q.  And during this investigation, did DEA conduct a

15    wiretap?

16    A.  Yes.

17    Q.  Okay.  And can you briefly describe the process to get a

18    wiretap?

19    A.  So the process to get a wiretap as evidence first --

20    agents need to first have evidence that there's electronic

21    devices being used in furtherance of drug trafficking

22    activities.  And once the agents have identified these

23    particular devices to be used and have probable cause, they

24    then write up a lengthy affidavit, and each device is stated

25    within that affidavit giving us authority to intercept these

1    types of calls.

2    Q.  And were the intercepts in this case authorized by court

3    order?

4    A.  Yes.

5    Q.  From what court?

6    A.  From the Central District of California.

7    Q.  Okay.  And how long did DEA conduct the wiretap into

8    this overall investigation?

9    A.  From April 2013 to January 2014.

10   Q.  And what types of communications did DEA intercept in

11   this case?

12   A.  DEA intercepted communications between defendants of the

13   CJNG cartel and the Los Cuinis cartel.

14   Q.  And what format were those communications in?

15   A.  They were in text messages.  The majority of the

16   messages was in text messages.

17          They did receive pictures, voice memos.  But the

18   majority of the conversation was in text messages.

19   Q.  Okay.  If you know, how many different devices were

20   targeted during the investigation?

21   A.  39 total devices.

22   Q.  And how do users identify themselves on the BlackBerry

23   Messenger platform?

24   A.  So that BlackBerry Messenger platform, there's a

25   specific pin that's attached to each device, and when you

1   log on to that platform, you can -- the device is associated

2   to a user name.

3           And the user name can be changed.  You can change

4   the user name as many times as you want, but the device --

5   the pin code or the pin associated to the device remains the

6   same, and it's unique to that device.

7           THE COURT:  So was the wiretap run out of the

8   Central District of California only on BlackBerrys?

9           THE WITNESS:  Yes, sir.

10          THE COURT:  Okay.  All right.  And was it only

11  targeted at BlackBerry messages or text messages?

12          THE WITNESS:  It was text messages, phone calls,

13  emails.  Anything that we can intercept from the BlackBerry

14  messaging system.

15          THE COURT:  Okay.  So when you say BBM platform,

16  that's the platform used by the BlackBerrys that were

17  subject to the intercept?

18          THE WITNESS:  Yes, ma'am.

19          THE COURT:  And -- okay.  Fine.

20          Proceed.

21          MS. KING:  Okay.

22  BY MS. KING:

23  Q.  In an application that involves more than one device,

24  how do you identify the device in the affidavit?

25  A.  So in the affidavit, we identify the device by the

1    BlackBerry pin and also the user name.  So each user has a

2    pin and a user name attached to the device.

3    Q.  And in an application that has more than one device, how

4    do you differentiate between the devices in the application?

5    A.  On the application we list Target Device No. 1 belongs

6    to pin such and such with user name.  For example, there's

7    many user names in this case, but that's how we identify in

8    the application the target device and the pin and the user

9    name.

10   Q.  Okay.  I'd like now to bring your attention to Target

11   Device No. 5.

12   A.  Okay.

13   Q.  When was the first judicially authorized intercept for

14   Device No. 5?

15   A.  This was in May 2013.

16   Q.  Okay.  And how many renewals were there of this order?

17   A.  There are four renewals.

18   Q.  Have you reviewed these applications and orders?

19   A.  Yes.

20   Q.  Okay.  And how long was DEA intercepting messages from

21   Target Device No. 5?

22   A.  From May to -- from May -- approximately May to June to

23   October 2013.

24   Q.  And have you had an opportunity to review the messages

25   from Target Device No. 5?

1    A.   Yes.

2    Q.   What language were these communications in primarily?

3    A.   Spanish.

4    Q.   Okay.  And were some of these communications translated

5    into English by a certified interpreter?

6    A.   Yes.

7    Q.   And have you had a chance to review what's been marked

8    as Government Exhibits Nos. 4 through 19?

9    A.   Yes.

10   Q.   And what are they?

11   A.   They're the BlackBerry messaging chat conversations

12   between Device No. 5 and other members of these cartels that

13   I mentioned.

14   Q.   And are these the native versions of the messages?

15   A.   They -- they're translated.  They're not -- they're not

16   the native versions from the provider, but they are -- they

17   are versions of the transcripts, yes.

18   Q.   Do they appear to be a fair and accurate transcript and

19   translation of the defendant's messages?

20   A.   Yes.

21   Q.   And can you tell us who is identified as the user of

22   Target Device No. 5?

23   A.   So the user of Target Device No. 5 was Juan Manuel

24   Abouzaid El Bayeh.

25   Q.   And what were some of the ways that DEA identified it

1    was the defendant sending messages from Target Device No. 5?

2    A.  So the DEA was able to identify that the defendant was

3    the user of Device 5 based -- through a conversation that

4    was intercepted over the messages.  The defendant sent a

5    photo of himself to another user, so we had the photo of the

6    defendant, and then also within the chats he did mention

7    that -- the date of his birthday, so we were able to

8    understand when his birthday was.  And then also during his

9    plea agreement, he did also say that he was a user of the

10   device -- Target Device No. 5, which is the screen name of

11   El Escorpion.

12   Q.  I'm showing you what's been marked as Government's

13   Exhibit No. 4.

14              MS. KING:  We're working on it.

15              THE COURT:  I have the book.  Just proceed.

16              MS. KING:  Okay.

17   Q.  Do you recognize this?

18   A.  Yes.  This is the photo that was sent by the defendant

19   to another user that we intercepted over the BlackBerry

20   messages.

21   Q.  Okay.  And do you see that man in the photo in the

22   courtroom today?

23   A.  Yes.  He's sitting here at the defendant table wearing

24   orange.

25              THE COURT:  You'll want to get them up on the

1    screen so everybody over on the defense table can see and

2    use it.

3             So what's your problem?  Do you need Mr. Coates or

4    a technological person to come?

5             MS. ANCALLE:  It's showing here.  It's just not

6    showing here.

7             THE COURT:  Mark, do you want to check the

8    connections or --

9             THE COURTROOM DEPUTY:  Just take it out and put it

10   back in for me.

11            THE COURT:  Or, Ms. King, do you know how to use

12   the ELMO?  Because you can just take a copy of it, put it up

13   on the ELMO, and then we can use it on the screen.

14            We'll see if Mr. Coates can get it fixed first

15   from your computer.  Otherwise you can put it up on the

16   ELMO.  And we'll call our IT person to see what he can do,

17   our back up.

18            And Mark, could you call IT?

19            Okay.  We can all see it.  Any other questions

20   about that Exhibit 4?

21            MS. KING:  No other questions on that exhibit.

22            THE COURT:  Okay.

23   BY MS. KING:

24   Q.  I'd like to turn now to -- can you please tell us what

25   the investigation revealed about the defendant and his

1    connection to --

2            THE COURT:  You don't want to establish that this

3    Exhibit 4 was taken from Target 5 and was a photograph he

4    mentioned that -- yes.

5            MS. KING:  Yes.

6    BY MS. KING:

7    Q.  Do you recognize Government Exhibit No. 4?

8    A.  Yes, I do.  It's the photograph that was intercepted

9    over the BlackBerry message wiretap investigation of the

10   defendant sending this photo to another user name on the

11   BlackBerry messaging system platform.

12           THE COURT:  And this is from Target Device 5?

13           THE WITNESS:  Yes, Your Honor, Target Device 5.

14           MS. KING:  Thank you.

15   Q.  I'd now like to turn to what did the investigation

16   reveal about the defendant and his connection to CJNG from

17   the intercepted messages.

18           THE COURT:  Excuse me just one second.

19           Yes, Mr. Feitel?

20           MR. FEITEL:  I'm sorry, Your Honor, I just cannot

21   make out the questions.  I'll do anything I can to help, but

22   I just can't hear.

23           THE COURT:  Do you want to use some headphones?

24           MR. FEITEL:  Ms. Rhee also says she can't hear,

25   and she has much younger ears than I do.

1          MS. KING:  I'll endeavor to speak up much louder.

2     I apologize to you and defense counsel.

3          THE COURT:  It used to be that people asked

4     questions of the witness from the end of the jury box, and

5     then, in the new fangled courtrooms, they've moved the

6     lectern up much closer to the witness, and I think it leads

7     to bad practices on both sides, that they're just talking to

8     the witness in a much quieter voice than projecting like you

9     should be doing.

10          All right.  So let's project.

11          MS. KING:  Yes, Your Honor.

12          THE COURT:  Pretend you're at the end of the jury

13     box --

14          MS. KING:  Yes, Your Honor.

15          THE COURT:  -- and then everybody can hear you who

16     needs to.

17     BY MS. KING:

18     Q.  Can you tell us what the investigation revealed about

19     the defendant and his connection to CJNG from the

20     intercepted messages.

21     A.  From the intercepted messages, agents were able to

22     understand that the defendant had a close relationship with

23     high leaders of both CJNG and the Los Cuinis cartel.

24     Q.  And can you identify some of those high-ranking members

25     that you're referring to.

1    A.   Yes, so within the investigation the defendant talked on

2    BlackBerry Messenger with Ruben Oseguera-Gonzalez, who is

3    the second-highest-ranking member of the CJNG cartel,

4    biological son of El Mencho, who is the leader of the

5    cartel.

6              And he was also in conversations with Jose

7    Gonzalez-Valencia, who is a high leader of the Los Cuinis

8    cartel.

9              And he was also in discussions with Abigael

10   Gonzalez-Valencia.   Abigael is the leader of the Los Cuinis

11   cartel.

12   Q.   I'd like to first focus more on his connections with

13   Abigael Gonzalez-Valencia.   How did DEA know that Abigael

14   Gonzalez-Valencia and the defendant were in communication

15   with each other?

16   A.   So the DEA knew based upon the intercepts that they

17   received, and in the intercept there was a -- the user name

18   was -- for Abigael was "Boss."   So every time the defendant

19   would text the user "Boss," we knew that he was in

20   communication with Abigael.

21   Q.   And how often were Abigael Gonzalez-Valencia and the

22   defendant communicating in the time period that DEA was

23   intercepting the messages on Target Device No. 5?

24   A.   If not daily, weekly.   That they would be communicating

25   on the platform weekly.

1    Q.   Okay.   Other than communicating on that platform, did

2    the investigation reveal any other interaction or engagement

3    between the two of them?

4    A.   Yes.   They -- I mean, they talked about personal --

5    personal matters.   They've talked about -- Abigael's talked

6    about going to the defendant's mother's house for dinner.

7              But a lot of their conversations did consist of

8    their day-to-day drug activity and how they're going to

9    distribute drugs into the United States.

10   Q.   And during June 2013, what were they primarily talking

11   about?

12   A.   They were talking about a debt that was supposably owed

13   to Abigael.

14   Q.   And who owed the debt to Abigael?

15   A.   The debt was owed -- the brother-in-law of the defendant

16   had a debt, an outstanding debt, with Abigael.

17   Q.   And how is the defendant involved with the debt his

18   brother-in-law owed to Abigael?

19   A.   The defendant was a person -- the middleman between --

20   he would reach out to the brother-in-law.   The brother-in-

21   law would then give him information on an update of when the

22   debt was going to be paid.   And the defendant would then

23   reach out to Abigael and discuss, hey, he's -- he has the

24   money or he's trying to get the money.   So he was basically

25   the middleman.

1    Q.  Okay.  And from your review of these conversations, what

2    did the conversations reveal about the nature of their

3    relationship regarding this debt?

4              MR. FEITEL:  I'm sorry, Your Honor, I can't hear.

5    I heard up until "what does the conversation reveal about

6    the nature," and I lost the part that I think was the most

7    important part.

8              THE COURT:  Okay.  So speak slowly and please

9    repeat the question.

10             MS. KING:  Yes.

11   BY MS. KING:

12   Q.  In the context of the conversations that you've

13   reviewed, what did those conversations reveal about the

14   defendant's role in the repayment of the debt and the nature

15   of their relationship?

16             MR. FEITEL:  Your Honor, first, I object that it's

17   a two-part question.  Second, I object --

18             THE COURT:  Sustained.

19             MR. FEITEL:  Thank you.

20             THE COURT:  Could you break the question down?

21             MS. KING:  Yes.

22             THE COURT:  Or turn to the conversations and ask

23   him as to each conversation what the subject matter is and

24   what that tells him about anything else about role.

25             MS. KING:  Okay.  Yes, Your Honor.

1          I would like to show Government Exhibit 5.

2          (Interruption)

3          THE COURT:  Why don't we pause here for a second

4   since this a sealed hearing.

5          No, it's on the prosecution table, and it's her

6   machine.  Thank you.

7          (Pause)

8          THE COURT:  The IT folks here are just magicians.

9   You walk into the room, and all the technology starts

10  cooperating.  Wow.

11         Thank you.

12  BY MS. KING:

13  Q.  So we're now showing Government Exhibit No. 5.  Can you

14  please tell us the date of this communication?

15  A.  So this communication was on June 11, 2013.

16  Q.  I would like us to read Lines 4 to 7.  I'll read for

17  Boss, and you can read for El Escorpion.

18  A.  Okay.

19  Q.  "Yes brother but look at where we are dude he said

20  Thursday."

21  A.  "Yes I'm pressuring him to deposit every day because it

22  all has to be there in full by the 25th."

23  Q.  "Not by the 25th brother by last Thursday."

24  A.  "Yes I know I'm talking about the total amount for the

25  25th."

```
1    Q.   Okay.

2    A.   "Bro' I'll picked up" -- do you want me to read 8, too?

3    Q.   That's okay.   Thank you.

4         What does -- in your review of this message, what

5    does this communication reveal about the nature of their

6    relationship?

7    A.   So this -- based off of my review of this intercept or

8    this conversation, the nature of this -- of their

9    relationship is the defendant is able to influence a leader

10   of the Los Cuinis cartel, which in this case is Abigael, to

11   further extend the deadline of this debt that's being paid

12   by his brother-in-law.

13   Q.   And what, if anything, did Abigael Gonzalez-Valencia do

14   with respect to the deadline for the repayment?

15   A.   I mean, here it's obvious that the repayment was

16   supposed to be due on Thursday, but Abigael was willing to

17   extend this, this deadline.

18   Q.   And was that deadline extended?

19   A.   Yes.

20   Q.   How do you know that?

21   A.   Because they had -- they had further conversations in

22   other text messages about the debt being paid at a later

23   date.

24         MS. KING:   I'd like to show what's marked as

25   Government Exhibit No. 6.
```

1    Q.   Can you tell us the date of this message.

2    A.   This message was June 19, 2013.

3    Q.   And can you just very briefly tell us what this message

4    is showing?

5    A.   This message is showing just basically the -- that he's

6    able -- that the defendant is able to influence Abigael to

7    extend the deadline for the debt being due.

8    Q.   And based on your review of intercepts from after this

9    message, do you know if the debt was repaid by that date of

10   the 25th?

11   A.   No, it was not.

12   Q.   And how do you know that?

13   A.   Because -- because he -- because there were other

14   conversations after the 25th that was intercepted with --

15   they were still talking about the debt being paid.

16   Q.   Okay.

17        MS. KING:   I'm showing what's marked as Government

18   Exhibit No. 7.

19        THE COURT:   Well, can we just pause here?   What

20   was the debt for, if you're able to tell from any of the

21   review of the communications?

22        THE WITNESS:   The debt was for drugs that --

23   payment for drugs that was due to Abigael from the brother-

24   in-law.

25        THE COURT:   Well, this says on -- I'm just looking

1  at Government Exhibit 6, which has been admitted, talking

2  about melons, nine melons.

3          THE WITNESS:  We're --

4          THE COURT:  So are we melons, or is that drugs?

5  What makes you think it's drugs?

6          THE WITNESS:  So "melons" is a code word for

7  money, for a large sum of money.  We're just about to answer

8  that.  We're about to --

9          MS. KING:  Your Honor, I would like to correct the

10  record here.  The evidence in the record shows that the debt

11  was for a real estate transaction.

12          THE COURT:  Oh, okay.  A real estate transaction.

13          MS. KING:  Yes, Your Honor.

14          THE COURT:  Okay.

15          MR. FEITEL:  I'm sorry.  I'm sorry, Your Honor,

16  did the government like change the testimony of its own

17  witness from a drug debt to some other debt?  Is that what

18  -- I mean, I don't object.

19          THE COURT:  We've talked about extending the

20  deadline for a period of a debt.  This is my simple

21  question.

22          Agent, what was the debt for?  Drugs?

23          THE WITNESS:  It was for --

24          THE COURT:  Or what?

25          THE WITNESS:  No, I was mistaken.  It was for a

1    real estate transaction.

2             THE COURT:  It was for a real estate transaction,

3    okay.

4    BY MR. KING:

5    Q.  And how was that debt satisfied ultimately?

6    A.  That debt was paid approximately in July or August of

7    2013 by six kilos of cocaine.  They paid that debt in

8    cocaine.

9             THE COURT:  Could you -- I'm just looking at

10   what's been admitted into evidence as Government's Exhibit 6

11   with El Escorpion saying "I've got Naim under a lot of

12   pressure."  Naim.  Who is Naim?

13            THE WITNESS:  Naim is the brother-in-law, Your

14   Honor.

15            THE COURT:  Naim is the brother-in-law.

16            THE WITNESS:  Yes.

17            THE COURT:  "Under a lot of pressure he tells me

18   that on the 22nd he will collect on those invoices which are

19   like 9 melons to send them to us."

20            THE WITNESS:  Yes.

21            THE COURT:  Do you know, from reviewing all of the

22   context of these intercepted communications, what he's

23   referring to by "9 melons"?

24            THE WITNESS:  Yes, so "9 melons" is -- "melons" is

25   a code word for a sum of money.

```
 1              THE COURT:  A sum of money.

 2              THE WITNESS:  Yes.  So they use -- in their chat

 3    conversations, they use code words for money, for precursor

 4    chemicals.  In other words, they used words like "melon" to

 5    conceal their type of conversations.

 6              THE COURT:  And how much money is the code word

 7    for "melon" representing?

 8              THE WITNESS:  So here melons could be millions,

 9    but here it could mean millions of pesos or millions of

10    dollars.

11              It's a large sum of money.  Every time they refer

12    to the word "melon," it's a large sum of money.

13              THE COURT:  And then it will go on to say, "I will

14    send the endorsement contracts for Josan's apartment I

15    already confirmed it with him and it's ready to sign over

16    the deed."  What are they referring to there, if you know?

17              THE WITNESS:  They're referring to the real estate

18    deal, or they're also referring to another -- yeah, to the

19    real estate deal.

20              THE COURT:  All right.  Proceed.

21              I think you were jumping to Government Exhibit 7.

22              MS. KING:  Yes, Your Honor.

23              THE COURT:  And there wasn't much discussion of

24    Government Exhibit 6, so proceed.

25              MS. KING:  Yes, Your Honor.
```

BY MS. KING:

Q.   I'm showing what's marked as Government Exhibit No. 7.
Can you tell us the date of this conversation.

A.   The date of this conversation was July 1, 2013.

Q.   And this is the conversation -- this conversation
occurred after the date that had previously been set as the
due date for the debt?

A.   Yes.

Q.   Okay.  I'd like to move away from this specific
conversation about the debt and ask you if the intercept
showed -- if the intercepted messages showed any other
aspects of the relationship between the defendant and
Abigael Gonzalez-Valencia?

A.   Okay.  Sorry, can you repeat?

Q.   In your review of the intercepts, did the defendant ever
talk about his relationship with Abigael with anyone else?

A.   Yes, he did.

Q.   And who was that?

A.   Victor Rodriguez Cobian.

Q.   Okay.  And do you know what screen name he was using?

A.   He was using the screen name "Leo."

Q.   Okay.  And is he associated with CJNG?

A.   Yes.  He's a commander within that cartel.

Q.   Okay.  I'd like to show what's marked as Government
Exhibit No. 8.

```
 1              THE COURT:  So you're not going to go into what
 2    was said at all in Government Exhibit 7?
 3              MS. KING:  I would like to, Your Honor.
 4              THE COURT:  Do you want me to do that in my spare
 5    time after the hearing without a witness here to explain
 6    what things mean --
 7              MS. KING:  No, Your Honor.
 8              THE COURT:  -- or are you going to spend any time
 9    -- is there a reason you introduced Government Exhibit 7?
10    And if so, what am I supposed to make of Government Exhibit
11    7?
12              MS. KING:  Yes, Your Honor.
13              THE COURT:  Do you want to elicit that from your
14    witness?
15              MS. KING:  Yes.
16    BY MS. KING:
17    Q.  So going back to Government Exhibit No. 7, I'd like to
18    read Messages 2 and -- Lines 2 and 3.  If you can read for
19    El Escorpion, I'll read for Boss.
20    A.  Yes.  "Well brother I'm here putting pressure on him
21    that it will be there today supposedly today he will be
22    getting the deposits from several invoices so he can go
23    ahead and send us the money."
24    Q.  "It's been months they've been telling these stories
25    about invoices and bullshit."
```

1           Can you please tell us, in your understanding --

2    sorry.

3           Can you please remind us again the date of this

4    conversation?

5    A.   The date of this conversation was July 1st.

6    Q.   All right.  And can you please remind us of the date

7    that had previously been set for the debt to be paid?

8    A.   So the debt was supposed to be paid on -- the re -- so

9    the rescheduling of the due date was June 25th.  So here in

10   this conversation they're still talking about the debt that

11   was supposed to be paid on June 25th, but here it's now --

12   they're talking it's July 1st.

13   Q.   Thank you.

14   A.   So he -- so the defendant is still influencing or

15   persuading Abigael to, hey, let's extend this debt a little

16   bit longer.

17           THE COURT:  And El Escorpion says on Line 4, "Yes

18   brother I know but hopefully if we finish it's the first of

19   the month that's when customers make their payments I'll

20   keep pressuring here."

21           What customers making payments do you think he's

22   talking about there?

23           THE WITNESS:  Just other customers that make

24   payments to the cartel is my understanding of his -- my

25   interpretation of this chat, of this message.

```
 1              THE COURT:  Because of the sale of other real
 2    estate transactions or what?  If you know.  And if you
 3    don't, just say you don't know.
 4              THE WITNESS:  I don't know.
 5              THE COURT:  Uh-huh.
 6              MS. KING:  Thank you, Your Honor.
 7    BY MR. KING:
 8    Q.  I'd like to go back to -- you had identified who was
 9    using the screen name "Leo."  Can you tell us Leo's
10    connection to CJNG.
11    A.  He's a commander within the CJNG cartel.
12    Q.  Okay.  I'd like to show what's been marked as
13    Government's Exhibit No. 8.
14              Okay.  I'd like us to read through Lines 5 through
15    8.  I'll read the messages from Leo, and you can read the
16    messages from El Escorpion.
17    A.  Okay.  "Hahaha" --
18              MR. FEITEL:  Your Honor, is there some context
19    that we might have about what this conversation pertains to
20    before we read its contents?  I thought that might be
21    helpful.
22              THE COURT:  Okay.  Could you address that?
23              MS. KING:  Yes.
24    BY MS. KING:
25    Q.  In your review of the intercepts, did the defendant ever
```

```
 1   talk about his relationship with Abigael with anyone else?
 2   A.  Yes, he did.  He talked about his relationship with
 3   other commanders within the cartel, which is -- in this text
 4   message he's referring to this commander to Abigael.
 5           THE COURT:  He's referring to what?
 6           THE WITNESS:  He -- so in this conversation that
 7   we're about to read, the context is that the defendant is
 8   going to -- is talking with a commander who he identified as
 9   Victor Manuel Rodriguez Cobian, and Cobian is a commander of
10   this cartel.  And they're talking about how, when members of
11   the cartel are doing good work for the cartel, they should
12   be recognized.
13           So that's what this conversation's about.
14           THE COURT:  Okay.  And I thought this was somebody
15   named Leo.  And who is Leo?
16           THE WITNESS:  So Leo -- sorry.
17           THE COURT:  Very slowly so that my court reporter
18   can also capture what is the name.  You went very quickly
19   through.
20           THE WITNESS:  I understand, ma'am.
21           So "Leo" is a screen name of the BlackBerry
22   Messenger device.  So "Leo" is the screen name, but the user
23   behind "Leo" is Victor Manuel.
24           THE COURT:  Victor.  Manuel.
25           THE WITNESS:  Rodriguez Cobian.  And he is --
```

```
 1              THE COURT:  How do you spell "Cobian"?

 2              THE WITNESS:  C-O-N-B-I-A-N [sic], Cobian.

 3              THE COURT:  C-O-N-B-I-A-E-N?

 4              THE WITNESS:  B-I-A-N, Cobian.

 5              THE COURT:  B-I-A-N.

 6              THE WITNESS:  Yes.

 7              THE COURT:  Okay.

 8              THE WITNESS:  And he's deceased now.

 9     BY MS. KING:

10     Q.  Okay.  I'd like us to read what's been marked as Lines 5

11     through 8.  I can read the messages from Leo, and you can

12     read the messages from El Escorpion.

13     A.  "Hahaha that's how it is my commander last night I was

14     talking to the *boss* and like I told you I told him brother

15     honestly if it were not for the presence of La Chata there

16     and how fucking good he is at pressuring the moving" -- "and

17     moving stuff and wouldn't" -- "that wouldn't go out."

18     Q.  "And what did he say."

19     A.  "Don't let up" --

20     Q.  Sorry, "Don't let up brother so you can invest there

21     with him."

22     A.  "And honestly commander that is the truth like I told

23     him you have to acknowledge when anyone does something well

24     he knows that and he agrees with me 100% he said to me yes

25     brother and negro did a really.  Good job too."
```

1    Q.  And based on your review of the intercepts and your

2    knowledge of the investigation, who are they referring --

3    who is being referred to when El Escorpion says "Boss"?

4    A.  So in this conversation "Boss" is Abigael.  So the

5    defendant's referring to -- when he's talking to Leo in this

6    conversation, he's talking about Boss.  He's talking about

7    Abigael, which is the user name of -- which is his user name

8    "Boss."

9    Q.  All right.  And in your review of the intercepts, did

10   anyone come to the defendant to get access to Abigael?

11   A.  Yes, yes.

12           MS. KING:  Showing what's been marked as

13   Government Exhibit No. 9.

14           All right.  I would like to read this message into

15   the record.  I will read for Pamurod, and you can read for

16   El Escorpion.

17           THE COURT:  And what's the date for the record?

18   What is the date of this message?

19           THE WITNESS:  August 11, 2013.

20           THE COURT:  All right.  You can proceed.

21   BY MS. KING:

22   Q.  "Hey!!, what's up!, brother, how are you!.  Can I ask

23   you a favor.  Tell the *boss* I'm in the city and I need to

24   talk to him please, when and at what time could I see him."

25   A.  "Brother how are you?  I'm out of town I'll be back

1    tomorrow night the *boss* is not here he's out of town he'll

2    be back in a month I think why don't you talk to gygo."

3    Q.  And based on your review of the intercepts and knowledge

4    of this investigation, who are they talking about when they

5    say "Boss"?

6    A.  Abigael.

7    Q.  Okay.  I'd like to shift focus now to the defendant's

8    contact with Jose Gonzalez-Valencia.  What was the screen

9    name that Jose Gonzalez-Valencia was using?

10   A.  Santy.

11   Q.  And generally what did they talk about over the

12   intercepted messages?

13   A.  They've talked about --

14            MR. FEITEL:  Your Honor, I object to what did they

15   generally talk about.  Perhaps we could narrow the focus to

16   something, you know, relevant to the issue of leadership.

17            THE COURT:  Overruled.  Overruled.  In general

18   terms what did they talk about?

19            THE WITNESS:  They talked about -- they talked

20   about drug trafficking activities and also personal matters

21   over the intercepts.

22   Q.  Okay.  I'd like to show you what's been marked as

23   Government's Exhibit No. 10.

24            I would like to read these messages out loud.  I

25   can read for Santy, if you can read for El Escorpion.

```
1    A.  Yes.
2            MR. FEITEL:  Your Honor, I object as to relevance.
3    I can explain why.
4            These conversation concern -- I believe that --
5    I'm certain that everyone knows this conversation applies --
6    excuse me, pertains to cocaine, not to methamphetamine,
7    which I don't think was relevant anyway, and I'm not sure
8    why we're reading this particular conversation.
9            THE COURT:  Overruled.
10   Q.  So --
11           THE COURT:  And the date of this message in
12   particular, for purposes of the record?
13           THE WITNESS:  October 1, 2013, Your Honor.
14   Q.  Okay.  I'll read for Santy, if you can read for El
15   Escorpion.
16           "Brother I have work there squares ask your friend
17   if he needs any."
18   A.  "Ok brother thanks" -- "okay brother thanks for letting
19   me know how much can I offer them for?"
20   Q.  "I'll give them to you for 17 300 it's up to you how
21   much you ask for them."
22   A.  "Well I'll put them for at 17 500 that's fine the
23   important thing is that it gets done a small profit is
24   perfect brother if you raise it too much, nothing gets done
25   ok."
```

Q.  Okay.

In your training and experience, what do you understand "squares" to mean in the context of this conversation?

A.  Cocaine in this conversation.

Q.  Okay.  And are the numbers provided here consistent with the price of a kilogram of cocaine at the U.S./Mexican border area in 2013?

A.  Yes.

Q.  Okay.  And who buys squares of cocaine?

A.  Drug traffickers.  It's a distribution amount.  It's not a personal -- personal use amount.

Q.  Thank you.

In your review -- just to go back to the question about the price of the cocaine.  Is that in U.S. dollars or pesos?

A.  That's in U.S. dollars.

Q.  Thank you.

And in your review of the messages, did you review any other messages that you believed may have been related to drug trafficking activity?

A.  Yes.

Q.  I'm showing what's been marked as Government Exhibit No. 11.  Is this one of those conversations?

A.  Yes, this is a conversation.

1    Q.   Okay.  And can you tell us the date of this

2    conversation.

3    A.   June 24, 2013.

4    Q.   And can you read this message out loud.

5    A.   "Yes he is going" -- "yes he is going to give you some

6    papers for you to bring them to josan don't forget to ask

7    him for them before you come."

8    Q.   And can you tell us in your training and experience what

9    you understand they are referring to when they say "papers"?

10   A.   "Papers" is referred to as money.  It's a code word for

11   money.

12   Q.   Thank you.  I would like to shift your attention now to

13   communications between the defendant and Ruben Oseguera-

14   Gonzalez.

15             How did you know that the defendant was in contact

16   with Ruben Oseguera-Gonzalez?

17   A.   Based upon the intercepts that we had.

18   Q.   Okay.  And what screen name was Ruben Oseguera-Gonzalez

19   using during this time?

20   A.   So using this intercept of Target Device No. 5, Ruben

21   used multiple screen names.  He used multiple screen names.

22   Q.   Okay.  And can you tell us what those were?

23   A.   "Billy the Kid" and also "Ice Man" were both of -- two

24   screen names he used.

25   Q.   Okay.  And can you tell us what the defendant and Ruben

1    Oseguera-Gonzalez were discussing in October 2023?

2    A.    So they were discussing about -- there was a person the

3    defendant was looking for, and Ruben had this person

4    kidnapped, so there was -- in this text thread conversation

5    the defendant is convincing Ruben, who is the leader of the

6    CJNG cartel, to release this defendant.

7         Sorry, not defendant.    To release this kidnapped

8    person that was in his possession.

9    Q.    I'm showing you what has been marked as Government's

10   Exhibit No. 12.

11        THE COURT:    And was the kidnapped person the

12   person referred to as the engineer?

13        THE WITNESS:    Yes, Your Honor.

14   Q.   And can you tell us, when someone is referred to as an

15   engineer, what do you understand that to be referring to?

16   A.   It's a nickname for a smart person or for a person

17   that's pretty smart.

18   Q.   Thank you.

19        And I'd like us to read some of the messages into

20   the record.   I'd like to start with -- I'd like to start

21   with Message 6.   I'll read for Billy the Kid, and you can

22   read for El Escorpion.

23        THE WITNESS:   Okay.

24        THE COURT:   And which exhibit are you looking at?

25   GX12?

```
 1              MS. KING:  Yes.
 2              THE COURT:  Okay.
 3    Q.  I'd like to -- sorry, I'd like to read Messages 12
 4    through 18.  I'll read for Billy the Kid, and you can read
 5    for El Escorpion.
 6    A.  Okay.
 7    Q.  "The dude is doing wrong brother he hasn't told you the
 8    truth about what he does."
 9    A.  "What does the dude do?"
10    Q.  "I need to talk to you in person so you know the truth."
11    A.  "Yes brother where can I see you but leave them alone
12    for a bit for me so there's no mistake please."
13    Q.  "There are no mistakes with me brother you know how I
14    work."
15    A.  "You know if somebody is doing wrong obviously he has to
16    go but my brother.
17              "I know you my brother and I know that you do tell
18    me where I -- where can I see you."
19    Q.  And from your review of the messages -- sorry.
20              In the days after exchanging these messages, did
21    Ruben Oseguera-Gonzalez and the defendant continue
22    communicating about this individual?
23    A.  Yes, they did.
24    Q.  And what did they talk about?
25    A.  They talked about -- they talked about first meeting
```

1   this individual or -- so they talked about -- the defendant

2   talked to Ruben about, hey, don't harm this person.  Let me

3   come and talk to you first about this person.

4   Q.  Okay.  And what was the date of the conversation in

5   Government Exhibit No. 12?

6   A.  No. 12?  October 19, 2013.

7   Q.  Okay.  I'd now like to show you what's been marked as

8   Government Exhibit No. 13.

9           Can you tell us the date of this conversation.

10  A.  October 21, 2013.

11  Q.  And how does it relate to the conversation we last

12  viewed?

13  A.  They're still talking about the release of the kidnapped

14  person.

15  Q.  And do you know from your review of the intercepts what

16  Ruben Oseguera-Gonzalez decided to do with the kidnapped

17  person?

18  A.  The defendant was able to convince the release of this

19  person, and Ruben did release this kidnapped person.

20  Q.  Okay.  And if you know, were there further discussions

21  about the kidnapped person, Salvador, between the defendant

22  and Ruben Oseguera-Gonzalez?

23  A.  Yes, there were further discussions.

24  Q.  Okay.  I'd like to show what's marked as Government's

25  Exhibit No. 14, and I would like us to read Lines 2 through

1    4.  I'll read for Billy the Kid and --

2              THE COURT:  And you're just going to not go into

3    any other information about GX13?

4              MS. KING:  No, Your Honor.

5              THE COURT:  Okay.

6    Q.  So for Government Exhibit No. 14, I'll start with Line

7    2.

8              "Get everything situated and tell him we're here

9    for him and from now on no one will bother him anymore

10   because now he is set up with me."

11   A.  "He's telling me to tell the man to give us just a few

12   days for him and the guys to recover from the beating and

13   that some of them are in the hospital recovering from

14   [broken] ribs and such so that the whole team can be

15   together."

16   Q.  Okay.  And what do you understand Ruben to be referring

17   to when he says that "he is set up with me"?

18   A.  So I understand this to be -- "set up with me" meaning

19   this person that is kidnapped is now released and now

20   working for the CJNG cartel.

21   Q.  And what is he working for the CJNG cartel on?

22   A.  So he has -- here in the chats that was intercepted

23   later, we understood that he was working on OxyContin,

24   large-scale distribution OxyContin project.  This person

25   that was kidnapped was working on that type of project.

```
 1   Q.   Thank you.

 2             MS. KING:   Your Honor, if I can have a moment to

 3   consult with my co-counsel?

 4             THE COURT:   Uh-huh.

 5             (Pause)

 6             MS. KING:   Thank you, Your Honor.

 7             THE COURT:   Uh-huh.

 8   BY MS. KING:

 9   Q.   Based on your review of the intercepts, are there

10   additional messages that show the defendant's involvement in

11   methamphetamine production?

12   A.   Yes.

13             MR. FEITEL:   I'm sorry, Your Honor.   I missed the

14   last part after "are there other messages that show."

15             THE COURT:   The defendant's involvement in

16   methamphetamine production.

17             MR. FEITEL:   I object.

18             THE COURT:   Because as an evidentiary matter it's

19   not relevant here?

20             MR. FEITEL:   We do not -- independent of the legal

21   challenge, which I tried to be narrow about, we do not

22   contest our client's culpability for it.   He admitted it in

23   front of Your Honor under oath during the change of plea

24   hearing.   I brought this to the government's attention a

25   couple of times candidly saying I don't think we really want
```

1    to do this if we don't have to, and I was professionally

2    rebuffed.

3            So I do object.  I think it's not relevant.

4            THE COURT:  Why do I need to hear this?  Is this

5    relevant to his role enhancement?

6            MS. KING:  Yes, Your Honor.  I can rephrase the

7    question.

8            THE COURT:  Okay.

9    BY MS. KING:

10   Q.  In your review of the intercepts, did you review any

11   messages where the defendant spoke about his role in the

12   movement of narcotics or in the movement of controlled

13   substances?

14   A.  Yes.

15           MS. KING:  I'd like to show what's marked as

16   Government Exhibit No. 16.

17   Q.  Can you tell us the date of this conversation.

18   A.  September 4, 2013.

19   Q.  And do you see a reference in -- the conversation starts

20   off with a reference to deodorants coming out short.  Can

21   you tell us what "deodorants" are?

22   A.  "Deodorants" is a code word for precursor chemicals used

23   to create methamphetamine.

24   Q.  Okay.

25           I'd like now to turn to the last message in this

1    conversation, Message 7.  Can you read message --

2            THE COURT:  And is there anything about Government

3    Exhibit 16 that relates to deodorants and the defendant's

4    role that I should be aware of, or can I just ignore

5    Government Exhibit 16?

6            MS. KING:  No, Your Honor.  I think --

7            THE COURT:  It's been introduced on the record for

8    some reason.  I'm not understanding why it's been introduced

9    at this point.

10           MS. KING:  Yes, Your Honor.

11   BY MS. KING:

12   Q.  Can you tell us, in the context of discussing deodorants

13   as a precursor, what are they discussing using the

14   deodorants for in this conversation?

15           THE WITNESS:  So, Your Honor, in this conversation

16   the defendant is talking to the user of screen name "T.M.,"

17   and they're talking about how the deodorant is -- when they

18   refer to "deodorant," they're talking about the precursor

19   chemicals, and here in this chat they're talking about how

20   it's short meaning that they don't have enough precursor

21   chemicals to actually produce the methamphetamine.

22           So in this situation people that are working in

23   this cartel are reaching out to defendant for his

24   instruction on the reasons why is this precursor chemical

25   short, and they're looking for an answer from the defendant

1    to explain the reasoning behind that.  So his role is to

2    offer that explanation.

3              MS. KING:  I'd like to read some of the messages

4    into the record.

5              THE COURT:  From which exhibit?

6              MS. KING:  From Government Exhibit No. 16.

7    Q.  If we can read the exhibit, Lines 1 through 7.  If you

8    read as El Escorpion, I will read as T.M.

9    A.  Okay.

10   Q.  "I'll be getting the new chip tomorrow and I'll give it

11   to you... Listen bro' the deodorants came out short."

12   A.  "How weird bro those are the original ones the ones that

13   were [sic] grabbed from chepa those are 100% original maybe

14   it was the laminates that were put in it yeah?"

15   Q.  "No brother they did work but they were short among all

16   the bottles I was missing more than half."

17   A.  "Were all the 50 gallons full to the top they were

18   missing any" -- "weren't missing anything?  How weird my

19   brother."

20   Q.  "I had to measure them liter by liter and make them here

21   my brother and that's why I'm telling you that they were

22   short."

23   A.  "Ok let me mention it to the guy you know who owed him

24   half but I'll" -- "but I'll tell him so that it can be left

25   like that one for another you know it's been a long time and

1    the guys don't even have a drop left hahaha that's" --

2    "those ones there have been put up for a while I got them

3    for him with la chepa but we'll get together during the week

4    when you're around here.

5            "I wanted to mention to you my brother the guy

6    with the ride is set to leave tomorrow or the day after in

7    case you need room there's a way?"

8    Q.  And can you tell us from your understanding what is

9    being referred to when they're talking about a ride being

10   set to leave?

11   A.  So here in this conversation he's referring -- a ride is

12   a code word for a method of transportation for these -- for

13   the drugs after they're produced.

14           And then here in the conversation he always says

15   -- it says left -- it says set to leave tomorrow or the day

16   after in case you need room.  "Room" means we have enough

17   room in the storage system for this -- for transportation.

18           MR. FEITEL:  Your Honor, I move to strike any

19   testimony concerning this exhibit.  Your Honor asked did it

20   relate to leadership.  The government said yes.  I have yet

21   to hear anything about it having to do with leadership.  It

22   has to do perhaps with drug transportation, but I don't see

23   any reasonable relationship between these explanations and

24   the issue of leadership which is before the Court.

25           THE COURT:  Overruled.

1   Q.  We looked at earlier a message from -- that was sent

2   from the defendant to the user name "Mime."  In your review

3   of the intercepted messages, was there another message with

4   the user name "Mime"?

5   A.  Yes.

6   Q.  And what was that message?

7   A.  That was a message that was sent from the defendant to

8   Mime about a chemical description.

9   Q.  Okay.  I'm showing what's been marked as Government

10  Exhibit No. 18.  Are you familiar with the chemicals in this

11  exhibit?

12  A.  Yes.

13  Q.  And in your training and experience, do you know what

14  these chemicals can be used for?

15  A.  Yes, they're used primarily to make methamphetamine.

16  Q.  And you said that -- I know we looked at a message

17  earlier from this same user name.

18          MS. KING:  I'd like to strike that question, Your

19  Honor.  Not a question, the statement.  I apologize.

20          One moment, Your Honor.

21          THE COURT:  Uh-huh.

22          (Pause)

23  Q.  Okay.  Can you tell us the date of Government Exhibit

24  18.

25  A.  June 21, 2013.

1    Q.   Thank you.

2         And was this -- did you observe any other messages

3    in the intercepts that mentioned precursors and in the

4    context of defendant's relationship with the high-ranked

5    leaders we've discussed?

6    A.   Yes.

7    Q.   And what messages were those?

8    A.   There were messages between the defendant and Ruben, the

9    second-highest ranking leader of the CJNG cartel.

10   Q.   Okay.  I'd like to show what's marked as Government's

11   Exhibit No. 19.

12        I'd like us to read Lines 6 through 10.  I'll read

13   as Ice Man, if you can read as El Escorpion.

14        Sorry, before we do that, can you please tell us

15   the date of this conversation.

16   A.   This conversation was on July 2, 2013.

17   Q.   Okay.  If we can begin with Line 6?

18   A.   "Bro' I'm here with cui doing an errand but we'll eat

19   there on Thursday at 3 with my mom you know you're always

20   welcome."

21   Q.   "Alright brother I'll see you on Thursday have a good

22   day."

23   A.   "Thanks brother have a good day I'm out looking at

24   burlap bags to see if I might bring some in a few days the

25   same" -- "the same and I'm going to need 2 laminates bro'

1    how much will you sell them to me cheaply to do those tests

2    I told you about?"

3    Q.   "Done brother you already know that."

4    A.   "Thanks so much brother I'll let you know when I have

5    the burlap bags here to buy the laminates from you may god

6    bless you and send my regards to your dad please and may god

7    protect him for us I'll see you Thursday god willing."

8    Q.   And can you tell us in your training and experience what

9    they're referring to when they say "burlap bags"?

10   A.   So "burlap bags" -- based off my training and experience

11   and understanding, this conversation and the intercepts --

12   refers to the packaging material used to package precursor

13   chemicals.

14   Q.   And can you also explain to us "laminates"?

15   A.   "Laminates" is also a code word that's used to describe

16   the precursor chemicals.

17   Q.   Okay.  And in the messages there was a reference that El

18   Escorpion was here with Cui.  Can you tell us what Cui is

19   based on your knowledge of the investigation?

20   A.   So based off my knowledge of the investigation, that is

21   referring -- Cui, C-U-I, Cui, is referring to the nickname

22   of Cuini, and Cuini is a name for Abigael Gonzalez-

23   Valencia.

24   Q.   Okay.  Thank you.

25             MS. KING:  No further questions on direct, Your

1    Honor.

2              THE COURT:  All right.

3              Any cross?

4              MR. FEITEL:  While we're here.

5                     CROSS-EXAMINATION

6    BY MR. FEITEL:

7    Q.  Special Agent Pickard, good morning.

8    A.  Good morning, sir.

9    Q.  How are you today?

10   A.  I'm doing well.

11   Q.  Have you ever testified under oath before in a federal

12   court?

13   A.  No.

14   Q.  You did not at all participate in the underlying wiretap

15   investigation in this case, did you?

16   A.  I did not participate, no.

17   Q.  All right.  It began in 2013.  You were not a DEA agent

18   back in the 2013 era, yes?

19   A.  That's correct, sir.

20   Q.  So your only knowledge of the investigation would have

21   been what you would have read or in part what you would have

22   read in preparation for court here today, correct?

23   A.  Yes, correct, but I also was part of the -- I was the

24   agent that went to Mexico City for the extradition of the

25   defendant, so I was part of that.

Q.   When you say "the defendant," do you mean Mr. Abouzaid?

A.   Yes.

Q.   Was there something about that particular event,
traveling to Mexico to arrest him, that informs your
knowledge for testimony here in court today?

A.   No.

Q.   Okay.  So that was an irrelevant comment more or less?

A.   Yes.

Q.   So in addition to not having participated in the
wiretap, have you -- excuse me, in addition to what you've
read about the wiretap, have you spoken with anybody about
this investigation?

A.   Yes.  I'm not the primary agent on this investigation.
I'm assigned to it, but I have spoken with agents that have
been investigating this case and also the primary agents who
started this investigation from the very beginning.

Q.   And that would be Special Agent Kyle Mori?

A.   Yes, correct.

Q.   Have you read all of the wiretap affidavit submitted by
Special Agent Mori submitted with this wiretap?

A.   I have.

Q.   All of them?

A.   I've read the wiretap that is pertaining to Target
Device No. 5.

Q.   All right.  I asked you have you read the wiretap

1    applications for all of the intercepts from Target Device 1

2    through Target Device 34 in the Title 3 in this case?

3    A.   Yes, I have.

4    Q.   Okay.  So have you talked to Special Agent Mori about in

5    particular Target Device No. 5?

6    A.   Yes.

7    Q.   Special Agent Mori's still working at the DEA, correct?

8    A.   Yes, correct.

9    Q.   And he would be probably the most knowledgeable person

10   about this case?

11   A.   Yes, correct.

12   Q.   All right.  He's not here today, is he?

13   A.   No, he's not.

14   Q.   Okay.  And do you know the reason why?

15   A.   I'm not sure.

16   Q.   Well, let me try to see if I can help you with that.

17        Could it possibly be because Special Agent Mori

18   told me that he didn't think that Mr. Abouzaid was a leader

19   in this conspiracy?  Are you aware of that?

20   A.   Yes, I'm aware of that, but I can explain.

21   Q.   I wasn't asking you to explain.  I asked if you were

22   aware of it.

23   A.   Yes, I am aware of that.

24   Q.   Okay.  So Special Agent Mori, the most knowledgeable

25   person who did all the wiretaps and more in the

1    investigation, has explained that he didn't think that

2    Mr. Abouzaid was a leader, correct?

3    A.   Correct.

4    Q.   And he's not here in court today?

5    A.   He's not.

6    Q.   You are.

7    A.   Yes.

8

9

10

11

12

13

14

15

16

17

18

19

20    Q.   Who did you ask?

21    A.   Special Agent Kyle Mori.

22    Q.   Okay.  And we'll come back to that in a minute.

23          During the course of this hearing, the government

24    introduced a series of BlackBerry intercepts through your

25    direct examination.  I'm sure you remember that.  Yes?

1    A.   Yes.

2    Q.   Okay.   Who selected those exhibits for use in the court

3    here today?

4    A.   Special Agent Kyle Mori.

5    Q.   Kyle Mori is the one who selected them?

6    A.   Yes.

7    Q.   Okay.   Did you review them with him?

8    A.   Yes.

9    Q.   And did you review the meaning of them with him?

10   A.   Yes.

11   Q.   So how was it, then, that on direct examination, when

12   someone asked you what the underlying debt involved with

13   respect to Naim, you said at first that it was drugs?   How

14   did you make that mistake?

15   A.   That was a misspell -- that was a mis -- I misspoke in

16   that situation.   But it wasn't for drugs; it was for real

17   estate.

18   Q.   Have you ever worked on a wiretap yourself?

19   A.   Writing the actual affidavit, no.   But I was part of a

20   wiretap when I was working in Honolulu, Hawaii.

21   Q.   I'm sorry, when you were working where?

22   A.   When I was working for a six-month period for the DEA in

23   Hawaii before I transferred to Los Angeles, I did sit in a

24   wire room, and I do understand how the intercepts come in

25   and how translators intercept the messages.

1          THE COURT:  But you've never been an affiant for a

2    wiretap application?

3          THE WITNESS:  No.  No, Your Honor.

4    Q.  And do you speak Spanish?

5    A.  No, I do not.

6    Q.  Other than Special Agent Mori, did you consult with

7    anyone else on the case?

8    A.  No.

9    Q.  Have you read the plea agreement in this case?

10   A.  No.

11   Q.  Have you read the statement of facts in this case?

12   A.  Yes, I have.

13   Q.  But not the plea agreement?

14   A.  No.

15   Q.  Are you aware that the plea agreement itself does not

16   contain any enhancement under the law for leadership?

17   A.  I'm not aware of that.

18   Q.  So you've never testified in federal court.  Have you

19   ever testified in state court?

20   A.  Yes, I have.  State court I have.

21   Q.  And were you ever qualified as an expert to testify in

22   any particular area of endeavor?

23   A.  No.

24   Q.  Did anyone ever try to qualify you as an expert but were

25   unable to do so?

1    A.  No, I was never -- no, I was never.

2              THE COURT:  Did you testify in state court as a

3    DEA agent?

4              THE WITNESS:  No, as a police officer.

5              THE COURT:  Okay.

6    BY MR. FEITEL:

7    Q.  Now, during your direct examination there were a lot of

8    questions concerning intercepts relating to a debt that was

9    owed by someone to Abigael Valencia-Gonzalez.  Do you recall

10   those questions?

11   A.  Yes.

12   Q.  So you remember now that the underlying reason for the

13   debt was a real estate transaction, correct?

14   A.  Yes.

15   Q.  And the person who owed money to Abigael Valencia-

16   Gonzalez was Naim -- sorry -- Naim Libien-Tella; is that

17   correct?

18   A.  Correct.

19   Q.  And do you know who Naim Libien-Tella is?

20   A.  He's the brother-in-law of the defendant.

21   Q.  Now, are you aware that Naim Libien-Tella was an

22   affiant in the underlying extradition proceedings against

23   Mr. Abouzaid?

24   A.  I wasn't aware of that.

25   Q.  So that means you probably haven't -- you have not read

1    the affidavit that Mr. Libien-Tella prepared in support of

2    the extradition?

3    A.   No.

4    Q.   Okay.  Do you know that Mr. Libien-Tella sort of was

5    cooperating with the United States?

6    A.   I did know that, but I didn't know that he -- I didn't

7    know the other question.

8    Q.   Well, so in order to prepare for your testimony today,

9    since Mr. Libien-Tella is in cooperation, did you call him

10   up to ask him what all that talk about the debt was about?

11   A.   I didn't do that, no.

12   Q.   Okay.  Do you know that the underlying reason for the

13   debt was that Mr. -- we'll just call him by his second last

14   name -- Mr. Tella purchased a piece of property and owed

15   Abigael Valencia-Gonzalez money for it?  You're aware that's

16   the underlying transaction, yes?

17   A.   Yes, that was the -- yes, that was the conversations

18   they were having about the debt being owed, was for this

19   real estate transaction.

20   Q.   I'm sorry, can you repeat the last part?  It's a habit

21   when you don't testify a lot -- everyone does it -- to

22   mumble off at the end, but, you know, old ears.  Can you

23   just repeat what you said about that?

24   A.   So what I was saying was yes, that was the debt that was

25   supposed to be owed was for a real estate transaction.

1    Q.   Okay.  And that had nothing to do with drugs, right?

2    A.   No.

3    Q.   And in all those conversations that you reviewed with

4    the government on direct examination where there's a

5    discussion between Mr. Abouzaid and Abigael Valencia-

6    Gonzalez about the repayment of debt, that's all about a

7    financial real estate transaction, correct?

8    A.   Correct.

9    Q.   And you would imagine in your experience in real life

10   and as an agent that Mr. Abouzaid would want to protect his

11   brother-in-law from someone like Abigael Valencia-Gonzalez?

12   A.   Correct.

13   Q.   Well, there's nothing about it that's correct.  That's

14   absolutely the case of what happened in here.  Isn't that

15   right?

16   A.   Correct, but the defendant did have --

17   Q.   I'm sorry, I didn't ask you to extemporize, did I?

18   A.   No.

19   Q.   Okay.  So the defendant is basically asking for more

20   time for his brother-in-law to pay back a debt to the head

21   of one of Mexico's, by your estimation, largest drug

22   trafficking money laundering organizations, correct?

23   A.   Correct.

24   Q.   Okay.  And there's nothing in that particular set of

25   transactions that relates to drug trafficking at all, is

1    there?

2    A.  I mean, he did pay the debt with six kilos of cocaine

3    but...

4    Q.  I appreciate your volunteering that, so now I have to

5    ask you about what you know about that.

6            The six kilograms of cocaine were paid for by

7    Mr. Tella because he sold a car and someone gave him cocaine

8    for the car; isn't that correct?

9    A.  Yes.

10   Q.  Okay.  The person who gave Mr. Tella the cocaine was not

11   my client, Mr. Abouzaid, was it?

12   A.  Correct.

13   Q.  Okay.  Mr. Abouzaid, sort of to help his brother-in-law,

14   said, "hey, take the cocaine," and he checked, and Abigael

15   Valencia-Gonzalez agreed to take it in payment, correct?

16   A.  That's correct.

17   Q.  Okay.  So the conversations about the debt themselves

18   don't have as its underlying transaction anything to do with

19   drugs, correct?

20   A.  Correct.

21   Q.  And to the extent that you volunteered here on

22   cross that it had to do with cocaine, all of that was on

23   Mr. Tella's initiation, correct?

24   A.  Correct.

25   Q.  Who is "Mime"?

1    A.   Mime is unknown.   We don't know who the user is behind

2    "Mime."

23    Q.   So you have no reason, as you sit here in court today,

24    to have any legitimate doubt that the underlying basis of

25    all that debt was a real estate transaction and nothing

1    having to do with drugs, correct?

2    A.   Correct.

3    Q.   And you didn't ask Mr. Tella word one about it in

4    preparation for court here today, also correct?

5    A.   Correct.

6    Q.   There was also some questions that were asked to you

7    about the kidnapping and Mr. Abouzaid's communications with

8    Ruben Oseguera.  Do you remember those questions?

9    A.   Yes.



Q.   In the context of reading those calls knowing what you

know about it, isn't it clear that Mr. Abouzaid is not the

person in a position of authority?  He's basically begging

for other people's lives from Ruben Oseguera?

A.   I mean, he's influencing other leadership in the cartel.

Q.   Do you think that -- are you married?

A.   Yes.

Q.   And when you want your wife to do something, and you ask

her for permission to do it, do you consider that

influencing her or, as in my family situation with Ms. Rhee

here, it's more like akin to begging?

A.   Well, it just really depends on the relationship.  So in

this situation where the defendant has a close relationship

with high leaders of the cartel it's -- he was able to -- he

was in a position of influence so he -- your analogy is a

```
 1    little different in this situation.  He's able to influence

 2    these leaders just as I'm able to influence my wife in

 3    making a decision because we're both leaders in our

 4    marriage, so it's in the same situation.

 5              MR. FEITEL:  I'm going to ask that your comment

 6    about Mr. Abouzaid being a leader be struck from the record

 7    because there's no basis of anything you've said here in

 8    court today to justify it.

 9              THE COURT:  Overruled.

10    BY MR. FEITEL:

11    Q.  But you do know to a certainty that the version of

12    events surrounding the kidnapping was that Mr. Abouzaid was

13    desperate, as a favor to someone, to try to get these

14    hostages released; isn't that the case?

15    A.  Yes.

16    Q.  Now, with respect to Mime, do you know if the defendant

17    has any brothers or sisters?

18    A.  Sorry, repeat the question.

19    Q.  Sure.  Do you know if the defendant, Mr. Abouzaid, has

20    any brothers or sisters?

21    A.  I'm not -- I don't know.

22    Q.  Do you remember reading in the DEA report ▮▮▮▮▮▮

23    ▮▮▮▮▮ that he has a sister named Salime?

24    A.  Oh, correct, correct.

25    Q.  And giving your expansive knowledge of how drug
```

1    traffickers work or people in general, do people -- have you

2    ever heard that people -- or would it be reasonable to

3    assume that someone whose nickname is Salime, S-A-L-I-M-E,

4    would reduce their name to the abbreviation "Mime"?

5    A.  Possibly.

6    Q.  And in the context of one of the conversations you were

7    asked -- and I'll pull up the number.  We can pull it up on

8    the screen.

9              MR. FEITEL:  If we could pull up Government's

10   Exhibit 11, please.  It was just there.

11   Q.  This is a conversation, correct, Government's Exhibit

12   11, between Mr. Abouzaid and someone named Mime, correct?

13   A.  Correct.

14   Q.  Now, the conversation says for Mr. Abouzaid's side, "Yes

15   he is going to give you some papers for you to bring them to

16   josan don't forget to ask him for them before you come."

17              Do you see that up on the screen, correct?

18   A.  Yes, correct.

19   Q.  Okay.  What's the date of this communication?

20   A.  June 24, 2013.

21   Q.  Okay.  And that's right in the middle of the time when

22   Mr. Abouzaid is being pressed by Abigael to collect from his

23   brother-in-law, right?

24   A.  Correct.

25   Q.  Okay.  Do you know who Josan is?

1    A.  I do not.

2    Q.  Would you be surprised to learn that Mr. Abouzaid has a

3    brother whose nickname is Josan?

4    A.  Yes, I would be surprised.

5    Q.  You would be surprised.

6         So if I got an affidavit from his brother saying

7    that that was his name and family members referred to him as

8    Josan, would you be less surprised?

9    A.  Yes.

10   Q.  Well, let's assume, for purpose of argument's sake here

11   in court today, that Mime is his sister and Josan is his

12   brother.  Does that change your understanding of the meaning

13   of this conversation in the context of it happening during

14   the debt collection process with Abigael Valencia-Gonzalez?

15   A.  I mean, at the time that we intercepted this message, we

16   didn't have information on who Josan was.

17   Q.  I'm asking you here -- no, I understand that.  And you

18   weren't involved so this one I can't pin on you.

19   A.  Exactly.

20   Q.  But you're here in court today.

21        But would it change your mind about what this

22   means if you knew that Mime was his sister and Josan was his

23   brother?

24   A.  I mean, it wouldn't -- it wouldn't change my mind, but

25   it would -- it would -- that would be an explanation of

something else.

Q.  Well, wouldn't one possible explanation be that the
reference to papers isn't money but -- or even if it is
money, it's about the collection in regard to paying back
the money that Naim owed?

A.  Possibly, but I couldn't determine that with evidence
that I do have.

Q.  No.  And since you didn't know who anybody was, you
couldn't have made the decision before you came here, right?

A.  Correct.

Q.  And no one told you who these people were, correct?

A.  Correct.

Q.  And you never asked?

A.  Well, for Mime -- Mime was never identified in the
BlackBerry Messengers as an actual user.  But through the
course of the investigation, Special Agent Mori and others,
when they were receiving the intercepts, they were able to
identify the defendant and other users.  But this user was
not identified.

Q.  All right.  So without belaboring the point, when you do
these Black -- when they did the BlackBerry interceptions,
any person that a target device came into contact with would
be identified in the reports, correct?

A.  Correct.

Q.  All right.  So isn't -- based on your review, there were

1    literally hundreds, if not thousands, of people who came in

2    contact with the 34 or 35 target devices in this case; isn't

3    that correct?

4    A.  Yes.  There were a lot of records, a lot of messages

5    that came in, thousands of records.

6    Q.  And it's possible that in the moment not everyone was

7    identified, correct?

8    A.  Correct.

9    Q.  But didn't you think that if you were going to come to

10   court and testify against Mr. Abouzaid, that at least it

11   behooves you to try to figure out who the people mentioned

12   in these BlackBerry messages were?

13   A.  I mean, we -- yes.

14   Q.  So what did you do to try to figure that out?

15   A.  We did it in proffers.  We did ask defendants who these

16   -- who these -- do you know the user of this screen name,

17   and they would -- they would say no.

18

19

20

21

22

23

24   Q.  And the same with Josan, correct?

25   A.  Correct.

```
 1    Q.  My point is a different one.
 2         Since you came to court today with BlackBerry
 3    messages that people selected for you to testify about, the
 4    truth is you didn't do anything to try to figure out some of
 5    the details unless someone spoon fed you the information
 6    before you got here, correct?
 7    A.  Correct.
 8    Q.  Okay.  And so now you're left sitting here, and if it's
 9    true that it's Mime, his sister, and that Josan is his
10    brother, this conversation looks a lot different than it
11    does in terms of whether -- if Mime and Josan were some
12    other big drug traffickers in the cartel, right?
13    A.  I can only answer that question by saying possibly.
14    Q.  And you don't have to.  That's fine.  Sometimes the
15    answer's "I don't know."
16    A.  Right.
17         MR. FEITEL:  So, Your Honor, if I could just --
18    for brevity, if I could just consult with Ms. Rhee to make
19    sure I haven't forgotten anything?
20         THE COURT:  Of course.
21         MR. FEITEL:  Thank you.
22         (Pause)
23         MR. FEITEL:  Detective Pickard -- excuse me, I
24    apologize, Special Agent Pickard, thank you for coming down
25    today.
```

```
1              I have nothing further, Your Honor.

2              THE COURT:  Any redirect?

3              MS. KING:  Yes, Your Honor.

4              MR. MEISEL:  The Court's indulgence.

5              THE COURT:  Uh-huh.

6              (Pause)

7              MR. MEISEL:  Thank you.

8              THE COURT:  Uh-huh.

9                      REDIRECT EXAMINATION

10  BY MS. KING:

11  Q.  Based on your review of all of the intercepted messages

12  here, how would you describe the tone of the conversations

13  between the defendant and Abigael Gonzalez-Valencia?

14              MR. FEITEL:  I'm sorry, Your Honor.

15              MS. KING:  Sorry.

16              THE COURT:  She's going to repeat the question.

17              MS. KING:  I'll repeat the question.

18  Q.  Based on your review of the intercepts, how would you

19  describe the tone of the conversations between the defendant

20  and Abigael Gonzalez-Valencia?

21  A.  The tone of their conversations from the BlackBerry

22  intercepts that we intercepted through the course of our

23  investigation, that tone was very -- they were close.  The

24  defendant was able to persuade or influence Abigael's

25  decision-making.
```

1          MR. FEITEL:  Objection.  It's beyond the scope of

2     the question.  The question was how is the tone.  The part

3     now is he's trying to make up for lost ground from before.

4          THE COURT:  Overruled.

5     Q.  And how would you describe the tone of the conversations

6     between the defendant and Jose Gonzalez-Valencia?

7          THE COURT:  And when you say "tone," do you mean

8     were they cordial?  Angry?  I mean, I think that's where

9     it's going.

10         So what do you mean by "tone"?

11    Q.  Would you describe their communications as casual?

12    A.  Yes.

13    Q.  Would you describe their communications as friendly?

14    A.  Yes.

15    Q.  Okay.  And does that -- that's the conversations with

16    Abigael Gonzalez-Valencia?

17    A.  Yes.

18    Q.  And what about the conversations with Jose Gonzalez-

19    Valencia?

20    A.  I would say they're also in the same type of tone;

21    casual, friendly, close.

22    Q.  And the conversations with Ruben Oseguera-Gonzalez?

23    A.  Yes, correct.  Same.  They're -- I mean, in those

24    conversations he reached out to Ruben, and they would call

25    each other brother.  And so yes, very close.

1    Q.   Okay.  And can you remind us again how the debt was --

2    how the debt that the defendant's brother-in-law owed to

3    Abigael Gonzalez-Valencia was repaid?

4    A.   It was repaid in six kilos of cocaine.

5    Q.   Did Abigael Gonzalez-Valencia accept the payment in

6    cocaine?

7    A.   Yes.

8    Q.   Okay.  And when DEA is reviewing intercepted

9    communications, does DEA take steps to identify the user

10   names and devices that are involved in those intercepts?

11   A.   Yes.

12   Q.   And did DEA in this case take steps to identify unknown

13   users?

14   A.   Yes.

15   Q.   Is it common that sometimes users remain unidentified in

16   intercepted messages?

17   A.   Yes.

18   Q.   And now turning to the kidnapping of the individual

19   named Salvador, was there a stated reason that Salvador

20   wasn't killed?

21   A.   Yes, because a defendant advocated for his life with --

22   he told Ruben, "Hey, don't harm him.  Let me come to you in

23   person and talk to you about this matter."

24   Q.   And was there a stated use that Salvador could serve for

25   Ruben after his release?

1    A.   Of course.   That's the reason that he was released,

2    because the defendant and Ruben -- Ruben agreed to release

3    Salvador, who was this kidnapped person, to work for CJNG to

4    produce and manufacture OxyContin at a large scale.   So it

5    was in their benefit to release this person.

6    Q.   Thank you.

7          I'd also like to now show Government Exhibit No.

8    11.   And can you read us the date of this conversation?

9    A.   The date of this conversation was June 24, 2013.

10   Q.   Okay.   And this was a conversation -- this was a message

11   sent to which user name?

12   A.   To Mime.

13   Q.   Okay.   I'd like to show Government Exhibit No. 18.   And

14   can you read us the date of this conversation?

15   A.   June 21, 2013.

16   Q.   And can you tell us who received these messages?

17   A.   Mime.

18   Q.   Thank you.

19          MS. KING:   No further questions, Your Honor.

20          THE COURT:   All right.   Agent, you're excused.

21          THE WITNESS:   Thank you, Your Honor.

22          THE COURT:   And the government isn't calling Agent

23   Mori, who I've seen in my court quite a bit.

24          MS. KING:   No, Your Honor.

25          THE COURT:   Okay.   And would you agree, Ms. King

```
 1      -- why don't you step forward.

 2              Would you agree, Ms. King, that Agent Mori, based

 3      on his prior testimony in front of me, is very familiar with

 4      the CJNG and this whole investigation because he's been on

 5      the case for a long time?

 6              MS. KING:  Yes, Your Honor.

 7              THE COURT:  And do you want to address the cross-

 8      examination question by Mr. Feitel about Agent Mori's view

 9      -- well, let me step back for a second.

10      ███████████████████████████████████████████████████████

11      ███████████████████████████████████████████████████████

12      ███████████████████████████████████████████████████████

13      ███████████████████████████████████████████████████████

14      ███████████████████████████████████████████████████████

15      ███████████████████████████████████████████████████████

16      ███████████████████████████████████████████████████████

17      ███████████████████████████████████████████████████████

18              THE COURT:  Uh-huh.  And, you know, I appreciate

19      that a DEA agent's view of a defendant's role is different

20      from what the legal analysis may be of -- under the

21      guidelines as to the role enhancement and its applicability,

22      but do you want to comment on Mr. Feitel's statement about

23      Agent Mori's view of this defendant's role in either Los

24      Cuinis and the CJNG?

25              MS. KING:  Yes, Your Honor.  I do understand
```

1    that --

2         THE COURT:  Or do you want to wait for papers with

3    an additional declaration from Agent Mori, or -- you don't

4    have to answer if you have a respectful response to get me

5    an answer at some other point.

6         MS. KING:  Yes, Your Honor.  I understand.  I

7    think I can provide a response today, and if you would like

8    follow-up information, we'll get that for you.

9         I do acknowledge that I know Special Agent Mori

10   had provided his opinion on leadership as it relates to this

11   defendant.  After that statement, we have had additional

12   conversations, the prosecutors and Special Agent Mori,

13   discussing the further evidence, discussing the sentencing

14   guidelines, and discussing relevant case law as well.  So

15   after that statement we did have additional conversations

16   that spoke about enhancements ████████████████████████

17   ████████████████████████████████████████████████████

18   ████████████████████

19         THE COURT:  All right.

20         MS. KING:  Thank you, Your Honor.

21         THE COURT:  All right.  And the government has --

22   just one second, Mr. Feitel.

23         The government has no other witnesses?

24         MS. KING:  No other witnesses, Your Honor.

25         THE COURT:  Okay.

1          MR. FEITEL:  Your Honor, I'd just ask for leave

2    for the record to remain open for seven days.  I'd like to

3    submit affidavits from the two people that were referenced

4    during cross-examination.

5          And I'll make them available to the government as

6    well so they can, you know, confer independently if they

7    want a who's who in this family saga.

8          But with that, we have no further evidence to

9    introduce today.

10         THE COURT:  All right.  So do the parties want to

11   confer and set up a proposed briefing schedule and confer

12   about a proposed sentencing date in the case?  Because it is

13   getting close to August and travel and vacations and so on.

14   So I -- rather than take ten minutes watching you all

15   confer, I think I could let you all do that all by your big

16   selves and then perhaps if I give you until next Wednesday

17   to submit a joint proposal for further scheduling of either

18   briefing, evidence, in the form of declarations and

19   sentencing memos, then would that give you enough time to

20   confer about all of that?

21         MS. KING:  Yes, Your Honor.

22         MR. FEITEL:  We agree on something.  Yes, Your

23   Honor, thank you.

24         THE COURT:  All right.  Okay.

25         So I'll be entering an order directing that the

1    parties confer and submit to the Court by next Wednesday,

2    whatever date that may be, a joint status report proposing a

3    schedule for submission of any further documentation the

4    parties believe is necessary and also three proposed dates

5    for a sentencing -- some dates for rescheduling the

6    sentencing in the defendant's case.

7              All right.  Is there anything further today from

8    the government?

9              MS. KING:  No, Your Honor, nothing further.

10             THE COURT:  And Mr. Feitel?

11             MR. FEITEL:  No, there's not.  Thank you, Your

12   Honor.

13             THE COURT:  All right.  You're all excused.

14                  (Whereupon the hearing was

15                   adjourned at 11:33 a.m.)

16

17

18

19

20

21

22

23

24

25

### CERTIFICATE OF OFFICIAL COURT REPORTER

I, LISA A. MOREIRA, RDR, CRR, do hereby certify that the above and foregoing constitutes a true and accurate transcript of my stenographic notes and is a full, true and complete transcript of the proceedings to the best of my ability.

Dated this 4th day of August, 2025.


/s/Lisa A. Moreira, RDR, CRR
Official Court Reporter
United States Courthouse
Room 6718
333 Constitution Avenue, NW
Washington, DC 20001

## #

**#1505** [1] - 1:16

## /

**/s/Lisa** [1] - 86:1

## 1

**1** [9] - 14:3, 14:4, 14:14, 14:20, 21:5, 36:4, 44:13, 54:7, 61:1
**10** [2] - 43:23, 57:12
**100%** [2] - 41:24, 54:13
**10001** [1] - 1:20
**11** [6] - 30:15, 42:19, 45:24, 73:10, 73:12, 81:8
**11:33** [1] - 85:15
**12** [4] - 47:10, 48:3, 49:5, 49:6
**13** [1] - 49:8
**1300** [1] - 1:16
**14** [2] - 49:25, 50:6
**145** [1] - 1:12
**15** [2] - 12:2, 18:7
**16** [4] - 52:16, 53:3, 53:5, 54:6
**17** [2] - 44:20, 44:22
**17-094** [1] - 3:3
**18** [6] - 1:4, 13:17, 48:4, 56:10, 56:24, 81:13
**19** [5] - 14:18, 22:8, 32:2, 49:6, 57:11
**1:17-cr-00094-BAH-1** [1] - 1:3
**1st** [2] - 38:5, 38:12

## 2

**2** [8] - 13:10, 13:18, 37:18, 49:25, 50:7, 57:16, 57:25
**20** [4] - 12:8, 12:25, 14:17, 18:7
**20001** [2] - 1:24, 86:4
**20008** [1] - 1:17
**2013** [23] - 17:18, 19:9, 21:15, 21:23, 28:10, 30:15, 32:2, 34:7, 36:4, 42:19, 44:13, 45:8, 46:3, 49:6, 49:10, 52:18, 56:25, 57:16, 59:17, 59:18, 73:20, 81:9, 81:15
**2014** [1] - 19:9
**202** [4] - 1:13, 1:17,

**1:21, 1:25**
**2023** [2] - 15:18, 47:1
**2024** [1] - 12:2
**2025** [2] - 1:4, 85:24
**20530** [1] - 1:13
**21** [4] - 15:24, 49:10, 56:25, 81:15
**22** [2] - 11:14, 11:25
**22066** [1] - 1:20
**22nd** [1] - 34:18
**23** [2] - 11:15, 12:1
**2300** [1] - 1:12
**24** [3] - 46:3, 73:20, 81:9
**255-6637** [1] - 1:17
**25th** [7] - 30:22, 30:23, 30:25, 32:10, 32:14, 38:9, 38:11
**285-8366** [1] - 1:21
**2D1.1** [1] - 7:5
**2D1.1(b)(5)(A** [1] - 7:25

## 3

**3** [5] - 13:10, 13:19, 37:18, 57:19, 61:2
**300** [1] - 44:20
**333** [2] - 1:24, 86:3
**34** [2] - 61:2, 76:2
**35** [1] - 76:2
**354-3187** [1] - 1:25
**38** [3] - 7:6, 7:9, 7:19
**39** [1] - 19:21
**3B1.1** [1] - 10:13

## 4

**4** [11] - 14:17, 22:8, 23:13, 24:20, 25:3, 25:7, 30:16, 38:17, 50:1, 52:18
**4th** [1] - 85:24

## 5

**5** [21] - 21:11, 21:14, 21:21, 21:25, 22:12, 22:22, 22:23, 23:1, 23:3, 23:10, 25:3, 25:12, 25:13, 27:23, 30:1, 30:13, 39:14, 41:10, 46:20, 60:24, 61:5
**50** [1] - 54:17
**500** [1] - 44:22
**598-2281** [1] - 1:13

## 6

**6** [8] - 31:25, 33:1,

**34:10, 35:24, 47:21, 57:12, 57:17, 69:4
**63** [1] - 1:20
**6718** [2] - 1:23, 86:3

## 7

**7** [10] - 30:16, 32:16, 35:21, 36:2, 37:2, 37:9, 37:11, 37:17, 53:1, 54:7

## 8

**8** [5] - 31:2, 36:25, 39:13, 39:15, 41:11
**800-pound** [1] - 12:20

## 9

**9** [4] - 34:19, 34:23, 34:24, 42:13
**9:40** [1] - 1:4

## A

**A-R-D** [1] - 15:14
**a.m** [2] - 1:4, 85:15
**abbreviation** [1] - 73:4
**Abigail** [40] - 27:9, 27:10, 27:13, 27:18, 27:20, 27:21, 28:13, 28:14, 28:16, 28:18, 28:23, 31:10, 31:13, 31:16, 32:6, 32:23, 36:13, 36:16, 38:15, 40:1, 40:4, 42:4, 42:7, 42:10, 43:6, 58:22, 65:9, 65:15, 66:15, 67:5, 67:11, 68:14, 73:22, 74:14, 78:13, 78:20, 79:16, 80:3, 80:5
**Abigail's** [2] - 28:5, 78:24
**ability** [1] - 85:23
**able** [13] - 23:2, 23:7, 26:21, 31:9, 32:6, 32:20, 49:18, 71:24, 72:1, 72:2, 75:17, 78:24
**ABOUZAID** [1] - 1:5
**Abouzaid** [31] - 3:4, 3:21, 4:25, 17:6, 22:24, 60:1, 61:18, 62:2, 62:8, 65:23, 67:5, 67:10, 68:11, 68:13, 69:8, 69:11, 69:16, 69:20, 70:10, 70:17, 70:22, 71:3, 71:12, 72:6, 72:12, 72:19, 73:12, 73:22,

**74:2, 76:10, 76:18
**Abouzaid's** [3] - 69:4, 70:7, 73:14
**absolutely** [1] - 67:14
**accept** [1] - 80:5
**access** [1] - 42:10
**accurate** [2] - 22:18, 85:21
**accused** [2] - 5:14, 5:15
**acknowledge** [2] - 41:23, 83:9
**act** [1] - 12:21
**Action** [1] - 1:3
**activities** [2] - 18:22, 43:20
**activity** [2] - 28:8, 45:21
**actual** [2] - 63:19, 75:15
**addition** [2] - 60:9, 60:10
**additional** [5] - 6:13, 51:10, 83:3, 83:11, 83:15
**address** [3] - 5:1, 39:22, 82:7
**addressed** [1] - 5:4
**adjourned** [1] - 85:15
**adjustment** [4] - 9:16, 10:1, 10:15, 10:16
**Administration** [1] - 15:16
**admissibility** [2] - 13:8, 13:9
**admission** [2] - 9:9, 9:23
**admissions** [1] - 9:12
**admitted** [8] - 9:4, 9:5, 9:7, 12:5, 13:18, 33:1, 34:10, 51:22
**advance** [1] - 13:3
**advocated** [1] - 80:21
**affiant** [2] - 64:1, 65:22
**affidavit** [8] - 18:24, 18:25, 20:24, 20:25, 60:19, 63:19, 66:1, 74:6
**affidavits** [1] - 84:3
**AGENT** [2] - 2:3, 15:9
**agent** [11] - 15:22, 16:11, 16:22, 33:22, 59:17, 59:24, 60:13, 65:3, 67:10, 70:17, 81:20
**Agent** [2] - 3:17, 15:2, 15:5, 59:7, 60:17, 60:20, 61:4, 61:7, 61:17, 61:24, 62:21, 63:4, 64:6, 75:16,

**77:24, 81:22, 82:2, 82:8, 82:10, 82:23, 83:3, 83:9, 83:12
**agent's** [1] - 82:19
**agents** [7] - 18:20, 18:22, 26:21, 60:14, 60:15, 62:9, 69:21
**agree** [4] - 10:23, 81:25, 82:2, 84:22
**agreed** [3] - 13:6, 68:15, 81:2
**agreement** [20] - 4:17, 5:7, 5:9, 5:15, 5:20, 6:4, 6:6, 6:12, 7:4, 7:13, 8:2, 8:4, 10:13, 11:14, 11:25, 23:9, 64:9, 64:13, 64:15, 83:18
**agreements** [1] - 6:8
**agrees** [1] - 41:24
**ahead** [1] - 37:23
**akin** [1] - 71:21
**alone** [1] - 48:11
**alright** [1] - 57:21
**AMERICA** [1] - 1:2
**America** [1] - 3:3
**amount** [4] - 8:15, 30:24, 45:11, 45:12
**analogy** [1] - 71:25
**analysis** [1] - 82:20
**ANCALLE** [1] - 24:5
**Ancalle** [1] - 3:18
**Angela** [1] - 3:18
**Angeles** [2] - 15:20, 63:23
**angry** [1] - 79:8
**answer** [6] - 33:7, 53:25, 71:7, 77:13, 83:4, 83:5
**answer's** [1] - 77:15
**anyway** [1] - 44:7
**apartment** [1] - 35:14
**apologize** [3] - 26:2, 56:19, 77:24
**appear** [1] - 22:18
**APPEARANCES** [1] - 1:10
**applicability** [1] - 82:21
**applicable** [1] - 7:4
**application** [6] - 20:23, 21:3, 21:4, 21:5, 21:8, 64:2
**applications** [2] - 21:18, 61:1
**applies** [2] - 10:16, 44:5
**appreciate** [2] - 68:4, 82:18
**approach** [2] - 13:24,

13:25
**April** [1] - 19:9
**area** [2] - 45:8, 64:22
**argue** [1] - 6:12
**argument** [4] - 7:20, 8:21, 13:17, 13:20
**argument's** [1] - 74:10
**arrest** [1] - 60:4
**aspects** [1] - 36:12
**assertion** [1] - 8:21
**assigned** [3] - 15:19, 17:5, 60:14
**associated** [3] - 20:1, 20:5, 36:22
**assume** [2] - 73:3, 74:10
**attached** [2] - 19:25, 21:2
**attention** [4] - 5:3, 21:10, 46:12, 51:24
**Attorney's** [1] - 6:9
**August** [5] - 12:2, 34:6, 42:19, 84:13, 85:24
**authentic** [1] - 13:7
**authority** [2] - 18:25, 71:13
**authorized** [2] - 19:2, 21:13
**available** [1] - 84:5
**Avenue** [3] - 1:16, 1:24, 86:3
**aware** [12] - 53:4, 61:19, 61:20, 61:22, 61:23, 62:8, 62:12, 64:15, 64:17, 65:21, 65:24, 66:15

## B

**B-I-A-N** [1] - 41:5
**bad** [1] - 26:7
**bags** [4] - 57:24, 58:5, 58:9, 58:10
**bargain** [1] - 6:11
**base** [4] - 7:4, 7:5, 7:8, 7:15
**based** [19] - 4:17, 6:7, 7:14, 23:3, 27:16, 31:7, 32:8, 42:1, 43:3, 46:17, 51:9, 58:10, 58:19, 58:20, 69:19, 75:25, 78:11, 78:18, 82:2
**basis** [3] - 8:19, 69:24, 72:7
**battle** [2] - 6:17, 6:21
**BAYEH** [1] - 1:5
**Bayeh** [5] - 3:4, 3:21, 3:24, 17:6, 22:24

**BBM** [1] - 20:15
**beating** [1] - 50:12
**become** [1] - 17:1
**BEFORE** [1] - 1:9
**beforehand** [2] - 12:10, 12:14
**began** [1] - 59:17
**begging** [3] - 70:19, 71:13, 71:21
**begin** [1] - 57:17
**beginning** [1] - 60:16
**behalf** [1] - 3:12
**behind** [3] - 40:23, 54:1, 69:1
**behooves** [1] - 76:11
**belaboring** [1] - 75:20
**belongs** [1] - 21:5
**benefit** [2] - 6:10, 81:5
**BERYL** [1] - 1:9
**best** [1] - 85:22
**better** [1] - 13:5
**between** [17] - 5:18, 17:20, 19:12, 21:4, 22:12, 28:3, 28:19, 36:12, 46:13, 49:21, 55:23, 57:8, 67:5, 73:12, 78:13, 78:19, 79:6
**beyond** [1] - 79:1
**BIAN** [1] - 41:4
**big** [2] - 77:12, 84:15
**Billy** [4] - 46:23, 47:21, 48:4, 50:1
**biological** [1] - 27:4
**birthday** [2] - 23:7, 23:8
**bit** [3] - 38:16, 48:12, 81:23
**Black** [1] - 75:21
**BlackBerry** [20] - 9:5, 14:5, 14:15, 19:22, 19:24, 20:11, 20:13, 21:1, 22:11, 23:19, 25:9, 25:11, 27:2, 40:21, 62:24, 75:15, 75:21, 76:12, 77:2, 78:21
**BlackBerrys** [2] - 20:8, 20:16
**bless** [1] - 58:6
**book** [1] - 23:15
**border** [1] - 45:8
**boss** [3] - 41:14, 42:23, 43:1
**Boss** [9] - 27:18, 27:19, 30:17, 37:19, 42:3, 42:4, 42:6, 42:8, 43:5
**bother** [1] - 50:9
**bottles** [1] - 54:16

**bound** [1] - 16:19
**box** [2] - 26:4, 26:13
████████
████████,
████████
**breaching** [1] - 5:8
**break** [1] - 29:20
**BRENT** [3] - 2:3, 15:9, 15:13
**Brent** [3] - 3:17, 15:2, 15:13
**brevity** [1] - 77:18
**brief** [1] - 6:3
**briefing** [4] - 4:13, 5:10, 84:11, 84:18
**briefly** [5] - 15:25, 17:15, 17:19, 18:17, 32:3
**bring** [6] - 5:2, 6:13, 21:10, 46:6, 57:24, 73:15
**bro** [1] - 54:12
**bro'** [4] - 31:2, 54:11, 57:18, 57:25
**broken** [1] - 50:14
**brother** [46] - 28:15, 28:18, 28:20, 30:19, 30:23, 31:12, 32:23, 34:13, 34:15, 37:20, 38:18, 41:14, 41:20, 41:25, 42:22, 42:25, 44:16, 44:18, 44:24, 48:7, 48:11, 48:13, 48:16, 48:17, 54:15, 54:19, 54:21, 55:5, 57:21, 57:23, 58:3, 58:4, 65:20, 67:11, 67:20, 68:13, 73:23, 74:3, 74:6, 74:12, 74:23, 77:10, 79:25, 80:2
**brother-in** [1] - 28:20
**brother-in-law** [12] - 28:15, 28:18, 28:20, 31:12, 34:13, 34:15, 65:20, 67:11, 67:20, 68:13, 73:23, 80:2
**brothers** [2] - 72:17, 72:20
**brought** [1] - 51:24
**bullshit** [1] - 37:25
**bunch** [1] - 6:12
**burlap** [1] - 57:24, 58:5, 58:9, 58:10
**but..** [1] - 68:3
**buy** [1] - 58:5
**buys** [1] - 45:10
**BY** [22] - 15:11, 16:17,

20:22, 24:23, 25:6, 26:17, 29:11, 30:12, 34:4, 36:1, 37:16, 39:7, 39:24, 41:9, 42:21, 51:8, 52:9, 53:11, 59:6, 65:6, 72:10, 78:10

## C

**calculation** [1] - 10:19
**California** [2] - 19:6, 20:8
**candidly** [1] - 51:25
**cannot** [2] - 14:10, 25:20
**capture** [1] - 40:18
**car** [2] - 68:7, 68:8
**career** [1] - 15:25
**Cartel** [1] - 17:16
**cartel** [28] - 17:21, 17:22, 17:23, 19:13, 26:23, 27:3, 27:5, 27:8, 27:11, 31:10, 36:23, 38:24, 39:11, 40:3, 40:10, 40:11, 47:6, 50:20, 50:21, 53:23, 57:9, 71:4, 71:15, 71:24, 77:12
**cartels** [2] - 17:22, 22:12
**Case** [1] - 3:3
**case** [31] - 5:12, 5:17, 5:22, 5:25, 8:13, 8:22, 13:15, 17:13, 19:2, 19:11, 21:7, 31:10, 55:7, 55:16, 59:15, 60:15, 61:2, 61:10, 62:10, 64:7, 64:9, 64:11, 67:14, 70:18, 72:14, 76:2, 80:12, 82:5, 83:14, 84:12, 85:6
**case-in-chief** [1] - 13:15
**cases** [3] - 5:14, 16:3, 16:8
**casual** [2] - 79:11, 79:21
**caveat** [2] - 4:25, 5:2
**Central** [2] - 19:6, 20:8
**certain** [1] - 44:5
**certainty** [1] - 72:11
**CERTIFICATE** [1] - 85:17
**certified** [1] - 22:5
**certify** [1] - 85:20
**challenge** [1] - 51:21
**chance** [3] - 5:10, 17:11, 22:7

**change** [6] - 20:3, 33:16, 51:23, 74:12, 74:21, 74:24
**changed** [1] - 20:3
**charge** [1] - 8:19
**charges** [1] - 6:13
**chat** [4] - 22:11, 35:2, 38:25, 53:19
**Chata** [1] - 41:15
**chats** [2] - 23:6, 50:22
**cheaply** [1] - 58:1
**check** [1] - 24:7
**checked** [1] - 68:14
**chemical** [2] - 53:24, 56:8
**chemicals** [8] - 35:4, 52:22, 53:19, 53:21, 56:10, 56:14, 58:13, 58:16
**chepa** [2] - 54:13, 55:3
**chief** [1] - 13:15
**child** [1] - 14:9
**chip** [1] - 54:10
**city** [1] - 42:23
**City** [1] - 59:24
**CJNG** [22] - 17:17, 17:20, 17:21, 17:23, 18:2, 18:4, 19:13, 25:16, 26:19, 26:23, 27:3, 36:22, 39:10, 39:11, 47:6, 50:20, 50:21, 57:9, 70:19, 81:3, 82:4, 82:24
**clarification** [1] - 8:10
**clear** [4] - 4:14, 7:1, 13:11, 71:12
**clearly** [1] - 8:8
**client** [2] - 5:23, 68:11
**client's** [1] - 51:22
**clients** [1] - 5:23
**close** [7] - 15:6, 26:22, 71:23, 78:23, 79:21, 79:25, 84:13
**closer** [1] - 26:6
**co** [6] - 3:12, 3:22, 16:5, 16:12, 16:13, 51:3
**co-counsel** [3] - 3:12, 3:22, 51:3
**co-defendants** [2] - 16:12, 16:13
**Coates** [2] - 24:3, 24:14
**Cobian** [7] - 36:19, 40:9, 40:25, 41:1, 41:2, 41:4
**cocaine** [17] - 7:16, 7:19, 34:7, 34:8, 44:6, 45:5, 45:7, 45:10, 45:15, 68:2,

68:6, 68:7, 68:10,
68:14, 68:22, 80:4,
80:6
code [9] - 20:5, 33:6,
34:25, 35:3, 35:6,
46:10, 52:22, 55:12,
58:15
colleagues [1] - 70:14
collect [2] - 34:18,
73:22
collection [2] - 74:14,
75:4
COLLEEN [1] - 1:11
Colleen [1] - 3:11
colleen.king@usdoj.
gov [1] - 1:14
colloquy [2] - 11:16,
12:1
Colombia [1] - 16:4
COLUMBIA [1] - 1:1
coming [2] - 52:20,
77:24
commander [7] -
36:23, 39:11, 40:4,
40:8, 40:9, 41:13,
41:22
commanders [1] -
40:3
comment [3] - 60:7,
72:5, 82:22
common [2] - 17:1,
80:15
communicating [4] -
27:22, 27:24, 28:1,
48:22
communication [7] -
9:5, 27:14, 27:20,
30:14, 30:15, 31:5,
73:19
communications [15]
- 16:9, 16:23, 17:1,
19:10, 19:12, 19:14,
22:2, 22:4, 32:21,
34:22, 46:13, 70:7,
79:11, 79:13, 80:9
complete [1] - 85:22
completed [1] - 16:1
completely [1] - 5:5
comprehensive [1] -
16:7
computer [1] - 24:15
CONBIAEN [1] - 41:3
CONBIAN [1] - 41:2
conceal [1] - 35:5
concern [1] - 44:4
concerning [2] -
55:19, 65:8
conduct [3] - 18:9,
18:14, 19:7
confer [6] - 84:6,

84:11, 84:15, 84:20,
85:1
confidential [1] - 16:6
confirmed [1] - 35:15
connection [6] - 6:6,
25:1, 25:16, 26:19,
39:10, 70:23
connections [2] -
24:8, 27:12
consensually [1] -
16:23
consider [1] - 71:19
consist [1] - 28:7
consistent [1] - 45:6
consisting [1] - 16:3
conspiracy [1] - 61:19
constitutes [1] - 85:20
Constitution [2] -
1:24, 86:3
constraints [1] - 6:14
consult [3] - 51:3,
64:6, 77:18
contact [4] - 43:8,
46:15, 75:22, 76:2
contain [1] - 64:16
containing [2] - 14:5,
14:15
contents [2] - 39:20,
62:18
contest [1] - 51:22
context [10] - 29:12,
34:22, 39:18, 40:7,
45:3, 53:12, 57:4,
71:11, 73:6, 74:13
continue [1] - 48:21
contracts [1] - 35:14
controlled [1] - 52:12
conversation [47] -
19:18, 23:3, 29:5,
29:23, 31:8, 36:3,
36:4, 36:5, 36:10,
38:4, 38:5, 38:10,
39:19, 40:6, 42:4,
42:6, 44:4, 44:5,
44:8, 45:4, 45:5,
45:25, 46:2, 47:4,
49:4, 49:9, 49:11,
52:17, 52:19, 53:1,
53:14, 53:15, 55:11,
55:14, 57:15, 57:16,
58:11, 70:14, 73:11,
73:14, 74:13, 77:10,
81:8, 81:9, 81:10,
81:14
conversation's [1] -
40:13
conversations [27] -
22:11, 27:6, 28:7,
29:1, 29:2, 29:12,
29:13, 29:22, 31:21,

32:14, 35:3, 35:5,
45:24, 66:17, 67:3,
68:17, 73:6, 78:12,
78:19, 78:21, 79:5,
79:15, 79:18, 79:22,
79:24, 83:12, 83:15
converted [1] - 7:16
convince [1] - 49:18
convincing [1] - 47:5

copy [1] - 24:12
cordial [1] - 79:8
correct [63] - 4:19,
7:10, 10:6, 18:5,
33:9, 59:19, 59:22,
59:23, 60:18, 61:7,
61:8, 61:11, 62:2,
62:3, 65:13, 65:17,
65:18, 67:7, 67:8,
67:12, 67:13, 67:16,
67:22, 67:23, 68:8,
68:12, 68:15, 68:16,
68:19, 68:20, 68:23,
68:24, 69:5, 69:6,
69:21, 70:1, 70:2,
70:4, 70:5, 70:15,
71:5, 72:24, 73:11,
73:12, 73:13, 73:17,
73:18, 73:24, 75:10,
75:11, 75:12, 75:23,
75:24, 76:3, 76:7,
76:8, 76:23, 76:24,
76:25, 77:6, 77:7,
79:23
correctly [1] - 8:5
counsel [10] - 3:10,
3:12, 3:16, 3:18,
3:22, 12:10, 13:2,
26:2, 51:3, 82:16
couple [1] - 51:25
course [7] - 4:3, 10:15,
62:23, 75:16, 77:20,
78:22, 81:1
COURT [146] - 1:1,
3:15, 3:19, 3:23, 4:5,
4:21, 5:2, 6:2, 6:20,
7:1, 7:12, 7:14, 7:21,
8:10, 8:24, 9:18,
9:21, 10:11, 10:25,
11:2, 11:8, 11:11,
11:17, 11:20, 12:3,
12:5, 12:12, 12:16,
12:20, 12:23, 13:5,
13:16, 13:22, 13:25,

14:2, 14:7, 14:12,
14:19, 14:24, 15:3,
15:5, 16:11, 16:16,
20:7, 20:10, 20:15,
20:19, 23:15, 23:25,
24:7, 24:11, 24:22,
25:2, 25:12, 25:18,
25:23, 26:3, 26:12,
26:15, 29:8, 29:18,
29:20, 29:22, 30:3,
30:8, 32:19, 32:25,
33:4, 33:12, 33:14,
33:19, 33:24, 34:2,
34:9, 34:15, 34:17,
34:21, 35:1, 35:6,
35:13, 35:20, 35:23,
37:1, 37:4, 37:8,
37:13, 38:17, 39:1,
39:5, 39:22, 40:5,
40:14, 40:17, 40:24,
41:1, 41:3, 41:5,
41:7, 42:17, 42:20,
43:17, 44:9, 44:11,
47:11, 47:24, 48:2,
50:2, 50:5, 51:4,
51:7, 51:15, 51:18,
52:4, 52:8, 53:2,
53:7, 54:5, 55:25,
56:21, 59:2, 64:1,
65:2, 65:5, 72:9,
77:20, 78:2, 78:5,
78:8, 78:16, 79:4,
79:7, 81:20, 81:22,
81:25, 82:7, 82:13,
82:18, 83:2, 83:19,
83:21, 83:25, 84:10,
84:24, 85:10, 85:13,
85:17
Court [9] - 1:22, 1:23,
5:10, 11:13, 11:24,
12:2, 55:24, 85:1,
86:2
court [22] - 14:10,
17:12, 19:2, 19:5,
40:17, 59:12, 59:22,
60:5, 62:4, 63:2,
64:18, 64:19, 64:20,
65:2, 69:23, 70:4,
72:8, 74:11, 74:20,
76:10, 77:2, 81:23
Court's [1] - 78:4
Courthouse [2] - 1:23,
86:2
courtroom [1] - 23:22
COURTROOM [3] -
3:2, 14:1, 24:9
courtrooms [1] - 26:5
create [1] - 52:23
credible [1] - 69:17
Criminal [2] - 1:3, 3:3

criminal [1] - 15:22
CRM [1] - 1:12
cross [4] - 59:3, 68:22,
82:7, 84:4
CROSS [1] - 59:5
cross-examination [1]
- 84:4
CROSS-
EXAMINATION [1] -
59:5
CRR [3] - 1:22, 85:19,
86:1
cui [1] - 57:18
Cul [4] - 58:18, 58:21
CUI [1] - 58:21
Cuini [2] - 58:22
Cuinis [11] - 17:17,
17:20, 17:21, 17:22,
18:2, 19:13, 26:23,
27:7, 27:10, 31:10,
82:24
culpability [1] - 51:22
current [2] - 15:21,
16:2
custody [1] - 14:22
customers [3] - 38:19,
38:21, 38:23

**D**

dad [1] - 58:6
daily [1] - 27:24
Dangerous [1] - 6:9
date [28] - 23:7, 30:14,
31:23, 32:1, 32:9,
36:3, 36:4, 36:6,
36:7, 38:3, 38:5,
38:6, 38:9, 42:17,
42:18, 44:11, 46:1,
49:4, 49:9, 52:17,
56:23, 57:15, 73:19,
81:8, 81:9, 81:14,
84:12, 85:2
Dated [1] - 85:24
dates [2] - 85:4, 85:5
day-to-day [1] - 28:8
days [4] - 48:20,
50:12, 57:24, 84:2
DC [4] - 1:13, 1:17,
1:24, 86:4
DEA [25] - 2:3, 15:17,
15:25, 16:22, 18:8,
18:14, 19:7, 19:10,
19:12, 21:20, 22:25,
23:2, 27:13, 27:16,
27:22, 59:17, 61:7,
63:22, 65:3, 69:4,
72:22, 80:8, 80:9,
80:12, 82:19
deadline [6] - 31:11,

31:14, 31:17, 31:18, 32:7, 33:20
**deal** [2] - 35:18, 35:19
**debriefed** [2] - 16:5, 16:11
**debt** [45] - 28:12, 28:14, 28:15, 28:16, 28:17, 28:22, 29:3, 29:14, 31:11, 31:22, 32:7, 32:9, 32:15, 32:20, 32:22, 33:10, 33:17, 33:20, 33:22, 34:5, 34:6, 34:7, 36:7, 36:10, 38:7, 38:8, 38:10, 38:15, 63:12, 65:8, 65:13, 66:10, 66:13, 66:18, 66:24, 67:6, 67:20, 68:2, 68:17, 69:25, 74:14, 80:1, 80:2
**deceased** [1] - 41:8
**decided** [2] - 49:16, 69:16
**decision** [3] - 72:3, 75:9, 78:25
**decision-making** [1] - 78:25
**declaration** [1] - 83:3
**declarations** [1] - 84:18
**deed** [2] - 35:16, 71:3
**deemed** [1] - 69:17
**defendant** [73] - 3:21, 4:16, 6:5, 6:11, 8:2, 9:4, 9:5, 9:12, 10:15, 16:13, 17:6, 23:1, 23:2, 23:4, 23:6, 23:18, 23:23, 24:25, 25:10, 25:16, 26:19, 26:22, 27:1, 27:14, 27:18, 27:22, 28:15, 28:17, 28:19, 28:22, 31:9, 32:6, 36:12, 36:15, 38:14, 39:25, 40:7, 42:10, 46:13, 46:15, 46:25, 47:3, 47:5, 47:6, 47:7, 48:21, 49:1, 49:18, 49:21, 52:11, 53:16, 53:23, 53:25, 56:2, 56:7, 57:8, 59:25, 60:1, 65:20, 67:16, 67:19, 71:23, 72:16, 72:19, 75:18, 78:13, 78:19, 78:24, 79:6, 80:21, 81:2, 82:11, 83:11
**Defendant** [2] - 1:6, 1:15
**DEFENDANT** [1] - 4:3

**defendant's** [16] - 8:20, 22:19, 28:6, 29:14, 42:5, 43:7, 51:10, 51:15, 53:3, 57:4, 80:2, 82:16, 82:19, 82:23, 83:17, 85:6
**defendants** [11] - 5:14, 16:6, 16:12, 16:13, 16:14, 18:10, 18:12, 19:12, 76:15
**defense** [11] - 6:4, 8:11, 9:3, 9:23, 10:2, 12:10, 13:2, 13:3, 24:1, 26:2, 82:16
**defined** [1] - 8:8
**deodorant** [2] - 53:17, 53:18
**deodorants** [7] - 52:20, 52:21, 52:22, 53:3, 53:12, 53:14, 54:11
**depart** [1] - 4:8
**deposit** [1] - 30:21
**deposits** [1] - 37:22
**DEPUTY** [3] - 3:2, 14:1, 24:9
**describe** [6] - 15:25, 18:17, 58:15, 78:12, 78:19, 79:5, 79:11, 79:13
**description** [2] - 56:8, 70:13
**desperate** [1] - 72:13
**detail** [1] - 9:14
**details** [1] - 77:5
**Detective** [1] - 77:23
**determination** [2] - 10:19, 69:19
**determine** [1] - 75:6
**device** [15] - 18:24, 19:25, 20:1, 20:4, 20:5, 20:6, 20:23, 20:24, 20:25, 21:2, 21:3, 21:8, 23:10, 40:22, 75:22
**Device** [19] - 21:5, 21:11, 21:14, 21:21, 21:25, 22:12, 22:22, 22:23, 23:1, 23:3, 23:10, 25:12, 25:13, 27:23, 46:20, 60:24, 61:1, 61:2, 61:5
**devices** [7] - 18:21, 18:23, 19:19, 19:21, 21:4, 76:2, 80:10
**different** [5] - 19:19, 72:1, 77:1, 77:10, 82:19
**differentiate** [1] - 21:4

**difficult** [1] - 3:25
**dinner** [1] - 28:6
**DIRECT** [1] - 15:10
**direct** [5] - 58:25, 62:25, 63:11, 65:7, 67:4
**directing** [1] - 84:25
**discuss** [1] - 28:23
**discussed** [5] - 12:9, 12:14, 13:2, 57:5, 70:10
**discussing** [7] - 47:1, 47:2, 53:12, 53:13, 83:13, 83:14
**discussion** [2] - 35:23, 67:5
**discussions** [3] - 27:9, 49:20, 49:23
**dispute** [4] - 4:11, 4:12, 4:25, 7:2
**disputed** [1] - 4:18
**disputes** [1] - 7:23
**disputing** [3] - 4:21, 7:8, 8:2
**distribute** [1] - 28:9
**distribution** [3] - 16:4, 45:11, 50:24
**District** [2] - 19:6, 20:8
**DISTRICT** [3] - 1:1, 1:1, 1:9
**division** [1] - 15:20
**Docket** [4] - 11:14, 11:15, 11:25
**documentation** [1] - 85:3
**documented** [1] - 16:10
**documents** [5] - 13:7, 13:9, 13:13, 13:15, 17:12
**DOJ** [2] - 1:12, 6:8
**DOJ-CRM** [1] - 1:12
**dollars** [3] - 35:10, 45:15, 45:17
**done** [3] - 44:23, 44:24, 58:3
**doubt** [1] - 69:24
**Doug** [1] - 3:13
**DOUGLAS** [1] - 1:11
**douglas.meisel@ usdoj.gov** [1] - 1:14
**down** [2] - 29:20, 77:24
**drive** [2] - 14:5, 14:14
**drop** [1] - 55:1
**Drug** [1] - 15:16
**drug** [15] - 7:16, 15:24, 16:19, 17:2, 18:21, 28:8, 33:17, 43:20, 45:11, 45:21, 55:22,

67:21, 67:25, 72:25, 77:12
**drugs** [12] - 28:9, 32:22, 32:23, 33:4, 33:5, 33:22, 55:13, 63:13, 63:16, 67:1, 68:19, 70:1
**Drugs** [1] - 6:9
**dual** [1] - 10:19
**dude** [3] - 30:19, 48:7, 48:9
**due** [5] - 31:16, 32:7, 32:23, 36:7, 38:9
**during** [13] - 17:9, 18:14, 19:20, 23:8, 28:10, 46:19, 51:23, 55:3, 62:23, 65:7, 70:11, 74:13, 84:4

**E**

**ears** [2] - 25:25, 66:22
**eat** [1] - 57:18
**effect** [1] - 10:19
**efforts** [2] - 17:8, 70:23
**eight** [1] - 18:13
**either** [3] - 7:2, 82:23, 84:17
**El** [22] - 3:4, 3:21, 3:24, 17:6, 22:24, 23:11, 27:4, 30:17, 34:11, 37:19, 38:17, 39:16, 41:12, 42:3, 42:16, 43:25, 44:14, 47:22, 48:5, 54:8, 57:13, 58:17
**EL** [1] - 1:5
**electronic** [1] - 18:20
**elicit** [2] - 8:15, 37:13
**eliciting** [1] - 8:18
**ELMO** [3] - 24:12, 24:13, 24:16
**email** [2] - 8:25
**emails** [1] - 20:13
**employed** [1] - 15:15
**employment** [1] - 15:17
**end** [3] - 26:4, 26:12, 66:22
**endeavor** [2] - 26:1, 64:22
**endorsement** [1] - 35:14
**Enforcement** [1] - 15:16
**engagement** [1] - 28:2
**engineer** [3] - 47:12, 47:15, 70:25
**engineer's** [1] - 70:19

**English** [1] - 22:5
**enhancement** [8] - 7:25, 8:23, 10:12, 10:16, 10:17, 52:5, 64:16, 82:21
**enhancements** [2] - 7:8, 83:16
**entering** [1] - 84:25
**entire** [1] - 5:6
**entitled** [1] - 10:18
**equality** [1] - 5:18
**era** [1] - 59:18
**errand** [1] - 57:18
**error** [1] - 11:18
**Escorpion** [16] - 23:11, 30:17, 34:11, 37:19, 38:17, 39:16, 41:12, 42:3, 42:16, 43:25, 44:15, 47:22, 48:5, 54:8, 57:13, 58:18
**ESQ** [4] - 1:11, 1:11, 1:15, 1:19
**establish** [1] - 25:2
**estate** [15] - 9:7, 33:11, 33:12, 34:1, 34:2, 35:17, 35:19, 39:2, 63:17, 65:13, 66:19, 66:25, 67:7, 69:9, 69:25
**estimation** [1] - 67:21
**event** [1] - 60:3
**events** [1] - 72:12
**evidence** [18] - 8:22, 9:2, 9:10, 9:22, 10:3, 12:9, 13:2, 13:4, 16:10, 18:19, 18:20, 33:10, 34:10, 75:6, 83:13, 83:17, 84:8, 84:18
**evidentiary** [9] - 4:6, 7:23, 8:3, 9:11, 9:22, 10:21, 12:6, 13:18, 51:18
**EVIDENTIARY** [1] - 1:8
**exactly** [2] - 5:13, 74:19
**examination** [6] - 62:25, 63:11, 65:7, 67:4, 82:8, 84:4
**EXAMINATION** [3] - 15:10, 59:5, 78:9
**examined** [1] - 6:6
**example** [1] - 21:6
**exchanging** [1] - 48:20
**excuse** [4] - 25:18, 44:6, 60:10, 77:23
**excused** [2] - 81:20,

85:13
**Exhibit** [44] - 13:10,
14:3, 14:4, 14:14,
14:20, 23:13, 24:20,
25:3, 25:7, 30:1,
30:13, 31:25, 32:18,
33:1, 34:10, 35:21,
35:24, 36:2, 36:25,
37:2, 37:9, 37:10,
37:17, 39:13, 42:13,
43:23, 45:23, 47:10,
49:5, 49:8, 49:25,
50:6, 52:16, 53:3,
53:5, 54:6, 56:10,
56:23, 57:11, 73:10,
73:11, 81:7, 81:13
**exhibit** [6] - 24:21,
47:24, 54:5, 54:7,
55:19, 56:11
**exhibits** [6] - 12:8,
12:25, 13:17, 13:23,
14:17, 63:2
**Exhibits** [1] - 22:8
**expansive** [1] - 72:25
**experience** [7] - 6:10,
45:2, 46:8, 56:13,
58:8, 58:10, 67:9
**expert** [2] - 64:21,
64:24
**explain** [9] - 14:2,
17:19, 37:5, 44:3,
54:1, 58:14, 61:20,
61:21, 71:8
**explained** [3] - 5:13,
62:1, 70:17
**explains** [1] - 69:8
**explanation** [3] - 54:2,
74:25, 75:2
**explanations** [1] -
55:23
**extemporize** [1] -
67:17
**extend** [4] - 31:11,
31:17, 32:7, 38:15
**extended** [1] - 31:18
**extending** [1] - 33:19
**extent** [2] - 10:4, 68:21
**extradition** [6] - 6:14,
8:4, 10:8, 59:24,
65:22, 66:2

**F**

**fact** [1] - 8:7
**facts** [4] - 11:15,
11:25, 64:11, 70:24
**factual** [2] - 8:19, 8:21
**failure** [1] - 5:8
**fair** [1] - 22:18
**fairly** [1] - 71:9

**Falls** [1] - 1:20
**familiar** [4] - 17:1,
17:8, 56:10, 82:3
**family** [3] - 71:20,
74:7, 84:7
**fangled** [1] - 26:5
**far** [1] - 4:18
**favor** [2] - 42:23, 72:13
**FBI** [1] - 15:9
**fed** [1] - 77:5
**federal** [2] - 59:11,
64:18
**FEITEL** [42] - 1:15,
1:16, 4:24, 5:4, 6:19,
6:24, 7:13, 7:18, 8:6,
10:10, 11:1, 12:4,
12:13, 13:6, 14:8,
25:20, 25:24, 29:4,
29:16, 29:19, 33:15,
39:18, 43:14, 44:2,
51:13, 51:17, 51:20,
55:18, 59:4, 59:6,
65:6, 72:5, 72:10,
73:9, 77:17, 77:21,
77:23, 78:14, 79:1,
84:1, 84:22, 85:11
**Feitel** [3] - 3:22, 4:21,
6:3, 7:12, 7:17, 8:5,
9:11, 10:6, 10:25,
12:24, 25:19, 82:8,
83:22, 85:10
**Feitel's** [1] - 82:22
**Feitel)**.......................
..........**59** [1] - 2:4
**few** [2] - 50:11, 57:24
**field** [1] - 15:20
**fight** [1] - 9:11
**figure** [3] - 76:11,
76:14, 77:4
**file** [1] - 8:22
**filed** [1] - 8:12
**files** [1] - 17:11
**financial** [1] - 67:7
**financier** [1] - 17:23
**fine** [3] - 20:19, 44:22,
77:14
**finish** [1] - 38:18
**first** [11] - 3:10, 18:19,
18:20, 21:13, 24:14,
27:12, 29:16, 38:18,
48:25, 49:3, 63:13
**fixed** [1] - 24:14
**flow** [1] - 5:7
**flurry** [1] - 8:12
**focus** [4] - 10:21,
27:12, 43:7, 43:15
**focused** [2] - 10:7,
10:12
**folks** [1] - 30:8
**follow** [1] - 83:8

**follow-up** [1] - 83:8
**following** [1] - 82:16
**FOR** [1] - 1:1
**foregoing** [1] - 85:20
**forget** [3] - 46:6, 69:4,
73:16
**forgotten** [1] - 77:19
**form** [1] - 84:18
**format** [2] - 14:5,
19:14
**forward** [2] - 3:8, 82:1
**four** [3] - 9:21, 9:25,
21:17
**four-hour** [1] - 9:21
**frankly** [2] - 6:4, 8:24
**frequency** [1] - 5:16
**Friday** [1] - 1:4
**friend** [1] - 44:16
**friendly** [2] - 79:13,
79:21
**front** [2] - 51:23, 82:3
**fucking** [1] - 41:16
**full** [4] - 9:25, 30:22,
54:17, 85:21
**furtherance** [2] -
13:13, 18:21

**G**

**gallons** [1] - 54:17
**Generacion** [1] - 17:16
**general** [3] - 43:17,
73:1
**generally** [2] - 43:11,
43:15
**Georgetown** [1] - 1:20
**given** [3] - 6:11, 6:13,
9:12
**god** [3] - 58:5, 58:6,
58:7
**Gonzalez** [33] - 27:2,
27:7, 27:10, 27:13,
27:14, 27:21, 31:13,
36:13, 43:8, 43:9,
46:14, 46:16, 46:18,
47:1, 48:21, 49:16,
49:22, 58:22, 65:9,
65:16, 66:15, 67:6,
67:11, 68:15, 74:14,
78:13, 78:20, 79:6,
79:16, 79:18, 79:22,
80:3, 80:5
**Gonzalez-Valencia**
[15] - 27:7, 27:10,
27:13, 27:14, 27:21,
31:13, 36:13, 43:8,
43:9, 78:13, 78:20,
79:6, 79:16, 80:3,
80:5
**gorilla** [1] - 12:20

**government** [27] -
3:10, 4:16, 5:5, 5:13,
5:15, 5:20, 6:10,
6:14, 6:23, 7:24,
10:23, 12:17, 13:1,
13:14, 15:1, 33:16,
55:20, 62:23, 67:4,
69:16, 70:22, 81:22,
82:17, 83:21, 83:23,
84:5, 85:8
**Government** [32] -
14:3, 14:4, 14:14,
14:19, 22:8, 25:7,
30:1, 30:13, 31:25,
32:17, 33:1, 35:21,
35:24, 36:2, 36:24,
37:2, 37:9, 37:10,
37:17, 42:13, 45:23,
49:5, 49:8, 50:6,
52:16, 53:2, 53:5,
54:6, 56:9, 56:23,
81:7, 81:13
**government's** [4] -
4:19, 8:14, 9:1,
51:24
**Government's** [11] -
13:10, 23:12, 34:10,
39:13, 43:23, 47:9,
49:24, 57:10, 73:9,
73:11
**grabbed** [1] - 54:13
**Great** [1] - 1:20
**ground** [1] - 79:3
**guideline** [1] - 10:13
**guidelines** [4] - 7:5,
10:20, 82:21, 83:14
**Gustavo** [1] - 3:6
**guy** [2] - 54:23, 55:5
**guys** [2] - 50:12, 55:1
**GX12** [1] - 47:25
**GX13** [1] - 50:3
**gygo** [1] - 43:2

**H**

**habit** [1] - 66:20
**hahaha** [3] - 39:17,
41:13, 55:1
**half** [2] - 54:16, 54:24
**hand** [3] - 3:25, 17:22
**hard** [3] - 12:15, 14:4,
14:14
**harm** [2] - 49:2, 80:22
**Hawaii** [2] - 63:20,
63:23
**head** [1] - 67:20
**headphones** [1] -
25:23
**hear** [9] - 12:24, 13:16,
13:19, 25:22, 25:24,

26:15, 29:4, 52:4,
55:21
**heard** [2] - 29:5, 73:2
**hearing** [19] - 3:25,
4:6, 4:7, 4:13, 6:22,
7:24, 9:4, 9:22, 9:24,
10:22, 12:6, 12:15,
13:18, 14:9, 30:4,
37:5, 51:24, 62:23,
85:14
**HEARING** [1] - 1:8
**hearsay** [1] - 13:12
**held** [2] - 11:16, 12:1
**HELD** [1] - 1:9
**help** [3] - 25:21, 61:16,
68:13
**helpful** [1] - 39:21
**hereby** [1] - 85:19
**high** [6] - 18:3, 26:23,
26:24, 27:7, 57:4,
71:24
**high-ranked** [1] - 57:4
**high-ranking** [2] -
18:3, 26:24
**highest** [2] - 27:3, 57:9
**himself** [1] - 23:5
**hold** [1] - 11:17
**honest** [2] - 6:2, 6:18
**honestly** [2] - 41:15,
41:22
**Honolulu** [1] - 63:20
**Honor** [82] - 3:2, 3:5,
3:11, 3:20, 4:3, 4:20,
4:24, 6:19, 7:11, 8:6,
8:17, 9:17, 9:20,
10:10, 10:24, 11:1,
11:7, 11:10, 11:12,
11:19, 12:7, 12:19,
12:22, 13:6, 13:21,
14:1, 14:23, 25:13,
25:20, 26:11, 26:14,
29:4, 29:16, 29:25,
33:9, 33:13, 33:15,
34:14, 35:22, 35:25,
37:3, 37:7, 37:12,
39:6, 39:18, 43:14,
44:2, 44:13, 47:13,
50:4, 51:2, 51:6,
51:13, 51:23, 52:6,
53:6, 53:10, 53:15,
55:18, 55:19, 56:19,
56:20, 59:1, 64:3,
77:17, 78:1, 78:3,
78:14, 81:19, 81:21,
81:24, 82:6, 82:12,
82:25, 83:6, 83:20,
83:24, 84:1, 84:21,
84:23, 85:9, 85:12
**HONORABLE** [1] - 1:9
**hope** [1] - 8:8

hopefully [1] - 38:18
hospital [1] - 50:13
hostages [1] - 72:14
hour [2] - 9:21, 9:25
hours [1] - 9:25
house [1] - 28:6
HOWELL [1] - 1:9
hundreds [1] - 76:1

**I**

Ice [2] - 46:23, 57:13
identified [9] - 18:22,
  22:21, 22:25, 39:8,
  40:8, 75:14, 75:19,
  75:23, 76:7
identify [10] - 3:9,
  19:22, 20:24, 20:25,
  21:7, 23:2, 26:24,
  75:18, 80:9, 80:12
ignore [1] - 53:4
imagine [1] - 67:9
important [2] - 29:7,
  44:23
importation [1] - 8:1
IN [1] - 1:1
in-law [1] - 32:24
inadmissible [1] -
  13:12
including [1] - 17:12
independent [3] -
  7:18, 7:20, 51:20
independently [1] -
  84:6
indicates [1] - 9:1
indictment [2] - 17:12,
  18:3
individual [3] - 48:22,
  49:1, 80:18
indulgence [1] - 78:4
influence [6] - 31:9,
  32:6, 71:25, 72:1,
  72:2, 78:24
influencing [3] -
  38:14, 71:15, 71:20
informants [1] - 16:6
information [6] - 16:7,
  28:21, 50:3, 74:16,
  77:5, 83:8
informing [1] - 82:17
informs [1] - 60:4
initial [3] - 11:13,
  11:23, 16:1
initiation [1] - 68:23
innocent [1] - 71:4
instruction [1] - 53:24
insufficient [1] - 8:22
intend [1] - 82:17
intended [1] - 6:24
interaction [1] - 28:2

intercept [10] - 18:25,
  19:10, 20:13, 20:17,
  21:13, 27:17, 31:7,
  36:10, 46:20, 63:25
intercepted [19] -
  16:22, 19:12, 23:4,
  23:19, 25:8, 25:17,
  26:20, 26:21, 32:14,
  34:22, 36:11, 43:12,
  50:22, 56:3, 74:15,
  78:11, 78:22, 80:8,
  80:16
intercepting [2] -
  21:20, 27:23
interceptions [1] -
  75:21
intercepts [23] - 19:2,
  27:16, 32:8, 36:15,
  39:25, 42:1, 42:9,
  43:3, 43:21, 46:17,
  49:15, 51:9, 52:10,
  57:3, 58:11, 61:1,
  62:24, 63:24, 65:8,
  75:17, 78:18, 78:22,
  80:10
international [1] - 16:3
interpretation [1] -
  38:25
INTERPRETER [1] -
  11:18
interpreter [2] - 11:18,
  22:5
Interpreters [1] - 3:6
Interruption [1] - 30:2
interviews [1] - 18:9
introduce [1] - 84:9
introduced [4] - 37:9,
  53:7, 53:8, 62:24
invented [1] - 70:24
invest [1] - 41:20
investigate [1] - 15:23
investigating [1] -
  60:15
investigation [31] -
  7:3, 10:14, 16:8,
  17:5, 17:9, 17:11,
  17:16, 18:2, 18:8,
  18:14, 19:8, 19:20,
  24:25, 25:9, 25:15,
  26:18, 27:1, 28:2,
  42:2, 43:4, 58:19,
  58:20, 59:15, 59:20,
  60:12, 60:13, 60:16,
  62:1, 75:16, 78:23,
  82:4
investigations [2] -
  16:9, 16:18
investigative [1] - 17:8
investigator [1] -
  15:22

invoices [3] - 34:18,
  37:22, 37:25
involved [7] - 9:8,
  16:18, 28:17, 63:12,
  74:18, 80:10, 82:10
involvement [2] -
  51:10, 51:15
involves [1] - 20:23
involving [3] - 9:6,
  9:22, 10:7
irrelevant [1] - 60:7
issue [6] - 5:9, 6:7,
  8:8, 10:7, 43:16,
  55:24
IT [3] - 24:16, 24:18,
  30:8
itself [1] - 64:15

**J**

Jalisco [1] - 17:16
January [1] - 19:9
job [1] - 41:25
joined [1] - 3:12
joint [2] - 84:17, 85:2
Josan [9] - 73:25,
  74:3, 74:8, 74:11,
  74:16, 74:22, 76:24,
  77:9, 77:11
josan [2] - 46:6, 73:16
Josan's [1] - 35:14
Jose [2] - 27:6, 43:8,
  43:9, 79:6, 79:18
JUAN [1] - 1:5
Juan [4] - 3:3, 3:21,
  17:6, 22:23
JUDGE [1] - 1:9
judicial [2] - 11:14,
  11:24
judicially [1] - 21:13
July [6] - 1:4, 34:6,
  36:4, 38:5, 38:12,
  57:16
jumping [1] - 35:21
June [12] - 15:18,
  21:22, 28:10, 30:15,
  32:2, 38:9, 38:11,
  46:3, 56:25, 73:20,
  81:9, 81:15
jury [2] - 26:4, 26:12
justify [1] - 72:8

**K**

keep [1] - 38:20
keeping [1] - 71:4
Kid [4] - 46:23, 47:21,
  48:4, 50:1
kidnapped [11] - 47:4,
  47:7, 47:11, 49:13,

49:16, 49:19, 49:21,
  50:19, 50:25, 70:20,
  81:3
kidnapping [4] - 70:7,
  70:24, 72:12, 80:18
kill [1] - 70:20
killed [1] - 80:20
killing [1] - 71:4
kilogram [1] - 45:7
kilograms [1] - 68:6
kilos [3] - 34:7, 68:2,
  80:4
KING [93] - 1:11, 3:11,
  3:17, 4:20, 7:11,
  8:17, 9:17, 9:20,
  10:24, 11:7, 11:10,
  11:12, 11:23, 12:7,
  12:19, 12:22, 12:25,
  13:21, 13:24, 14:4,
  14:14, 14:23, 15:1,
  15:11, 16:17, 20:21,
  20:22, 23:14, 23:16,
  24:21, 24:23, 25:5,
  25:6, 25:14, 26:1,
  26:11, 26:14, 26:17,
  29:10, 29:11, 29:21,
  29:25, 30:12, 31:24,
  32:17, 33:9, 33:13,
  34:4, 35:22, 35:25,
  36:1, 37:3, 37:7,
  37:12, 37:15, 37:16,
  39:6, 39:7, 39:23,
  39:24, 41:9, 42:12,
  42:21, 48:1, 50:4,
  51:2, 51:6, 51:8,
  52:6, 52:9, 52:15,
  53:6, 53:10, 53:11,
  54:3, 54:6, 56:18,
  58:25, 78:3, 78:10,
  78:15, 78:17, 81:19,
  81:24, 82:6, 82:12,
  82:15, 82:25, 83:6,
  83:20, 83:24, 84:21,
  85:9
King [12] - 3:11, 4:19,
  7:10, 11:4, 11:22,
  12:14, 12:16, 14:10,
  15:8, 24:11, 81:25,
  82:2
King).........................
  ..............15 [1] - 2:4
King).........................
  ..........78 [1] - 2:5
knowing [1] - 71:11
knowledge [7] - 42:2,
  43:3, 58:19, 58:20,
  59:20, 60:5, 72:25
knowledgeable [2] -
  61:9, 61:24
known [2] - 17:17

knows [2] - 41:24,
  44:5
Kyle [4] - 60:17, 62:21,
  63:4, 63:5

**L**

laminates [5] - 54:14,
  57:25, 58:5, 58:14,
  58:15
land [1] - 4:10
language [1] - 22:2
large [5] - 33:7, 35:11,
  35:12, 50:24, 81:4
large-scale [1] - 50:24
largest [1] - 67:21
last [8] - 15:13, 30:23,
  41:13, 49:11, 51:14,
  52:25, 66:13, 66:20
laundering [1] - 67:22
LAW [1] - 1:16, 1:19
law [17] - 5:17, 28:15,
  28:18, 28:20, 28:21,
  31:12, 32:24, 34:13,
  34:15, 64:16, 65:20,
  67:11, 67:20, 68:13,
  73:23, 80:2, 83:14
lay [1] - 4:10
leader [7] - 27:4, 27:7,
  27:10, 31:9, 47:5,
  57:9, 61:18, 62:2,
  72:6
leaders [5] - 26:23,
  57:5, 71:24, 72:2,
  72:3
leadership [7] - 43:16,
  55:20, 55:21, 55:24,
  64:16, 71:15, 83:10
leads [1] - 26:6
learn [1] - 74:2
least [2] - 69:11, 76:10
leave [4] - 48:11, 55:6,
  55:10, 55:15, 84:1
lectern [2] - 3:8, 26:6
left [4] - 54:24, 55:1,
  55:15, 77:8
legal [6] - 6:25, 8:8,
  8:20, 10:7, 51:20,
  82:20
legitimate [1] - 69:24
lengthy [1] - 18:24
Leo [11] - 36:21, 39:9,
  39:15, 40:15, 40:16,
  40:21, 40:22, 40:23,
  41:11, 42:5
Leo's [1] - 39:9
less [2] - 60:7, 74:8
letting [1] - 44:18
level [5] - 7:4, 7:6, 7:8,
  7:15, 10:17

**Level** [1] - 7:19
**Libien** [6] - 65:16, 65:19, 65:21, 66:1, 66:4, 66:9
**Libien-Tella** [6] - 65:16, 65:19, 65:21, 66:1, 66:4, 66:9
**life** [4] - 67:9, 70:19, 70:23, 80:21
**light** [1] - 83:16
**Line** [3] - 38:17, 50:6, 57:17
**Lines** [7] - 30:16, 37:18, 39:14, 41:10, 49:25, 54:7, 57:12
**LISA** [1] - 85:19
**Lisa** [1] - 1:22
**list** [1] - 21:5
**Listen** [1] - 54:11
**listened** [1] - 14:8
**liter** [1] - 54:20
**literally** [1] - 76:1
**litigating** [1] - 12:16
**litigation** [1] - 13:13
**litigator's** [1] - 14:12
**lives** [1] - 71:14
**log** [1] - 20:1
**logical** [1] - 5:7
**look** [1] - 30:19
**looked** [2] - 56:1, 56:16
**looking** [6] - 32:25, 34:9, 47:3, 47:24, 53:25, 57:23
**looks** [1] - 77:10
**Los** [13] - 15:20, 17:17, 17:20, 17:21, 17:22, 18:2, 19:13, 26:23, 27:7, 27:10, 31:10, 63:23, 82:23
**losing** [1] - 5:8
**loss** [1] - 5:24
**lost** [2] - 29:6, 79:3
**loud** [3] - 14:9, 43:24, 46:4
**louder** [1] - 26:1
**loudly** [1] - 12:18

**M**

**ma'am** [3] - 16:15, 20:18, 40:20
**machine** [1] - 30:6
**magicians** [1] - 30:8
**main** [2] - 10:21, 17:24
**majority** [2] - 19:15, 19:18
**man** [2] - 23:21, 50:11
**Man** [2] - 46:23, 57:13
**Manuel** [7] - 3:4, 3:21,

17:6, 22:23, 40:9, 40:23, 40:24
**MANUEL** [1] - 1:5
**manufacture** [1] - 81:4
**Mark** [2] - 24:7, 24:18
**marked** [21] - 12:8, 12:25, 13:9, 14:17, 22:7, 23:12, 31:24, 32:17, 36:2, 36:24, 39:12, 41:10, 42:12, 43:22, 45:23, 47:9, 49:7, 49:24, 52:15, 56:9, 57:10
**marriage** [1] - 72:4
**married** [1] - 71:16
**material** [1] - 58:12
**matter** [12] - 3:7, 8:3, 8:7, 8:24, 8:25, 11:13, 11:23, 29:23, 51:18, 70:10, 80:23
**matters** [2] - 28:5, 43:20
**mean** [20] - 5:12, 7:7, 16:12, 16:14, 28:4, 31:15, 33:18, 35:9, 37:6, 45:3, 60:1, 68:2, 71:15, 74:15, 74:24, 76:13, 79:7, 79:8, 79:10, 79:23
**meaning** [4] - 50:18, 53:20, 63:9, 74:12
**means** [3] - 55:16, 65:25, 74:22
**measure** [1] - 54:20
**meeting** [2] - 48:25, 82:16
**Meisel** [2] - 3:13, 11:4
**MEISEL** [4] - 1:11, 3:14, 78:4, 78:7
**melon** [3] - 35:4, 35:7, 35:12
**melons** [9] - 33:2, 33:4, 33:6, 34:19, 34:23, 34:24, 35:8
**member** [1] - 27:3
**members** [7] - 17:2, 18:4, 18:7, 22:12, 26:24, 40:10, 74:7
**memos** [2] - 19:17, 84:19
**Mencho** [1] - 27:4
**mention** [4] - 23:6, 54:23, 55:5, 76:22
**mentioned** [4] - 22:13, 25:4, 57:3, 76:11
**Mercado** [1] - 3:6
**Message** [2] - 47:21, 53:1
**message** [22] - 25:9, 31:4, 32:1, 32:2,

32:3, 32:5, 32:9, 38:25, 40:4, 42:14, 42:18, 44:11, 46:4, 52:25, 53:1, 56:1, 56:3, 56:6, 56:7, 56:16, 74:15, 81:10
**messages** [50] - 14:6, 14:15, 14:16, 19:15, 19:16, 19:18, 20:11, 20:12, 21:20, 21:24, 22:14, 22:19, 23:1, 23:4, 23:20, 25:17, 26:20, 26:21, 27:23, 31:22, 36:11, 39:15, 39:16, 41:11, 41:12, 43:12, 43:24, 45:19, 45:20, 47:19, 48:19, 48:20, 51:10, 51:14, 52:11, 54:3, 56:3, 57:2, 57:7, 57:8, 58:17, 63:25, 76:4, 76:12, 77:3, 78:11, 80:16, 81:16
**Messages** [2] - 37:18, 48:3
**messaging** [3] - 20:14, 22:11, 25:11
**Messenger** [4] - 19:23, 19:24, 27:2, 40:22
**Messengers** [1] - 75:15
**meth** [1] - 7:16
**methamphetamine** [18] - 7:19, 7:20, 8:1, 8:16, 8:19, 9:2, 9:6, 9:8, 9:13, 9:15, 9:22, 10:4, 44:6, 51:11, 51:16, 52:23, 53:21, 56:15
**method** [1] - 55:12
**Mexican** [1] - 17:2
**Mexico** [5] - 16:4, 16:19, 17:25, 59:24, 60:4
**Mexico's** [1] - 67:21
**microphone** [2] - 12:18, 15:6
**microphone's** [1] - 12:23
**middle** [1] - 73:21
**middleman** [2] - 28:19, 28:25
**might** [3] - 39:19, 39:20, 57:24
**millions** [3] - 35:8, 35:9
**Mime** [18] - 56:2, 56:4, 56:8, 68:25, 69:1, 69:2, 72:16, 73:4, 73:12, 74:11, 74:22,

75:14, 76:19, 77:9, 77:11, 81:12, 81:17
**mind** [3] - 9:24, 74:21, 74:24
**minute** [2] - 62:22, 69:3
**minutes** [1] - 84:14
**mis** [1] - 63:15
**missed** [1] - 51:13
**missing** [3] - 54:16, 54:18
**misspell** [1] - 63:15
**misspoke** [1] - 63:15
**mistake** [2] - 48:12, 63:14
**mistaken** [1] - 33:25
**mistakes** [1] - 48:13
**mom** [1] - 57:19
**moment** [3] - 51:2, 56:20, 76:6
**money** [19] - 28:24, 33:7, 34:25, 35:1, 35:3, 35:6, 35:11, 35:12, 37:23, 46:10, 46:11, 65:15, 66:15, 67:22, 75:3, 75:4, 75:5
**month** [3] - 38:19, 43:2, 63:22
**months** [1] - 37:24
**Moreira** [2] - 1:22, 86:1
**MOREIRA** [1] - 85:19
**Mori** [16] - 60:17, 60:20, 61:4, 61:17, 61:24, 62:21, 63:4, 63:5, 64:6, 75:16, 81:23, 82:2, 82:10, 83:3, 83:9, 83:12
**Mori's** [3] - 61:7, 82:8, 82:23
**morning** [13] - 3:9, 3:11, 3:14, 3:15, 3:20, 3:23, 4:2, 4:8, 11:12, 15:3, 15:4, 59:7, 59:8
**most** [3] - 29:6, 61:9, 61:24
**mother's** [1] - 28:6
**motion** [1] - 8:20
**move** [2] - 36:9, 55:18
**moved** [2] - 12:23, 26:5
**movement** [2] - 52:12
**moving** [2] - 41:16, 41:17
**MR** [45] - 3:14, 4:24, 5:4, 6:19, 6:24, 7:13, 7:18, 8:6, 10:10, 11:1, 12:4, 12:13,

13:6, 14:8, 25:20, 25:24, 29:4, 29:16, 29:19, 33:15, 34:4, 39:7, 39:18, 43:14, 44:2, 51:13, 51:17, 51:20, 55:18, 59:4, 59:6, 65:6, 72:5, 72:10, 73:9, 77:17, 77:21, 77:23, 78:4, 78:7, 78:14, 79:1, 84:1, 84:22, 85:11
**MS** [92] - 3:11, 3:17, 3:20, 4:20, 7:11, 8:17, 9:17, 9:20, 10:24, 11:7, 11:10, 11:12, 11:23, 12:7, 12:19, 12:22, 12:25, 13:21, 13:24, 14:4, 14:14, 14:23, 15:1, 15:11, 16:17, 20:21, 20:22, 23:14, 23:16, 24:5, 24:21, 24:23, 25:5, 25:6, 25:14, 26:1, 26:11, 26:14, 26:17, 29:10, 29:11, 29:21, 29:25, 30:12, 31:24, 32:17, 33:9, 33:13, 35:22, 35:25, 36:1, 37:3, 37:7, 37:12, 37:15, 37:16, 39:6, 39:23, 39:24, 41:9, 42:12, 42:21, 48:1, 50:4, 51:2, 51:6, 51:8, 52:6, 52:9, 52:15, 53:6, 53:10, 53:11, 54:3, 54:6, 56:18, 58:25, 78:3, 78:10, 78:15, 78:17, 81:19, 81:24, 82:6, 82:12, 82:15, 82:25, 83:6, 83:20, 83:24, 84:21, 85:9
**multiple** [2] - 46:21
**mumble** [1] - 66:22
**music** [1] - 14:9

**N**

**Naim** [11] - 34:11, 34:12, 34:13, 34:15, 63:13, 65:16, 65:19, 65:21, 75:5
**name** [34] - 15:12, 15:13, 20:2, 20:3, 20:4, 21:1, 21:2, 21:6, 21:9, 23:10, 25:10, 27:17, 36:20, 36:21, 39:9, 40:18, 40:21, 40:22, 42:7, 43:9, 46:18, 53:16, 56:2, 56:4, 56:17,

58:22, 66:14, 73:4, 74:7, 76:16, 76:19, 81:11
**named** [4] - 40:15, 72:23, 73:12, 80:19
**names** [5] - 21:7, 46:21, 46:24, 80:10
**narcotics** [4] - 16:4, 17:24, 17:25, 52:12
**Narcotics** [1] - 6:8
**narrow** [3] - 8:8, 43:15, 51:21
**native** [4] - 14:5, 14:15, 22:14, 22:16
**nature** [7] - 5:18, 29:2, 29:6, 29:14, 31:5, 31:8
**NE** [1] - 1:12
**necessary** [1] - 85:4
**need** [12] - 9:14, 12:24, 13:19, 14:12, 18:20, 24:3, 42:23, 48:10, 52:4, 55:7, 55:16, 57:25
**needed** [1] - 9:25
**needs** [3] - 5:17, 26:16, 44:17
**negro** [1] - 41:25
**never** [6] - 64:1, 64:18, 65:1, 75:13, 75:14
**new** [2] - 26:5, 54:10
**next** [2] - 84:16, 85:1
**nickname** [4] - 47:16, 58:21, 73:3, 74:3
**night** [2] - 41:13, 43:1
**nine** [1] - 33:2
**Nos** [1] - 22:8
**noted** [1] - 8:19
**notes** [1] - 85:21
**nothing** [7] - 44:24, 67:1, 67:13, 67:24, 69:25, 78:1, 85:9
**notice** [3] - 8:11, 11:14, 11:24
**Nueva** [1] - 17:16
**number** [1] - 73:7
**numbers** [1] - 45:6
**numerous** [1] - 16:6
**NW** [3] - 1:16, 1:24, 86:3

## O

**oath** [2] - 51:23, 59:11
**object** [8] - 13:8, 29:16, 29:17, 33:18, 43:14, 44:2, 51:17, 52:3
**objecting** [2] - 8:7
**objection** [8] - 8:9,

10:5, 12:3, 12:4, 12:11, 12:12, 13:3, 79:1
**observe** [1] - 57:2
**obvious** [1] - 31:15
**obviously** [1] - 48:15
**occurred** [1] - 36:6
**October** [5] - 21:23, 44:13, 47:1, 49:6, 49:10
**OF** [6] - 1:1, 1:2, 1:8, 1:16, 1:19, 85:17
**offense** [6] - 7:4, 7:6, 7:8, 7:15, 10:12, 10:16
**offenses** [2] - 15:23, 15:24
**offer** [3] - 13:14, 44:19, 54:2
**office** [1] - 69:21
**OFFICE** [2] - 1:16, 1:19
**Office** [1] - 6:9
**officer** [1] - 65:4
**OFFICIAL** [1] - 85:17
**Official** [1] - 1:23
**official** [1] - 86:2
**often** [1] - 27:21
**old** [1] - 66:22
**once** [1] - 18:22
**one** [21] - 7:24, 11:6, 11:17, 20:23, 21:3, 25:18, 45:24, 50:9, 54:25, 56:20, 63:5, 67:21, 70:3, 70:14, 73:6, 74:18, 75:2, 75:11, 77:1, 82:15, 83:22
**ones** [3] - 54:12, 55:2
**open** [2] - 14:21, 84:2
**opinion** [1] - 83:10
**opportunity** [3] - 6:16, 18:9, 21:24
**orange** [1] - 23:24
**order** [4] - 19:3, 21:16, 66:8, 84:25
**orders** [1] - 21:18
**organizations** [3] - 17:3, 17:23, 67:22
**original** [2] - 54:12, 54:13
**Oseguera** [11] - 27:2, 46:13, 46:16, 46:18, 47:1, 48:21, 49:16, 49:22, 70:8, 71:14, 79:22
**Oseguera-Gonzalez** [8] - 27:2, 46:16, 46:18, 47:1, 48:21, 49:16, 49:22, 79:22

**otherwise** [3] - 6:17, 13:17, 24:15
**outstanding** [1] - 28:16
**overall** [1] - 19:8
**overruled** [6] - 43:17, 44:9, 55:25, 72:9, 79:4
**owed** [12] - 28:12, 28:14, 28:15, 28:18, 54:23, 65:9, 65:15, 66:14, 66:18, 66:25, 75:5, 80:2
**own** [2] - 13:14, 33:16
**OxyContin** [3] - 50:23, 50:24, 81:4

## P

**package** [1] - 58:12
**packaging** [1] - 58:12
**PAGE** [1] - 2:2
**paid** [10] - 28:22, 31:11, 31:22, 32:15, 34:6, 34:7, 38:7, 38:8, 38:11, 68:6
**Pamurod** [1] - 42:15
**paper** [1] - 8:12
**papers** [7] - 4:22, 46:6, 46:9, 46:10, 73:15, 75:3, 83:2
**paralegal** [1] - 3:18
**part** [15] - 9:10, 16:3, 18:8, 29:6, 29:7, 29:17, 51:14, 59:21, 59:23, 59:25, 63:19, 66:20, 69:8, 69:19, 79:2
**participate** [2] - 59:14, 59:16
**participated** [2] - 60:9, 62:8
**particular** [9] - 6:7, 18:23, 44:8, 44:12, 60:3, 61:5, 64:22, 67:24, 76:19
**particularly** [1] - 83:16
**parties** [7] - 3:5, 3:8, 4:11, 4:12, 84:10, 85:1, 85:4
**parts** [1] - 18:1
**pause** [2] - 30:3, 32:19
**Pause** [6] - 30:7, 51:5, 56:22, 77:22, 78:6
**pay** [2] - 67:20, 68:2
**paying** [1] - 75:4
**payment** [2] - 32:23, 68:15, 80:5
**payments** [2] - 38:19, 38:21, 38:24

**penalty** [1] - 5:23
**Pennsylvania** [1] - 1:16
**people** [12] - 26:3, 53:22, 70:20, 71:4, 73:1, 73:2, 75:11, 76:1, 76:11, 77:3, 84:3
**people's** [1] - 71:14
**perfect** [1] - 44:24
**perhaps** [4] - 9:10, 43:15, 55:22, 84:16
**period** [3] - 27:22, 33:20, 63:22
**permission** [2] - 13:24, 71:19
**person** [31] - 24:4, 24:16, 28:19, 47:2, 47:3, 47:8, 47:11, 47:12, 47:16, 48:10, 49:2, 49:3, 49:14, 49:17, 49:19, 49:21, 50:19, 50:24, 61:9, 61:25, 65:15, 68:10, 70:24, 70:25, 71:13, 75:22, 80:23, 81:3, 81:5
**personal** [5] - 28:4, 28:5, 43:20, 45:12
**perspective** [2] - 8:14, 9:1
**persuade** [2] - 6:17, 78:24
**persuading** [1] - 38:15
**pertaining** [1] - 60:23
**pertains** [3] - 9:15, 39:19, 44:6
**pesos** [2] - 35:9, 45:16
**phone** [1] - 20:12
**photo** [5] - 23:5, 23:18, 23:21, 25:10
**photograph** [2] - 25:3, 25:8
**PICK** [1] - 15:13
**PICKARD** [2] - 2:3, 15:9
**Pickard** [6] - 3:17, 15:2, 15:13, 59:7, 77:23, 77:24
**picked** [1] - 31:2
**pictures** [1] - 19:17
**piece** [1] - 66:14
**Pike** [1] - 1:20
**pin** [8] - 19:25, 20:5, 21:1, 21:2, 21:6, 21:8, 74:18
**Plaintiff** [1] - 1:3
**plan** [1] - 8:17
**plans** [1] - 6:23
**platform** [8] - 19:23,

19:24, 20:1, 20:15, 20:16, 25:11, 27:25, 28:1
**plea** [21] - 4:17, 5:7, 5:15, 6:4, 6:5, 6:8, 7:3, 8:1, 9:4, 9:23, 10:13, 11:14, 11:16, 11:24, 12:1, 23:9, 51:23, 64:9, 64:13, 64:15, 83:18
**pleading** [1] - 8:9
**plus** [1] - 7:25
**point** [5] - 13:11, 53:9, 75:20, 77:1, 83:5
**police** [1] - 65:4
**position** [5] - 4:19, 15:21, 16:2, 71:13, 71:25
**possession** [1] - 47:8
**possible** [2] - 75:2, 76:6
**possibly** [4] - 61:17, 73:5, 75:6, 77:13
**potential** [1] - 5:25
**practices** [1] - 26:7
**precursor** [8] - 35:3, 52:22, 53:13, 53:18, 53:20, 53:24, 58:12, 58:16
**precursors** [1] - 57:3
**predicated** [1] - 7:15
**premised** [1] - 8:21
**preparation** [2] - 59:22, 70:4
**prepare** [1] - 66:8
**prepared** [2] - 13:13, 62:13, 66:1
**presence** [1] - 41:15
**present** [1] - 6:23
**presentence** [2] - 7:3, 10:14
**pressed** [1] - 73:22
**pressure** [3] - 34:12, 34:17, 37:20
**pressuring** [3] - 30:21, 38:20, 41:16
**presuming** [1] - 4:14
**pretend** [1] - 26:12
**pretty** [2] - 9:9, 47:17
**preview** [1] - 13:11
**previously** [2] - 36:6, 38:7
**price** [2] - 45:7, 45:15
**primarily** [2] - 22:2, 28:10, 56:15
**primary** [2] - 60:13, 60:15
**priority** [1] - 17:24
**probable** [1] - 18:23
**problem** [1] - 24:3

proceed [7] - 6:22, 15:8, 20:20, 23:15, 35:20, 35:24, 42:20
proceeding [2] - 4:6, 6:25
proceedings [2] - 65:22, 85:22
process [4] - 5:23, 18:17, 18:19, 74:14
produce [2] - 53:21, 81:4
produced [1] - 55:13
producing [1] - 8:18
production [2] - 51:11, 51:16
professionally [1] - 52:1



proffers [1] - 76:15
profit [1] - 44:23
project [3] - 26:10, 50:24, 50:25
projecting [1] - 26:8
property [1] - 66:14
proposal [1] - 84:17
proposed [3] - 84:11, 84:12, 85:4
proposing [1] - 85:2
prosecution [2] - 18:3, 30:5
prosecutors [4] - 62:9, 69:21, 70:18, 83:12
protect [2] - 58:7, 67:10
provide [2] - 7:4, 83:7
provided [4] - 8:11, 9:1, 45:6, 83:10
provider [1] - 22:16
PSR [2] - 7:15, 7:24
pull [3] - 73:7, 73:9
purchased [1] - 66:14
purpose [1] - 74:10
purposes [2] - 12:6, 44:12
put [6] - 24:9, 24:12, 24:15, 44:22, 54:14, 55:2
putting [1] - 37:20

Q

qualified [1] - 64:21
qualify [1] - 64:24
questioning [1] - 10:3
questions [11] - 24:19, 24:21, 25:21, 26:4,

58:25, 62:17, 65:8, 65:10, 70:6, 70:8, 81:19
quickly [1] - 40:18
quieter [1] - 26:8
quite [5] - 6:4, 6:18, 8:24, 14:10, 81:23

R

raise [2] - 3:25, 44:24
raised [2] - 9:24, 10:4
raising [1] - 6:7
ranked [1] - 57:4
ranking [4] - 18:3, 26:24, 27:3, 57:9
rather [1] - 84:14
RDR [3] - 1:22, 85:19, 86:1
re [2] - 38:8, 83:16
reach [2] - 28:20, 28:23
reached [1] - 79:24
reaching [1] - 53:23
read [54] - 30:16, 30:17, 31:2, 37:18, 37:19, 39:14, 39:15, 39:20, 40:7, 41:10, 41:11, 41:12, 42:14, 42:15, 43:24, 43:25, 44:14, 46:4, 47:19, 47:21, 47:22, 48:3, 48:4, 49:25, 50:1, 53:1, 54:3, 54:7, 54:8, 57:12, 57:13, 59:21, 59:22, 60:11, 60:19, 60:23, 60:25, 62:15, 64:9, 64:11, 65:25, 69:4, 76:21, 81:8, 81:14
reading [5] - 44:8, 69:8, 71:1, 71:11, 72:22
ready [2] - 11:8, 35:15
real [16] - 9:6, 33:11, 33:12, 34:1, 34:2, 35:17, 35:19, 39:1, 63:16, 65:13, 66:19, 66:25, 67:7, 67:9, 69:8, 69:25
really [4] - 10:11, 41:25, 51:25, 71:22
reason [9] - 9:10, 37:9, 53:8, 61:14, 65:12, 66:12, 69:23, 80:19, 81:1
reasonable [2] - 55:23, 73:2
reasoning [1] - 54:1
reasons [1] - 53:24

rebuffed [1] - 52:2
receive [1] - 19:17
received [5] - 12:9, 13:1, 16:10, 27:17, 81:16
receiving [2] - 13:4, 75:17
recognize [2] - 23:17, 25:7
recognized [1] - 40:12
recommend [2] - 7:25, 10:14
record [15] - 3:9, 4:14, 4:18, 8:22, 15:12, 33:10, 42:15, 42:17, 44:12, 47:20, 53:7, 54:4, 72:6, 84:2
recorded [1] - 16:23
records [2] - 76:4, 76:5
recover [1] - 50:12
recovering [1] - 50:13
redirect [2] - 71:9, 78:2
REDIRECT [1] - 78:9
reduce [2] - 8:14, 73:4
reduction [1] - 10:18
refer [2] - 35:11, 53:18
reference [4] - 52:19, 52:20, 58:17, 75:3
referenced [1] - 84:3
referred [7] - 42:3, 46:10, 47:12, 47:14, 55:9, 70:25, 74:7
referring [16] - 26:25, 34:23, 35:16, 35:17, 35:18, 40:4, 40:5, 42:2, 42:5, 46:9, 47:15, 50:16, 55:11, 58:9, 58:21
refers [1] - 58:12
regard [1] - 75:4
regarding [4] - 8:18, 10:3, 16:7, 29:3
regards [1] - 58:6
relate [2] - 49:11, 55:20
related [3] - 16:18, 17:12, 45:20
relates [3] - 53:3, 67:25, 83:10
relating [1] - 65:8
relation [1] - 5:16
relationship [14] - 17:20, 26:22, 29:3, 29:15, 31:6, 31:9, 36:12, 36:16, 40:1, 40:2, 55:23, 57:4, 71:22, 71:23
release [8] - 47:6,

47:7, 49:13, 49:18, 49:19, 80:25, 81:2, 81:5
released [3] - 50:19, 72:14, 81:1
relevance [1] - 44:2
relevant [6] - 43:16, 44:7, 51:19, 52:3, 52:5, 83:14
relieved [1] - 6:10
relieves [1] - 6:5
remain [2] - 80:15, 84:2
remains [1] - 20:5
remedy [3] - 5:5, 5:19, 5:21
remember [6] - 62:25, 65:12, 69:7, 70:8, 71:1, 72:22
remind [3] - 38:3, 38:6, 80:1
renewals [2] - 21:16, 21:17
reopening [1] - 5:6
repaid [3] - 32:9, 80:3, 80:4
repayment [4] - 29:14, 31:14, 31:15, 67:6
repeat [9] - 11:21, 12:24, 29:9, 36:14, 66:20, 66:23, 72:18, 78:16, 78:17
rephrase [1] - 52:6
report [10] - 7:3, 10:14, 62:12, 69:4, 69:7, 70:13, 71:1, 72:22, 76:21, 85:2
REPORTER [1] - 85:17
reporter [1] - 40:17
Reporter [3] - 1:22, 1:23, 86:2
reports [2] - 16:7, 75:23
represent [1] - 12:17
representing [1] - 35:7
request [2] - 11:13, 11:24
rescheduling [2] - 38:9, 85:5
resolve [1] - 5:10
respect [4] - 13:8, 31:14, 63:13, 72:16
respectful [1] - 83:4
response [2] - 83:4, 83:7
restriction [1] - 8:4
resulted [1] - 18:3
reveal [6] - 25:16, 28:2, 29:2, 29:5,

29:13, 31:5
revealed [2] - 24:25, 26:18
review [30] - 4:17, 6:7, 16:25, 17:11, 21:24, 22:7, 29:1, 31:4, 31:7, 32:8, 32:21, 36:15, 39:25, 42:1, 42:9, 43:3, 45:14, 45:19, 48:19, 49:15, 51:9, 52:10, 56:2, 63:7, 63:9, 75:25, 78:11, 78:18
reviewed [4] - 16:22, 21:18, 29:13, 67:3
reviewing [3] - 34:21, 80:8, 83:17
revisited [1] - 5:22
rf@rfeitellaw.com [1] - 1:18
Rhee [7] - 3:20, 4:22, 7:12, 10:6, 25:24, 71:20, 77:18
RHEE [3] - 1:19, 1:19, 3:20
ribs [1] - 50:14
ride [3] - 55:6, 55:9, 55:11
Robert [1] - 3:22
ROBERT [2] - 1:15, 1:16
Rodriguez [3] - 36:19, 40:9, 40:25
role [15] - 9:16, 10:1, 10:12, 10:14, 10:15, 10:17, 29:14, 29:24, 52:5, 52:11, 53:4, 54:1, 82:19, 82:21, 82:23
Roman [1] - 3:6
room [7] - 12:21, 30:9, 55:7, 55:16, 55:17, 63:24
Room [2] - 1:23, 86:3
Ruben [23] - 27:2, 46:13, 46:16, 46:18, 46:20, 46:25, 47:3, 47:5, 48:21, 49:2, 49:16, 49:19, 49:22, 50:16, 57:8, 70:8, 71:14, 79:22, 79:24, 80:22, 80:25, 81:2
Ruben's [1] - 71:4
Rule [1] - 8:20
run [1] - 20:7

S

safety [1] - 10:18
saga [1] - 84:7

**sake** [1] - 74:10
**sale** [1] - 39:1
**Salime** [2] - 72:23, 73:3
**SALIME** [1] - 73:3
**Salvador** [5] - 49:21, 80:19, 80:24, 81:3
**Sandi** [1] - 3:20
**SANDI** [2] - 1:19, 1:19
**sandirheelaw@gmail .com** [1] - 1:21
**Santy** [3] - 43:10, 43:25, 44:14
**satisfied** [1] - 34:5
**save** [1] - 70:23
**scale** [2] - 50:24, 81:4
**schedule** [2] - 84:11, 85:3
**scheduled** [1] - 4:7
**scheduling** [1] - 84:17
**scope** [1] - 79:1
**screen** [18] - 23:10, 24:1, 24:13, 36:20, 36:21, 39:9, 40:21, 40:22, 43:8, 46:18, 46:21, 46:24, 53:16, 73:8, 73:17, 76:16, 76:19
**sealed** [1] - 30:4
**SEALED** [1] - 1:6
**second** [9] - 11:17, 25:18, 27:3, 29:17, 30:3, 57:9, 66:13, 82:9, 83:22
**second-highest** [1] - 57:9
**second-highest-ranking** [1] - 27:3
**see** [18] - 7:2, 11:11, 13:19, 23:21, 24:1, 24:14, 24:16, 24:19, 42:24, 48:11, 48:18, 52:19, 55:22, 57:21, 57:24, 58:7, 61:16, 73:17
**seem** [1] - 5:7
**seized** [1] - 9:3
**selected** [3] - 63:2, 63:5, 77:3
**sell** [1] - 58:1
**selves** [1] - 84:16
**send** [4] - 34:19, 35:14, 37:23, 58:6
**sending** [2] - 23:1, 25:10
**sent** [5] - 23:4, 23:18, 56:1, 56:7, 81:11
**sentencing** [8] - 4:6, 4:10, 6:12, 83:13, 84:12, 84:19, 85:5,

85:6
**September** [1] - 52:18
**series** [1] - 62:24
**serve** [1] - 80:24
**session** [8] - 62:9, 62:12, 69:5, 69:7, 69:20, 70:11, 72:23, 82:15
**sessions** [2] - 82:10, 82:13
**set** [10] - 36:6, 38:7, 50:10, 50:17, 50:18, 55:6, 55:10, 55:15, 67:24, 84:11
**seven** [1] - 84:2
**several** [1] - 37:22
**shift** [2] - 43:7, 46:12
**short** [6] - 52:20, 53:20, 53:25, 54:11, 54:15, 54:22
**show** [3] - 30:1, 31:24, 36:24, 39:12, 43:22, 49:7, 49:24, 51:10, 51:14, 52:15, 57:10, 81:7, 81:13
**showed** [3] - 9:7, 36:11
**showing** [12] - 23:12, 24:5, 24:6, 30:13, 32:4, 32:5, 32:17, 36:2, 42:12, 45:23, 47:9, 56:9
**shows** [1] - 33:10
**sic** [2] - 41:2, 54:13
**side** [3] - 7:2, 10:2, 73:14
**sides** [1] - 26:7
**sign** [1] - 35:15
**simple** [1] - 33:20
**sister** [4] - 72:23, 74:11, 74:22, 77:9
**sisters** [2] - 72:17, 72:20
**sit** [4] - 9:3, 10:21, 63:23, 69:23
**sitting** [2] - 23:23, 77:8
**situated** [1] - 50:8
**situation** [6] - 53:22, 63:16, 71:20, 71:23, 72:1, 72:4
**six** [6] - 18:13, 34:7, 63:22, 68:2, 68:6, 80:4
**six-month** [1] - 63:22
**slowly** [2] - 29:8, 40:17
**small** [1] - 44:23
**smart** [2] - 47:16, 47:17
**sold** [1] - 68:7

**someone** [9] - 47:14, 63:12, 65:9, 67:11, 68:7, 72:13, 73:3, 73:12, 77:5
**sometime** [1] - 8:13
**sometimes** [2] - 77:14, 80:15
**somewhat** [1] - 9:8
**son** [1] - 27:4
**sorry** [22] - 16:15, 25:20, 29:4, 33:15, 36:14, 38:2, 40:16, 41:20, 47:7, 48:3, 48:19, 51:13, 57:14, 63:21, 65:16, 66:20, 67:17, 71:7, 72:18, 78:14, 78:15
**sort** [2] - 66:4, 68:13
**Spanish** [2] - 22:3, 64:4
**spare** [1] - 37:4
**special** [2] - 15:22, 62:21
**Special** [15] - 3:17, 15:2, 59:7, 60:17, 60:20, 61:4, 61:7, 61:17, 61:24, 63:4, 64:6, 75:16, 77:24, 83:9, 83:12
**SPECIAL** [2] - 2:3, 15:9
**Specialty** [1] - 8:20
**specific** [2] - 19:25, 36:9
**spell** [1] - 41:1
**SPENCER** [1] - 1:11
**spend** [1] - 37:8
**spoken** [2] - 60:11, 60:14
**spoon** [1] - 77:5
**squares** [2] - 44:16, 45:3, 45:10
**stand** [1] - 15:2
**standard** [2] - 6:8, 9:12
**start** [9] - 3:10, 4:9, 11:20, 11:22, 15:17, 17:17, 47:20, 50:6
**started** [2] - 17:18, 60:16
**starting** [1] - 7:8
**starts** [2] - 30:9, 52:19
**state** [4] - 15:12, 64:19, 64:20, 65:2
**statement** [7] - 11:15, 11:25, 56:19, 64:11, 82:22, 83:11, 83:15
**statements** [1] - 69:20
**STATES** [3] - 1:1, 1:2, 1:9

**States** [11] - 1:11, 3:3, 3:12, 12:17, 16:5, 16:20, 17:25, 28:9, 66:5, 69:13, 86:2
**status** [1] - 85:2
**stenographic** [1] - 85:21
**step** [2] - 82:1, 82:9
**steps** [2] - 80:9, 80:12
**still** [7] - 8:17, 13:19, 32:15, 38:10, 38:14, 49:13, 61:7
**storage** [1] - 55:17
**stories** [1] - 37:24
**Street** [1] - 1:12
**strike** [2] - 55:18, 56:18
**strong** [1] - 9:9
**struck** [1] - 72:6
**stuff** [1] - 41:17
**subject** [2] - 20:17, 29:23
**submission** [1] - 85:3
**submit** [3] - 84:3, 84:17, 85:1
**submitted** [2] - 60:19, 60:20
**substances** [2] - 16:19, 52:13
**sufficiency** [2] - 9:2, 10:3
**sufficient** [1] - 6:21
**suggests** [1] - 5:17
**Suite** [2] - 1:12, 1:20
**sum** [5] - 33:7, 34:25, 35:1, 35:11, 35:12
**supplemental** [1] - 4:13
**support** [2] - 8:23, 66:1
**supposably** [1] - 28:12
**supposed** [5] - 31:16, 37:10, 38:8, 38:11, 66:25
**supposedly** [1] - 37:21
**surprised** [4] - 74:2, 74:4, 74:5, 74:8
**surrounding** [1] - 72:12
**sustained** [1] - 29:18
**sworn** [1] - 3:7
**Sworn** [1] - 15:9
**symmetry** [1] - 5:22
**system** [3] - 20:14, 25:11, 55:17

# T

**T.M** [2] - 53:16, 54:8
**T3** [1] - 16:9
**table** [6] - 3:13, 3:16, 3:18, 23:23, 24:1, 30:5
**Target** [17] - 21:5, 21:10, 21:21, 21:25, 22:22, 22:23, 23:1, 23:10, 25:3, 25:12, 25:13, 27:23, 46:20, 60:23, 61:1, 61:2, 61:5
**target** [3] - 21:8, 75:22, 76:2
**targeted** [2] - 19:20, 20:11
**team** [2] - 9:19, 50:14
**techniques** [1] - 17:9
**technological** [1] - 24:4
**technology** [1] - 30:9
**Tella** [10] - 65:16, 65:19, 65:21, 66:1, 66:4, 66:9, 66:14, 68:7, 68:10, 70:3
**Tella's** [1] - 68:23
**ten** [1] - 84:14
**Teresa** [1] - 3:6
**terminology** [1] - 17:2
**terms** [5] - 5:6, 6:5, 6:11, 43:18, 77:11
**testified** [3] - 59:11, 64:18, 64:19
**testify** [6] - 64:21, 65:2, 66:21, 69:12, 69:16, 76:10, 77:3, 82:17
**testimony** [7] - 8:15, 8:18, 33:16, 55:19, 60:5, 66:8, 82:3
**tests** [1] - 58:1
**text** [9] - 19:15, 19:16, 19:18, 20:11, 20:12, 27:19, 31:22, 40:3, 47:4
**THE** [189] - 1:1, 1:1, 1:9, 3:2, 3:15, 3:19, 3:23, 4:3, 4:5, 4:21, 5:2, 6:2, 6:20, 7:1, 7:12, 7:14, 7:21, 8:10, 8:24, 9:18, 9:21, 10:11, 10:25, 11:2, 11:8, 11:11, 11:17, 11:18, 11:20, 12:3, 12:5, 12:12, 12:16, 12:20, 12:23, 13:5, 13:16, 13:22, 13:25, 14:1, 14:2,

14:7, 14:12, 14:19,
14:24, 15:3, 15:4,
15:5, 16:11, 16:14,
16:16, 20:7, 20:9,
20:10, 20:12, 20:15,
20:18, 20:19, 23:15,
23:25, 24:7, 24:9,
24:11, 24:22, 25:2,
25:12, 25:13, 25:18,
25:23, 26:3, 26:12,
26:15, 29:8, 29:18,
29:20, 29:22, 30:3,
30:8, 32:19, 32:22,
32:25, 33:3, 33:4,
33:6, 33:12, 33:14,
33:19, 33:23, 33:24,
33:25, 34:2, 34:9,
34:13, 34:15, 34:16,
34:17, 34:20, 34:21,
34:24, 35:1, 35:2,
35:6, 35:8, 35:13,
35:17, 35:20, 35:23,
37:1, 37:4, 37:8,
37:13, 38:17, 38:23,
39:1, 39:4, 39:5,
39:22, 40:5, 40:6,
40:14, 40:16, 40:17,
40:20, 40:24, 40:25,
41:1, 41:2, 41:3,
41:4, 41:5, 41:6,
41:7, 41:8, 42:17,
42:19, 42:20, 43:17,
43:19, 44:9, 44:11,
44:13, 47:11, 47:13,
47:23, 47:24, 48:2,
50:2, 50:5, 51:4,
51:7, 51:15, 51:18,
52:4, 52:8, 53:2,
53:7, 53:15, 54:5,
55:25, 56:21, 59:2,
64:1, 64:3, 65:2,
65:4, 65:5, 72:9,
77:20, 78:2, 78:5,
78:8, 78:16, 79:4,
79:7, 81:20, 81:21,
81:22, 81:25, 82:7,
82:13, 82:18, 83:2,
83:19, 83:21, 83:25,
84:10, 84:24, 85:10,
85:13
themselves [2] -
19:22, 68:17
theory [1] - 6:25
they've [4] - 26:5,
28:5, 37:24, 43:13
thousands [2] - 76:1,
76:5
thread [1] - 47:4
three [2] - 9:21, 85:4
Thursday [6] - 30:20,

30:23, 31:16, 57:19,
57:21, 58:7
title [1] - 15:21
Title [2] - 15:24, 61:2
today [23] - 6:22, 7:24,
14:11, 23:22, 37:21,
59:9, 59:22, 60:5,
61:12, 62:4, 63:3,
66:8, 69:23, 70:4,
72:8, 74:11, 74:20,
77:2, 77:25, 83:7,
84:9, 85:7
together [2] - 50:15,
55:3
tomorrow [4] - 43:1,
54:10, 55:6, 55:15
tone [9] - 78:12, 78:19,
78:21, 78:23, 79:2,
79:5, 79:7, 79:10,
79:20
top [1] - 54:17
topic [1] - 70:14
total [2] - 19:21, 30:24
towards [1] - 12:23
town [2] - 42:25, 43:1
traffic [4] - 8:25, 17:24
traffickers [3] - 45:11,
73:1, 77:12
trafficking [12] - 9:8,
9:13, 9:15, 9:23,
10:4, 16:19, 17:2,
18:21, 43:20, 45:21,
67:22, 67:25
training [7] - 16:1,
16:25, 45:2, 46:8,
56:13, 58:8, 58:10
transaction [13] - 9:6,
33:11, 33:12, 34:1,
34:2, 65:13, 66:16,
66:19, 66:25, 67:7,
68:18, 69:9, 69:25
transactions [2] -
39:2, 67:25
transcript [5] - 11:15,
12:1, 22:18, 85:21,
85:22
TRANSCRIPT [1] - 1:8
transcripted [1] -
14:16
transcription [1] -
14:6
transcripts [1] - 22:17
transferred [1] - 63:23
translated [1] - 14:17,
22:4, 22:15
translation [2] - 14:6,
22:19
translators [1] - 63:25
transportation [3] -
55:12, 55:17, 55:22

travel [1] - 84:13
traveling [1] - 60:4
treaty [1] - 10:8
tried [2] - 51:21, 71:3
true [3] - 77:9, 85:20,
85:22
truth [4] - 41:22, 48:8,
48:10, 77:4
try [8] - 6:16, 61:16,
64:24, 70:23, 72:13,
76:11, 76:14, 77:4
trying [2] - 28:24, 79:3
turn [4] - 24:24, 25:15,
29:22, 52:25
turning [1] - 80:18
two [7] - 7:25, 13:9,
17:21, 28:3, 29:17,
46:23, 84:3
two-part [1] - 29:17
type [5] - 15:23, 16:8,
35:5, 50:25, 79:20
types [3] - 16:8, 19:1,
19:10

U

U.S [4] - 1:23, 6:9,
45:15, 45:17
U.S./Mexican [1] -
45:7
ultimately [1] - 34:5
unable [1] - 64:25
under [10] - 7:5, 7:25,
10:12, 34:11, 34:17,
51:23, 59:11, 64:16,
82:20
underlying [8] - 59:14,
63:12, 65:12, 65:22,
66:12, 66:16, 68:18,
69:24
understood [1] - 50:23
unidentified [1] -
80:15
unique [1] - 20:6
UNITED [3] - 1:1, 1:2,
1:9
United [11] - 1:11, 3:3,
3:12, 12:17, 16:5,
16:20, 17:25, 28:9,
66:5, 69:12, 86:2
unknown [2] - 69:1,
80:12
unless [2] - 9:15, 77:5
up [29] - 10:17, 14:13,
15:6, 18:24, 23:25,
24:12, 24:15, 24:17,
26:1, 26:6, 29:5,
31:2, 41:19, 41:20,
42:22, 44:20, 50:10,
50:17, 50:18, 55:2,

66:10, 69:15, 73:7,
73:9, 73:17, 79:3,
83:8, 84:11
update [1] - 28:21
upend [1] - 6:24
uphill [2] - 6:17, 6:21
user [32] - 20:2, 20:3,
20:4, 21:1, 21:2,
21:6, 21:7, 21:8,
22:21, 22:23, 23:3,
23:5, 23:9, 23:19,
25:10, 27:17, 27:19,
40:22, 42:7, 53:16,
56:2, 56:4, 56:17,
69:1, 75:15, 75:18,
76:16, 76:19, 80:9,
81:11
users [4] - 19:22,
75:18, 80:13, 80:15

V

VA [1] - 1:20
vacations [1] - 84:13
Valencia [24] - 27:7,
27:10, 27:13, 27:14,
27:21, 31:13, 36:13,
43:8, 43:9, 58:23,
65:9, 65:15, 66:15,
67:5, 67:11, 68:15,
74:14, 78:13, 78:20,
79:6, 79:16, 79:19,
80:3, 80:5
Valencia-Gonzalez [5]
- 65:9, 66:15, 67:11,
68:15, 74:14
valve [1] - 10:18
version [2] - 14:15,
72:11
versions [3] - 22:14,
22:16, 22:17
victims [1] - 70:24
Victor [4] - 36:19,
40:9, 40:23, 40:24
view [3] - 82:8, 82:19,
82:23
viewed [1] - 49:12
violating [1] - 8:3
voice [4] - 12:17,
14:13, 19:17, 26:8
volunteered [1] -
68:21
volunteering [1] - 68:4

W

wait [3] - 83:2
walk [1] - 30:9
Washington [4] - 1:13,
1:17, 1:24, 86:4
watching [1] - 84:14

ways [1] - 22:25
wearing [1] - 23:23
Wednesday [2] -
84:16, 85:1
week [2] - 8:13, 55:3
weekly [2] - 27:24,
27:25
weight [2] - 7:16, 7:19
weird [2] - 54:12,
54:18
welcome [1] - 57:20
whole [3] - 6:12,
50:14, 82:4
wife [2] - 71:18, 72:2
willing [2] - 31:16,
58:7
wire [1] - 63:24
wiretap [18] - 13:15,
16:9, 18:15, 18:18,
18:19, 19:7, 20:7,
25:9, 59:14, 60:10,
60:11, 60:19, 60:20,
60:23, 60:25, 63:18,
63:20, 64:2
wiretaps [1] - 61:25
withdrawn [1] - 10:5
WITNESS [38] - 2:2,
15:4, 16:14, 20:9,
20:12, 20:18, 25:13,
32:22, 33:3, 33:6,
33:23, 33:25, 34:13,
34:16, 34:20, 34:24,
35:2, 35:8, 35:17,
38:23, 39:4, 40:6,
40:16, 40:20, 40:25,
41:2, 41:4, 41:6,
41:8, 42:19, 43:19,
44:13, 47:13, 47:23,
53:15, 64:3, 65:4,
81:21
witness [10] - 11:6,
11:9, 14:25, 26:4,
26:6, 26:8, 33:17,
37:5, 37:14, 69:17
witnesses [3] - 11:5,
83:23, 83:24
word [9] - 33:6, 34:25,
35:6, 35:12, 46:10,
52:22, 55:12, 58:15,
70:3
words [3] - 35:3, 35:4
world [1] - 18:1
wow [1] - 30:10
write [1] - 18:24
writing [1] - 63:19
written [2] - 16:6,
70:13

| **Y** |
|---|
| **yesterday** [1] - 8:11 |
| **you!** [1] - 42:22 |
| **you..** [1] - 54:11 |
| **younger** [1] - 25:25 |
| **yourself** [1] - 63:18 |
| **yourselves** [1] - 3:9 |

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL NO. 17-CR-094 (BAH)** |
| **v.** | █████████ |
| **JUAN MANUEL ABOUZAID EL BAYEH,** **also known as "El Escorpion," "El Hermano," "Nene," and "El Arabe,"** | |
| **Defendant.** | |

## GOVERNMENT'S REPLY TO DEFENDANT'S POST HEARING SUBMISSION

The United States, for the reasons described below, and its supplemental memorandum on the application of the U.S. Sentencing Guidelines, respectfully requests the Court find that there is sufficient evidence in the record to establish by a preponderance of evidence that the Defendant had an aggravating role in the offense which increases the base offense level by two levels under U.S.S.G. § 3B1.1(c).

On September 5, 2025, Juan Manuel Abouzaid El Bayeh ("the Defendant") submitted a post-hearing submission, asking the Court to find that the Defendant did not exercise sufficient "control" over another person in the conspiracy to support an aggravating role enhancement. ECF No. 61. The Defendant's arguments are unpersuasive because ██████████████████████ ████████████████████████████████████████████ (II) the evidence was properly considered by the Government and presented to the Court; and (III) the evidence supports a two-level enhancement for aggravating role.

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

1





## II.    The Evidence was Properly Considered by the Government and Presented to the Court.

The Defendant argues that the Government relied on no new or additional information at the hearing, but instead re-interpreted facts long known to the Government. ECF No. 61 at 2. ███

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████    The Sentencing Guidelines instruct, "[i]n determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." U.S.S.G. § 1B1.4. The Government, and the Court, are not limited to only considering the facts outlined in the ████ Plea Agreement and Statement of Facts. U.S.S.G. § 6A1.3(a) ("When any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present information to the court regarding that factor.").

The Defendant next takes issue with the Government not calling the "lead agent on the CJNG investigation" to testify, ECF No. 61 at 4-6, but Drug Enforcement Administration (DEA) Special Agent (SA) Brent Pickard is a credible and reliable witness with the requisite training and

experience to have testified at this hearing. Since joining DEA's Los Angeles Field Division in 2023, SA Pickard has been investigating international drug trafficking cases with a focus on the distribution of narcotics from Colombia to Mexico, then into the United States. Evid. Hr'g Tr. at 15-16. Reviewing intercepted and consensually recorded communications of Mexican drug traffickers is a routine part of SA Pickard's job and he is familiar with their common terminology. *Id.* at 16-17. SA Pickard is assigned to the Defendant's case and has studied the investigation files. *Id.* at 17. Through SA Pickard's testimony, the Government introduced fifteen exhibits consisting of Blackberry Messenger messages into evidence. The Defendant does not contest the authenticity or translations of the exhibits. ECF No. 61 at 3.

### III.    The Evidence Supports a Two-Level Aggravating Role Enhancement.

Finally, the Defendant argues that the Government failed to establish, by a preponderance of the evidence, that the defendant exercised control over another person in the conspiracy. ECF No. 61 at 6.

The Defendant cited *United States v. Vega*, which held that "to justify the three-level managerial-role enhancement, the Government had to prove by a preponderance of the evidence that Martinez Vega (i) managed or supervised (ii) at least one 'participant' who was criminally responsible for an offense (iii) in a criminal activity that involved five or more participants or was otherwise extensive." 826 F.3d 514, 539 (D.C. Cir. 2016). Assuming the same requirement applies to a two-level aggravating role enhancement, the evidence introduced by the Government suffices. For example, the Defendant exercised managerial function over at least one participant of the criminal conspiracy by providing names of precursor chemicals to be purchased and then directing the same individual to pick up money, likely for the purchase of the chemicals. *See* ECF No. 60 (Gov't Supp. Mem.) at 16 (citing Gov't Exs. 11 and 18). For another example, at least one

individual sought access to a top cartel leader, referring to him by his known moniker, "the boss," through the Defendant, corroborating his managerial role. *Id.* at 18 (citing Gov't Ex. 9).

The Defendant also relied on *United States v. Quigley*, 373 F.3d 133 (D.C. Cir. 2004) for the proposition that being a "hub" or "orchestrator" of a conspiracy is not sufficient without specific evidence of control over others. *Id.* at 7. *Quigley* is distinct from this case. In *Quigley*, the defendant was a real estate agent who "illegally obtain[ed] [Fair Housing Authority] insured mortgages based on fraudulently inflated appraisals and falsely qualified buyers . . . in approximately 42 home sales." *Id.* at 135. The *Quigley* court was considering whether it was appropriate to apply a four-level enhancement to a real estate agent who was a "hub" or "orchestrator" in a criminal conspiracy which involved a web of co-conspirators with clearly delineated roles in the conspiracy—property buyers, property appraisers, and real estate agent. *Id.* at 139-140. Notably, while the *Quigley* court acknowledged the "relative responsibility" and "three relevant tiers [in the Sentencing Guidelines] for conspiracies that are extensive," the court never addressed the two-level enhancement instead focusing on the appropriateness of the lower court applying a four-level enhancement, despite finding that the defendant was not a manager or supervisor subject to a three-level enhancement. *Id.* at 139-140.

Unlike the fraudulent scheme in *Quigley*, in this case, the Defendant is part of one of the world's largest drug trafficking organizations—which has various levels of leadership—and took on multiple organizational and managerial roles to advance the overall criminal goals of the organization: he negotiated the repayment of his brother-in-law's debt to Gonzalez Valencia, which was satisfied with 6 kilograms of cocaine; he helped one trafficker recover 392 kilograms of stolen cocaine; and he put another trafficker in contact with someone who could transport over 60 kilograms of cocaine in a car with a hidden compartment. *See* SOF ¶¶ 3, 4. As already discussed,

5

the Defendant also sent messages about precursor chemicals to make methamphetamine and setting the price of a distribution amount of cocaine. *See* Gov't. Ex. 10, 16, 18, 19. Significantly, the Defendant also passed messages directly from Menchito to a subordinate in the organization who was supposed to begin working for Menchito. *See* Govt. Ex. 14.

To support his argument that being an intermediary alone is not sufficient to apply a leadership enhancement, the Defendant cites to *United States v. Colon*, 919 F.3d 510, 518 (7th Cir. 2019). ECF No. 61 at 8. But that case supports the Government's argument in stating "an aggravating role adjustment is appropriate for a middleman only when coupled with other facts indicating the defendant exercised some control over others involved in the crime or was responsible for organizing others in carrying out the operation." *Id.* at 518 (internal citations omitted). As analyzed in the Government's post-hearing submission, there is ample evidence, including the Defendant's Statement of Facts and the content of his Blackberry Messenger messages introduced at the hearing, that the Defendant occupied a role in which he organized others in carrying out the conspiracy. The Defendant also exerted influence, or exercised some type of control, over the decision-making of multiple senior cartel leaders, including when he successfully advocated for the extension of a deadline for repayment of a debt owed to Abigael Gonzalez Valencia. Evid. Hr'g Tr. at 32, 34, 36; Gov't Exs. 5-7, and successfully convinced the second-in-command of the CJNG to release a hostage. Evid. Hr'g Tr. at 49; Gov't Ex. 12-14. It is immaterial whether he relied on truth or fiction to secure the release of the hostage; what matters is that he was able to influence the ultimate decision-maker of a powerful cartel. Importantly, this was not an isolated event. According to the Defendant's own statements to a CJNG "commander," he was able to advise Abigael Gonzalez Valencia on properly crediting cartel members for their

contributions to the cartel. The Government submits that such evidence has to suggest that the Defendant himself was part of the cartel's decision-making function.

In summary, the evidence in the record clearly supports the application of a two-level increase to the base offense level under U.S.S.G. § 3B1.1(c).

Dated: September 12, 2025

Respectfully submitted,

SOPHIA SUAREZ, Acting Chief
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice

By:     / s / *Colleen King*
Colleen King
Douglas Meisel
Lernik Begian
Trial Attorneys
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
Washington, D.C. 20530
Telephone: (202) 616-2200

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of this motion has been sent via email to counsel for the Defendant, this 12th day of September 2025.

By:    <u>*/s/   Colleen King*</u>
Colleen King
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 17-CR-094 (BAH)** |
| **JUAN MANUEL ABOUZAID EL BAYEH,** also known as "El Escorpion," "El Hermano," "Nene," and "El Arabe" | ▮▮▮▮▮▮▮ |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States, by and through its undersigned counsel, respectfully submits this sentencing memorandum for the above captioned matter. On August 15, 2024, Juan Manuel Abouzaid El Bayeh, also known as "El Escorpion," "El Hermano," "Nene," and "El Arabe," (the "Defendant") pled guilty pursuant to a Plea Agreement to one count of conspiracy to distribute cocaine for unlawful importation into the United States. ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ For the reasons set forth herein, the Government requests that this Court sentence the Defendant to 262 months imprisonment, five years of supervised release, and a mandatory $100 special assessment. The Government's recommended sentence is the low end of the U.S. Sentencing Guidelines ("Guidelines" or "U.S.S.G") range as calculated by the Government, which is 262 to 327 months. ▮▮▮▮▮▮▮▮▮ The Defendant is subject to a ten-year statutory mandatory minimum sentence.

---

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

I.    **INTRODUCTION**

During the course and in furtherance of the conspiracy, the Defendant was involved in the coordination and transport of at least 526 kilograms of cocaine within Mexico, destined for importation into the United States. The Defendant was a close advisor to top leaders of two interconnected Mexico-based cartels—Los Cuinis and the Cártel de Jalisco Nueva Generación ("CJNG") with Los Cuinis serving as the financier of both cartels. Together, they import staggering quantities of controlled substances, including cocaine and methamphetamine, into the United States, and engage in murders, kidnappings, torture, corruption, and other tactics to further their criminal objectives.

The Government's recommended 262-month sentence reflects the severity of the Defendant's criminal conduct and is proportional to his organization position within one of the world's most violent and powerful criminal organizations.

II.    **BACKGROUND**

A.  **Procedural History**

On May 10, 2017, a federal grand jury returned a one-count Indictment charging the Defendant with conspiracy to distribute five kilograms or more of cocaine and five hundred grams or more of methamphetamine, knowing and intending that the cocaine would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(B), 960(b)(1)(H), 963 and 18 U.S.C. § 2. Dkt. No. 1.

On March 10, 2021, Mexican authorities arrested the Defendant pursuant to an arrest warrant issued on a U.S. extradition request. The Defendant remained detained in Mexico until his extradition to the United States on April 26, 2024. By the time of his sentencing, the Defendant would have been in custody for 55 months and 14 days related to his U.S. charge.

On April 29, 2024, the Defendant was arraigned in the U.S. District Court for the District of Columbia. On August 15, 2024, the Defendant pleaded guilty to Count one of the Indictment, pursuant to a Plea Agreement. Dkt. No. 22 ("PA").



On July 18, 2025, the Government presented evidence on the contested issue of the Defendant's role as a manager or supervisor within the meaning of U.S.S.G. § 3B1.1(c). The parties subsequently provided supplemental briefing. *See* Dkt. Nos. 60-61, 64-65.

### B.  Offense Conduct

The following facts are drawn from the Joint Statement of Stipulated Facts, Dkt. No. 23, the Presentence Investigation Report, Dkt. No. 42 ("PSR"), and the pre-sentencing evidentiary hearing held before this Court on July 18, 2025.

From at least in or about 2012 and continuing thereafter up to and including May 10, 2017, within the countries of Mexico, the United States, and elsewhere, the Defendant conspired with

---

others to distribute more than 526 kilograms of cocaine and at least 45 kilograms of methamphetamine, intending and knowing that it would unlawfully be imported into the United States. Dkt. No. 23 ¶¶ 1-2, 8-9, 11. The Defendant was involved in arranging or attempting to arrange the sale or trade of methamphetamine and the chemicals used to manufacture methamphetamine in Mexico. *Id.* ¶¶ 5, 8. The Defendant personally arranged or attempted to arrange the sale of at least 74 kilograms of cocaine. *Id.* ¶ 3. He successfully negotiated the trade of six kilograms of cocaine between his brother-in-law and a leader of Los Cuinis to satisfy a debt. *Id.* The Defendant also attempted to arrange the trade of a house for $90,000 worth of methamphetamine. *Id.* ¶ 5. The Defendant also assisted others with negotiating and transporting cocaine shipments, such as assisting one trafficker who was attempting to recover 392 kilograms of cocaine that had been stolen and putting another trafficker in contact with someone who could transport 60 kilograms of cocaine. *Id.* ¶ 4. The Defendant was aware that the cocaine and methamphetamine would be illegally imported into the United States for further distribution. *Id.* ¶ 9.

During the investigation, DEA intercepted BlackBerry Messenger ("BBM") communications sent or received from a device used by the Defendant. Evid. Hr'g Tr. at 19-23. These messages revealed that the Defendant was in close contact with several top cartel leaders and demonstrated his unique position within the hierarchy of CJNG and Los Cuinis. The Defendant was in frequent communication with Abigael Gonalez Valencia ("Abigael"), a principal leader of the Los Cuinis, particularly during the time when he successfully extended the repayment deadline of his brother-in-law's debt to Abigael. Evid. Hr'g Tr. at 27. Intercepted messages showed he spoke about providing advice to Abigael about the importance of acknowledging and rewarding good work of subordinates, *id.* at 41, and further showed at least one individual seeking a meeting

4

with Abigael through the Defendant. *Id.* at 42-43. The Defendant also had direct relationship with Jose Gonzalez Valencia ("Chepa"), another top leader within Los Cuinis; the two discussed selling "squares," or kilograms of cocaine. *Id.* at 43-44.

The Defendant was also in direct communication with Menchito, the CJNG's then second-in-command. The Defendant and Menchito discussed precursor chemicals, *id.* at 57-58, which are a critical topic for cartel leadership as synthetic drugs such as methamphetamine are CJNG's lifelines; and, at another time, the Defendant encouraged Menchito to release a hostage. *Id.* at 49-50. Menchito followed the Defendant's advice and released the hostage. *Id.* The Defendant thereafter passed directions from Menchito to the individual who had been released about future drug production activities. *Id.*

### C. Statutory Penalties

The Defendant faces a mandatory minimum sentence of ten years of imprisonment, a maximum sentence of life imprisonment, a fine up to $10,000,000, and a term of supervised release of at least five years. 21 U.S.C. § 960(b)(1). The Government submits that the evidence has established that the Defendant is ineligible for safety valve relief pursuant to 18 U.S.C. § 3553(f).

### III.    DEFENDANT'S SENTENCING GUIDELINES RANGE

The Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). Although the Guidelines are advisory, not mandatory, "[a]s a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.*; *United States v. Booker*, 543 U.S. 220, 222 (2005) (holding that the Guidelines were not mandatory). The Guidelines are "the product of careful study based on

extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Gall*, 552 U.S. at 46.

## A. The Probation Office's Sentencing Guidelines Calculation

On June 26, 2025, before the Government presented the evidence on the Defendant's aggravating role, the Probation Office issued a final PSR. Dkt. No. 42. The Probation Office determined the Defendant's estimated Sentencing Guidelines range is 135 to 168 months. Specifically, based on the drug quantity that the Defendant is responsible for—526 kilograms of cocaine and 45 kilograms of methamphetamine—and pursuant to U.S.S.G. § 2D1.1(a)(5) and (c)(1), the Probation Office calculated the Defendant's base offense level at 38. PSR ¶ 35. The Probation Office applied a two-level increase because the offense involved the importation of methamphetamine. PSR ¶ 36. The Probation Office recommended a two-level reduction consistent with U.S.S.G. § 2D1.1(b)(18) for meeting the safety valve criteria in U.S.S.G. § 5C1.2(a)(1)-(5). PSR ¶ 37. The Probation Office also applied a three-level reduction for acceptance of responsibility. PSR ¶¶ 43-44. Finally, the Probation Office determined that the Defendant met criteria for zero-point offender and applied an additional two-level reduction. PSR ¶ 45. At criminal history category I, the Probation Office calculated the Defendant's total offense level as 33. PSR ¶¶ 7, 46.

## B. The Government's Sentencing Guidelines Calculation

The Government has calculated the Defendant's estimated Sentencing Guidelines range as 262 to 327 months imprisonment. The Government submits that there is sufficient evidence to establish that the Defendant had an aggravating role in the offense supporting a two-level increase in the base offense level under U.S.S.G. § 3B1.1(c). *See* Dkt. Nos. 60 (Gov't Post-Hr'g Brief), 64 (Gov't Post-Hr'g Reply). Because of this enhancement, the Defendant is not eligible for relief

under the safety valve and zero-point offender provisions. The Government agrees with the Probation Office's calculation otherwise and calculates the Defendant's total offense level at 39.

## IV.    SENTENCING FACTORS UNDER 18 U.S.C. §3553(a)

After calculating the applicable Guidelines range, a district court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Gall*, 552 U.S. at 49-50. In doing so, a district court "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented." *Id.* at 39.

### A. The Nature and Circumstances of the Offense, and the Need for the Sentence to Reflect the Severity of the Offense and Promote Respect for the Law

The nature and circumstances of the Defendant's crime weigh heavily towards a significant term of incarceration. The Defendant is a high-level member of CJNG, currently one of the most prolific and violent cartel in Mexico. CJNG has a presence in nearly every part of Mexico and operates throughout South America, Central America, and the United States. Its drug trafficking activities have caused profound damage to communities throughout Mexico and the United States, including the incalculable loss of life due to drug use and associated violence, and has imposed astronomical costs associated with law enforcement, corrections, medical treatment, and substance abuse treatment. CJNG inflicts trauma on the world through more than drug trafficking alone. It engages in extortion, migrant smuggling, oil and mineral theft, and the weapons trade.[3] CJNG has perpetrated countless acts of violence to maintain control in Mexico, including attacks on the Mexican military and police and the assassinations, or attempted assassinations, of numerous

---

[3] Fact Sheet, U.S. Dept. of State, Designation of International Cartels (Feb. 20, 2025), https://www.state.gov/designation-of-international-cartels.

Mexican officials. As a result of these actions, the U.S. Department of State designated CJNG as a Foreign Terrorist Organization in February 2025.[4]

CJNG and Los Cuinis maintain power and influence, not only through the violence perpetrated by its members, but through its strong top-down leadership. CJNG operates as a hierarchical organization in which orders from top leaders, like Abigael and Menchito, are communicated down through loyal deputies, senior lieutenants, and trusted advisors. The top leaders, who are often reclusive, rely on trusted individuals like the Defendant to manage cartel affairs and maintain their power and influence. The Defendant was not a mere "barnacle" clinging to leaders of CJNG and Los Cuinis, he was trusted by the very top echelon of cartel leadership, engaging directly with Abigael, Chepa, and Menchito. The frequency, tone, and nature of the Defendant's communications with these top-tier leaders reveals his elevated status and influence over cartel operations. *See generally* Dkt. No. 60 at 12-20. The Defendant's counsel informed life-and-death decisions; he set resale prices for multi-kilogram quantities of cocaine; he was consulted and advised on precursor chemical supply shortfalls impacting the cartel's production of methamphetamine; and he served as a gatekeeper for other cartel members seeking access to Abigael. *Id*. The Defendant is part of the vital connective tissue that allows CJNG and Los Cuinis to exercise command and control with lethal efficiency.

The Defendant's involvement in international drug trafficking with CJNG and Los Cuinis is a serious crime against the United States. Congress has gone to great lengths to warn drug traffickers that the United States will not tolerate the importation and trafficking of illicit drugs in the United States. This message was first codified in the Comprehensive Drug Abuse Prevention

---

[4] Foreign Terrorist Organization Designations of Tren de Aragua, Mara Salvatrucha, Cartel de Sinaloa, Cartel de Jalisco Nueva Generacion, Carteles Unidos, Cartel del Noreste, Cartel del Golfo, and La Nueva Familia Michoacana, 90 FR 10030, 10030-31(Feb. 20, 2025).

and Control Act of 1970. *See* 84 Stat. 1236. Title III of the 1970 Act—referred to as the Controlled Substances Import and Export Act of 1970—criminalized the manufacture and distribution of a controlled substance "intending" or "knowing" that the controlled substance would be unlawfully imported into the United States. Pub. L. No. 91-513, Title III, § 1009 (Oct. 27, 1970), codified at 21 U.S.C. § 959. Further, Congress amended the statute in 2016 to criminalize the manufacture and distribution of a controlled substance "with reasonable cause to believe" that the controlled substance would be unlawfully imported into the United States. Pub. L. No. 114-154, § 2 (May 16, 2016), codified at 21 U.S.C. § 959. Congress has been consistent and clear with its intent to criminalize and disrupt the international drug trade insofar as the illicit substances bound for the United States.

The Defendant's conduct facilitating the trafficking of cocaine in Mexico destined for the United States is exactly the type of conduct Congress sought to prevent. The Government believes a sentence of 262 months imprisonment is appropriate to reflect the seriousness of the offense and promote respect for the law. The requested sentence reasserts the message that the United States will take decisive action in the face of the danger posed by cartels and impose consequences on the leadership structure that supports and facilitates these criminal activities. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### B.  The History and Characteristics of the Defendant

The Defendant is a 52-year-old citizen of Mexico. Dkt. No. 42 ¶ 58. He is a lifelong resident of Guadalajara, Mexico, and has legal permanent resident status in the United States, where he resided in Laredo, Texas for nine years. *Id.* ¶ 59. The Defendant completed high school and earned his bachelor's degree in international commerce from *Universidad Autonoma* of Guadalajara,

Mexico. *Id.* ¶ 68. At the time of his arrest, he was a real estate agent in Mexico, earning approximately $10,000 USD per month. *Id.* ¶¶ 69-70.

The Defendant was not born into crime, nor was he driven into crime by poverty or lack of opportunities. *See Id.* ¶ 11. The Defendant reported having a good childhood and being raised in a house full of love, where he maintained hobbies like football and swimming. *Id.* ¶ 57. By all measures, the Defendant had a stable and nurturing upbringing. Indeed, he was well-educated, attending the oldest private university in Mexico.[5] The Defendant also achieved success professionally, with his real estate business bringing in a significant monthly income. To put his $10,000 monthly income in context, the average monthly earnings of residents of Jalisco in March 2021 was at about $278 USD a month, less than 3% of what the Defendant was making.[6] Simply put: the Defendant did not join CJNG and Los Cuinis to make a living. The Defendant, highly-educated and affluent, stands out among other CJNG and Los Cuinis members that this prosecutorial office has seen and this Court has sentenced. Few cartel members have received formal education, and likely fewer have earned bachelor's degrees, which explains in part, the Defendant's elevated status as a trusted advisor to the cartels' top leaders. But despite, or because of, these advantages, the Defendant consciously chose to engage in drug trafficking. These factors weigh heavily in favor of the recommended sentence.

---

[5] 90 Años de Innovación Educativa, Universidad Autónoma de Guadalajara, 2025, https://www.uag.mx/es/90-aniversario/.

[6] According to the Government of Mexico, the average monthly salary of resident of Jalisco in March 2021 was $5,936 MXD ($278.25 USD, at the currency conversation rate on the date of the Defendant's arrest). *See* Encuesta Nacional de Ocupacion y Empleo, Evolution of Average Monthly Salary in Jalisco, https://www.economia.gob.mx/datamexico/en/profile/geo/guadalajara?occupationMetrics=salary Option&totalAndInformalJob=totalOption#education-and-employment.

### C. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by a given defendant. 18 U.S.C. § 3553(a)(2)(B)-(C); *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010) (discussing goals of general and specific deterrence).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). It is important that the Court impose a sentence that deters others from engaging in this activity and undermining the law. While this prosecution, and others associated with Los Cuinis and CJNG, including the recent sentencings of Chepa and Menchito, have disrupted some of the cartel leadership structure, drug trafficking continues on a massive scale. Imposing a significant sentence for someone with the Defendant's position within the cartel, as an advisor and close associate of top leaders, sends a message to similarly situated individuals that punishment by the U.S. criminal justice system is certain and severe.

### *Specific Deterrence*

The Defendant's actions demonstrate the need for specific deterrence. The Defendant knowingly and willfully participated in the drug trafficking activities with members of Los Cuinis and CJNG. He maintained close relationships with top leaders of the cartels and held himself out as a link in the chain of command. His actions demonstrate his willingness to advance the objectives of the cartels. While the Government acknowledges that the Defendant accepted responsibility by pleading guilty, his willingness to engage in illicit drug trafficking, despite his legitimate gainful employment, establishes a need to deter him from engaging in similar conduct in the future.

The Defendant was highly connected to the top echelon of Los Cuinis and CJNG. Without sufficient deterrence, the Defendant, when released, could easily fall in as an advisor to emerging and replacement leaders attempting to organize another cartel or reinvigorate the cartels—particularly as the U.S. and Mexican Governments weaken, and possibly one day eradicate, the CJNG. Notably, CJNG itself was born out of the downfall of the Milenio Cartel, demonstrating the unfortunate cartel lifecycle of a successor cartel emerging from the removal of top leaders. The Defendant's prior connections at the highest level of both cartels gives him legitimacy in the eyes of current and next generation cartel members. The reasons establishing his previous stature and influence—his personal business success in Mexico prior to his arrest, his educational background, and the connections he held with leaders of the organization—will be unchanged following his release.

Further, the Probation Office noted that defense counsel provided information that due to sanctions from the U.S. Treasury Department, the Defendant's Mexican bank account was closed. Dkt. No. 42 ¶ 72. The Defendant engaged in drug trafficking leading to this conviction when he did not have a demonstrated financial need to do so. His original motivation, while remaining enigmatic to the Government, would be significantly escalated when he no longer has the same financial resources. The Defendant's sentence needs to provide adequate deterrence for the Defendant to not step back into the cartel's operations to financially support himself.

Therefore, the risk of recidivism in this case is substantial, cannot be overlooked, and justifies a lengthy sentence. The recommended sentence will be a meaningful step to protect the public and impress upon the Defendant that accountability is inevitable.

### D. Unwarranted Sentencing Disparities

Finally, § 3553(a)(6) requires a specific evaluation of similarly situated defendants "to

avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." When determining whether a sentence creates an unwarranted disparity, courts should consider, *inter alia*, a defendant's criminal history, total offense level, Guidelines range, acceptance of responsibility, the nature and extent of a defendant's participation in the criminal activity, and whether and to what extent cooperation was a factor at sentencing. *See, e.g.*, *United States v. Mejia*, 597 F.3d 1329, 1344 (D.C. Cir. 2010) (concluding that difference in sentences was "entirely explained" and not unwarranted due to differences in conduct). A defendant is only entitled to "a weighing of the section 3553(a) factors that are relevant to [his] case, not to a particular result." *United States v. Carrasco-De-Jesus*, 589 F.3d 22, 29 (1st Cir. 2009).

### Edgar Fabian Villasenor-Garcia 21-CR-480 (D.D.C.)

This highly comparable case was in front of this Court. Edgar Villasenor-Garcia ("Villasenor-Garcia") pled guilty to conspiracy to distribute cocaine and methamphetamine for unlawful importation into the United States, in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(B)(ii), 960(b)(1)(H), and 963. Villasenor-Garcia personally distributed at least 5 kilograms of methamphetamine per week for two years and at least 0.5 kilograms of cocaine per week for one year in Mexico, knowing that the substances were destined for the United States. Villasenor-Garcia personally carried a firearm during and in furtherance of the conspiracy.

Villasenor-Garcia's base offense level was 38. He received a two-level increase for possession of a firearm, a two-level increase for importation of methamphetamine into the United States and was not eligible for zero-point offender or safety-valve reductions. After receiving a three-level reduction for acceptance of responsibility, his total offense level was 39 at criminal history category I, with a Guidelines Range of 262 to 327 months imprisonment. The Government

recommended 262 months imprisonment, and this Court sentenced him to 250 months imprisonment. At sentencing, this Court noted in the Statement of Reasons that even though Villasenor-Garcia was a well-educated criminal lawyer in Mexico, he nonetheless engaged in drug trafficking and violence as a member of the CJNG. Additionally, the Court noted that Villasenor-Garcia knew that CJNG was producing large quantities of methamphetamine in Mexico using "perfume" and other precursor chemicals and sending large quantities of methamphetamine and cocaine to the United States for distribution.

Despite some differences in the underlying conduct, the Defendant's Guidelines Range, as calculated by the Government, is the same as Villasenor-Garcia's. They were members of the same organization, have the same base offense level, and the same four-level increase through enhancements based on their individual conduct. Significantly, much like Villasenor-Garcia, the Defendant was also highly educated and financially well-off when he chose to participate in the activity of the cartel. Although the Defendant is responsible for a lower quantity of cocaine than Villasenor-Garcia and did not receive a two-level enhancement for use of a firearm, the Defendant's aggravating role provided a two-level enhancement, and he still distributed substantial quantities of cocaine resulting in the same base offense level. Additionally, through his engagement with top-tier leaders of CJNG and Los Cuinis, the Defendant was likewise aware of the expansive drug trafficking activities of both cartels. Similarly, the Defendant engaged in conversations about methamphetamine precursors with other CJNG leaders and the production of methamphetamine, which he knew would be sent to the United States. Therefore, the Defendant's conduct warrants the recommended 262-month sentence in comparison to Villasenor-Garcia's sentence.

14

**Gabriel Cerda-Guillen, 8:16-CR-366 (D. NEB)**

Gabriel Cerda-Guillen pled guilty to a conspiracy to distribute and possess with intent to distribute methamphetamine and marijuana, in violation of 21 U.S.C. §§ 841(a), 84l(b)(l), and 846. For over a year, Cerda-Guillen was a member of a drug trafficking organization that operated within the United States and Mexico. Cerda-Guillen was a methamphetamine producer and distributor, responsible for approximately 22 to 44 kilograms of methamphetamine. Cerda-Guillen concealed within other objects approximately 10 kilograms of methamphetamine and 1,000 kilograms of marijuana for shipment. Cerda-Guillen also pled guilty to a separate count of money laundering conspiracy.

Cerda-Guillen's base offense level was 38. Cerda-Guillen received a two-level role enhancement, and another two-level enhancement for the money laundering conviction under 18 U.S.C. § 1956. Cerda-Guillen had no known criminal history. After a three-level reduction for timely acceptance of responsibility, Cerda-Guillen's total offense level was 39, with a Guidelines range of 262 to 327 months' imprisonment. Cerda-Guillen was sentenced to 262 months of imprisonment on the drug conspiracy charge alone. Cooperation was not a factor at sentencing.

Despite some differences in the underlying conduct, Defendant and Cerda-Guillen have the same Guidelines range and recommended sentence. Defendant is responsible for a higher aggregate drug quantity compared to Cerda-Guillen. *See, e.g.*, U.S.S.G. § 2D1.1 cmt. n.8(D) (providing drug conversion tables and noting a higher converted drug weight for cocaine than for marijuana). Therefore, Defendant's conduct warrants the recommended 262-month sentence in comparison to Cerda-Guillen's sentence.

**V.** **CONCLUSION**

For the reasons set forth above, the Government recommends 262 months imprisonment, five years of supervised release, and a mandatory $100 special assessment.

Respectfully Submitted,

Dated: October 14, 2025

NHAN NGUYEN, Acting Chief
Narcotic and Dangerous Drugs Section
Criminal Division
U.S. Department of Justice

By:      */s/ Colleen King*
Colleen King
Douglas Meisel
Lernik Begian
Trail Attorneys
Narcotic and Dangerous Drugs Section
Criminal Division
U.S. Department of Justice
Washington, D.C. 20005
Telephone: (202) 616-2200

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of this motion has been sent via email to counsel for the Defendant, this 14th day of October 2025.

By:    <u>/s/   *Colleen King*                    </u>
Colleen King
Trial Attorney
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES | : | |
| v. | : | 1:17 CR 00094 (BAH) |
| JUAN MANUEL ABOUZAID EL BAYEH | : | **UNDER SEAL** |
| Defendant. | : | |

## DEFENDANT'S POST HEARING SUBMISSION

### INTRODUCTION

On July 18, 2025, this Court presided over a contested sentencing hearing during which the Government attempted to establish that the defendant was a "leader" in the charged conspiracy and that an upward adjustment applies in this case. For all the reasons set forth herein, the Court should conclude that the prosecution did not prove – even by a preponderance of the evidence – that Juan Manuel Abouzaid exercised sufficient "control" over another person in the conspiracy to support the imposition of a leadership enhancement.

### RELEVANT FACTUAL BACKGROUND

The following is a summary of the relevant factual background of the case.

### 1.  *The Plea Agreement In This Case Did Not Include Any Leadership Enhancement*

On August 15, 2024, the defendant pled guilty before this Court pursuant to a written Plea Agreement and Statement of Facts to an international cocaine importation conspiracy charge. The Plea Agreement contained an agreement between the parties as to the applicable federal sentencing guideline, which was calculated as Offense Level 33.[1] The plea agreement did not contain an enhancement for leadership. ███████████████████████

---

[1] The plea calculated the defendant's guideline as follows: Level 38 for drug quantity; plus two (2) additional levels for the importation of methamphetamine, for a total of Level 40. The plea agreement then provided for a reduction of three (3) levels for the entry of a timely guilty plea; a reduction of two (2) additional levels for zero-point offender; and a final reduction of two (2) levels because the defendant was safety-valve eligible.

1

████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████

      █████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████████ That trial ended in a jury verdict of guilty on all counts on September 24, 2024 and the Court thereafter sentenced him to life, plus thirty years. The defendant did not testify during the trial.

**2.**  ***The Government's Current Position As To Leadership Is Not Based Upon Any New Evidence***

The Government thereafter advised the defendant that he was in breach of his plea agreement. On November 26, 2024, the Government submitted objections to the draft Presentence Report prepared in this case, arguing that the defendant's Total Offense Level should include upward adjustments for: (1) leadership; and (2) obstruction of justice. See DE 30. The prosecution thereafter submitted an unopposed motion to convert the sentencing hearing into an evidentiary hearing to resolve the Government's allegation that both enhancements applied. See *Consent Motion For Converting Sentencing Hearing To Evidentiary Hearing* (filed under seal May 29, 2025).

The Probation Office did not change the defendant's Total Offense Level in response to the Government's objections, noting that "no additional information was provided to Probation to support" the enhancements. DE 42; Final PSR at p. 21. The Government's presentation during the contested sentencing hearing likewise did not contain any new or additional information but rather was an after the fact effort to re-interpret facts long known to the Government.

2

### 3. *The Facts Contained In The Original Plea Agreement Are Entitled To A Presumption Of Regularity*

Prior to the evidentiary hearing, the Government notified this Court and defense counsel that it only intended to argue in favor of an upward adjustment for leadership. At the hearing, the prosecution presented the testimony of Drug Enforcement Administration Special Agent (SA) Brent Pickard and introduced into evidence certain Blackberry messages that were intercepted during a wiretap conducted by the DEA in 2013, or more than twelve years ago. The defense did not contest the authenticity of the messages or the English translations produced by the Government.

The following section analyzes the testimony and exhibits introduced during the contested sentencing hearing to demonstrate why it failed to establish that the defendant was a leader in the conspiracy. As part of that review, the defense notes that this Court should have concerns over the prosecution's decision to seek a sentencing enhancement for defendant Abouzaid after entering into a negotiated Plea Agreement and Statement of fact that did not include any facts that would support leadership.

First, the United States Attorney's Manual ("USAM") provides that plea agreements should accurately reflect a defendant's criminal conduct:

> Plea agreements should honestly reflect the totality and seriousness of the defendant's conduct, and any departure to which the prosecutor is agreeing, and must be accomplished through appropriate Sentencing Guideline provisions. . . . The Department's policy is to stipulate only to facts that accurately represent the defendant's conduct.

USAM at 9-16.300 (Plea Agreements – Federal Rule of Criminal Procedure 11(E). This Court should conclude that the Plea Agreement entered into between the Narcotic and Dangerous Drug Section and the defendant accurately reflected his criminal conduct – which did not include a leadership enhancement. It is noteworthy that the prosecutors who negotiated the plea agreement

in this case had been intimately involved in the prosecution of the CJNG cartel and constituted the "trial team" for the Ruben Oseguera Gonzalez case. Those prosecutors were not involved in the decision to seek an upward adjustment for leadership in this case. Accordingly, the Court should give the contents of the plea agreement a presumption of reasonableness.

### 4. The Prosecution Purposely Relied Upon A DEA Agent With Very Limited Knowledge During The Evidentiary Hearing

In a similar way, the prosecution made the tactical decision to rely on the testimony of DEA Special Agent (SA) Brett Pickard at the contested sentencing hearing, rather than SA Kyle Mori, who was the lead agent on the CJNG investigation. Tr. 07/18/25 at p. 61 (hereinafter "Tr."). SA Pickard had very little overall experience as a DEA agent. He joined the agency in June of 2023, does not speak Spanish, and had never previously written a wiretap application, had never been qualified as an expert witness, nor even previously testified in federal court. Tr. at pp. 15, 63-64.

More importantly, Pickard had only very limited knowledge of the CJNG investigation that led to the charges against defendant Abouzaid. Pickard did not participate in the CJNG wiretap. Tr. at p. 59. ███████████████████████████████

████████████████████████████████████████████████

███ Pickard did not know that Abouzaid's brother-in-law signed an affidavit in support of the defendant's extradition. Tr. at p. 65. Pickard's lack of knowledge led him to erroneously testify that a reference in a blackberry message sent by the defendant referred to a debt from a drug transaction, when it in fact related to a real estate deal. The prosecutor immediately had to use a leading question to clarify Pickard's misstatements in the record before the Court. Tr. at pp. 33-34. See Gov Exh. 6.

SA Pickard did not know that the blackberry messages contained in Government Exhibit 18 at the contested sentencing hearing were sent by the defendant to his sister, who was using the Blackberry screen name "Mime." Tr. at 72. Likewise, SA Pickard did not know that the reference in Government Exhibit 11 to a person known as "Josan," was the defendant's brother. Tr. at p. 73. Indeed, SA Pickard testified that he would be "surprised" to learn that the defendant had a brother named Josan and that it would alter his interpretation of the contents of the messages, which he erroneously thought the use of the word "papers" was a reference to drug trafficking proceeds. Tr. at pp. 75-77. [2]

In contrast, Special Agent Mori was "probably the most knowledgeable person about this case." Tr. at p. 61. SA Mori wrote the wiretap affidavits for the thirty-nine (39) devices intercepted during the CJNG investigation. Tr. at pp. 19, 61. During the contested sentencing hearing, defense counsel inquired as to why SA Mori was not testifying. SA Pickard first responded that he was "not sure," but later acknowledged during cross-examination it was possible that the reason was because SA Mori had advised new defense counsel that Juan Manuel Abouzaid was "not" a leader in the conspiracy. Tr. at pp. 61-62. While the Court correctly noted that SA Mori's opinion is not binding, this Court did inquire after the close of the evidence and confirmed with the prosecutors that Mori had opined that the defendant was not a leader. Tr. at pp. 82-83.

This Court should conclude that the Government intentionally presented the testimony of SA Pickard because he was not knowledgeable about the investigation of the CJNG, did not participate directly in the criminal case against Juan Manuel Abouzaid, was not

---

[2] Attached to this Memorandum is a signed Declaration from the Defendant's sister, Salime Abouzaid El Bayeh, attesting that: (1) she used the Blackberry Messenger screen name "Mimi" in 2013; and (2) she has a brother named Jose Antonio Abouzaid El Bayeh, who was referred to as "Josan" by the family; and (3) that based upon her knowledge she believes the word "papers" is a reference to real estate documents.

qualified as an expert in the interpretation of intercepted messages, was not in a position to offer any valid opinion about the meaning of the messages. Rather, SA Pickard was spoon fed the contents of a limited number of blackberry messages and acted as nothing more than a custodian of records to introduce the messages during the hearing. SA Pickard admitted as much during cross-examination:

> Q. Since you came to court today with BlackBerry messages that people selected for you to testify about, the truth is you didn't do anything to try to figure out some of the details unless someone spoon fed you the information before you got here, correct?
> A.  Correct.

Tr. at p. 77.

This defense believes that in light of these critiques the Court should critically assess SA Pickard's testimony and give almost no weight to his conclusions about the meaning of the messages.

## LEGAL ANALYSIS

As explained herein in detail; to be a "leader" under the Federal Sentencing Guidelines, the Government must prove by a preponderance that the defendant exercised control over another person in the conspiracy. The Government's evidence from the contested sentencing hearing in this case failed to establish this essential element and this Court should conclude that an upward adjustment does not apply here.

## I.
### Caselaw Establishes That Control Over Another Person In The Conspiracy Is The *Sine Qua Non* Of Leadership

The Federal Sentencing Guidelines and relevant caselaw unequivocally require that the Government must establish a defendant's control over another person in the conspiracy for a leadership adjustment to apply:

Mere control over a scheme rather than over a *participant* in a scheme" is not enough to warrant an aggravating role enhancement. *Bapack*, 129 F.3d at 1324 (internal quotation marks omitted). Instead, the guidelines require that "the defendant must have been the organizer, leader, manager or supervisor of one or more *participants*" in the criminal activity. U.S.S.G. § 3B1.1 application note 2 (emphasis added). A "participant" is a "person who is criminally responsible for the commission of the offense, but need not have been convicted." *Id.* § 3B1.1 application note 1. An individual is " 'criminally responsible' under § 3B1.1 only if 'he commit[s] all of the elements of a statutory crime *with the requisite mens rea*.' " *United States v. McCoy*, 242 F.3d 399, 410 (D.C. Cir. 2001) (quoting *Bapack*, 129 F.3d at 1325).

United States v. Vega, 826 F.3d 514, 538–39 (D.C. Cir. 2016). The burden of proof is a preponderance of the evidence. See, e.g., United States v. Mohammed, No.CR 06-357 (CKK), 2022 WL 2802353, at *4 (D.D.C. July 18, 2022). Accord United States v. Carter, 591 F.3d 656, 659 (D.C. Cir. 2010) ("[w]hen seeking a sentence enhancement, the government must prove a prior conviction by a preponderance of the evidence"). See also U.S.S.G. Section 6A1.3 *Commentary*.

Based upon this requirement, proof that the defendant occupied an important or central role in the criminal scheme is not enough. In United States v. Quigley, 373 F.3d 133, 140 (D.C. Cir. 2004), for example, this Court reversed an upward adjustment for leadership despite evidence that the defendant orchestrated the criminal activity, concluding that:

Entirely lacking on the record before us is any evidence that Quigley had any sort of hierarchically superior relationship with the persons who were purportedly her subordinates. We understand the concept of "control" or "authority," implicit in the notion of "management" or "supervision," to connote some sort of hierarchical relationship, in the sense that an employer is hierarchically superior to his employee. The district court failed, however, to require any proof that Quigley was hierarchically superior to her co-conspirators. Instead, the district court focused its inquiry upon whether Quigley was the "hub" or "orchestrator" of the conspiracy.

Similarly, evidence that a defendant served as the "intermediary" in a drug trafficking movement does not automatically satisfy the leadership enhancement, absent specific evidence

7

of control over others. The Seventh Circuit specifically held in a recent decision that an intermediary is not automatically a leader under the guidelines:

> On past occasions we have considered whether someone who acts as an intermediary or middleman—as Colon did here—should receive a leadership enhancement. In doing so, we have emphasized that "middleman status alone cannot support a finding that a defendant was a supervisor, manager or leader of a criminal activity." *Brown*, 944 F.2d at 1382. Instead, **an aggravating role adjustment is appropriate for a middleman only when coupled with other facts indicating the defendant exercised some control over others involved in the crime or was responsible for organizing others in carrying out the operation**. *Id.* at 1381. So, too, have we recognized that "[s]upplying drugs and negotiating the terms of their sale do not by themselves justify a Section 3B1.1 increase." *United States v. Weaver*, 716 F.3d 439, 444 (7th Cir. 2013) (quoting *United States v. Vargas*, 16 F.3d 155, 160 (7th Cir. 1994)). These actions alone do not indicate that the middleman had any greater degree of responsibility for orchestrating the transactions "than anyone else involved, including the customer." *Id.*

United States v. Colon, 919 F.3d 510, 518 (7th Cir. 2019)(emphasis added). Accord United States v. Martinez, 584 F.3d 1022, 1027–29 (11th Cir. 2009)(court concluded that evidence the defendant "orchestrated" drug shipments, was involved in wire transfers and "utilized" other persons to mail and receive drug shipments was "not enough" to establish leadership).

The application of these principles to the record adduced before this court compels the conclusion that the evidence below failed to establish that the leadership enhancement applies in this case in regards to defendant Juan Manuel Abouzaid.

## II.

### The Government's Evidence Did Not Establish That The Defendant Was A Leader

The Government's theory advanced through SA Pickard's testimony was that defendant Abouzaid was a leader in the charged conspiracy because: (1) he was in contact with high-ranking members of the CJNG; and (2) had the ability to influence their decisions. The Government's presentation of events focused principally on two events: (1) the collection of an

alleged drug debt; and (2) efforts to obtain the release of kidnapping victims. The Government's evidence consisted of the introduction of the intercepted blackberry communications from the year 2013 between the defendant and other persons – some of whom were not identified by the Government.

### 1. The Alleged "Drug" Debt

The prosecution introduced the blackberry messages contained in, *inter alia*, Government Exhibits 7 and 8 between the defendant and Abigael Gonzalez Valencia (one of the leaders of the *Los Cuinis* Drug Trafficking Organization) in support of its theory that the defendant was a leader in the conspiracy. SA Pickard originally testified that the use of the word "melons" in the messages was code for a "large sum" of money, but he could not testify whether it was dollars or Mexican pesos, nor otherwise identify the amount. Tr. 34-35. Moreover, although SA Pickard originally testified that the conversations concerned a "drug debt" involving the defendant, that was incorrect. Rather, the messages concerned a real estate transaction that involved the defendant's brother-in-law Naim Libian Tello. Indeed, the prosecutor was forced to correct the record as follows:

> MS. KING: Your Honor, I would like to correct the record here. The evidence in the record shows that the debt was for a real estate transaction.

Tr. at p. 32-33.

The Government's efforts to rely upon the debt collection as a vehicle to establish some kind of hierarchical relationship between the defendant and Abigael Gonzalez Valencia was likewise unavailing:

> Q. Okay. I'd like to move away from this specific conversation about the debt and ask you if the intercept showed -- **if the intercepted messages showed any other aspects of the relationship between the defendant and Abigael Gonzalez-Valencia?**
> A. Okay. Sorry, can you repeat?

Tr. at p. 36 (emphasis added).

The witness apparently forgot that he was supposed to respond by claiming that the conversation somehow established that the defendant had the ability to influence one of the cartel leaders. Undeterred by this original failure to remember the purpose of his testimony, SA Pickard would later volunteer this conclusion in a non-responsive answer to a question about the dates of the blackberry messages.

> Q. All right. And can you please remind us of the date that had previously been set for the debt to be paid?
> A. So the debt was supposed to be paid on -- the re – so the rescheduling of the due date was June 25th. So here in this conversation they're still talking about the debt that was supposed to be paid on June 25th, but here it's now -they're talking it's July 1st.
> Q. Thank you.
> A. So he -- **so the defendant is still influencing or persuading Abigael to, hey, let's extend this debt a little bit longer**.

Tr. at p. 38 (emphasis added). The prosecution did not ask a single follow up question to clarify or explain how this exchange of messages demonstrated the defendant's ability to "influence" Abigael Gonzalez Valencia. Rather, the conversation suggests – at most – that Gonzalez Valencia listened to the defendant before he made the decision as to whether or not the time for repaying the real estate debt should be extended.

SA Pickard's conclusory statements about "influencing or persuading" are nothing more than preplanned speculation, which should be rejected by this Court. Nothing contained in the blackberry messages about the debt established that the defendant "exercised control" over Gonzalez Valencia. The potential ability to "influence" someone is emphatically not the functional equivalent of exercising "control" under the sentencing guidelines.

### 2. *The Defendant's Efforts To Save The Kidnapping Victims*

The Government also introduced blackberry messages 12, 13, and 14, which contained conversations between the defendant and Ruben Oseguera Gonzalez about the kidnapping of

several persons in Mexico, including someone identified as "Salvador," who was referred to by

the nickname the "Engineer." During the conversations, the defendant asks Oseguera Gonzalez

to help free Salvador, stating that he has known him for five years and that he is "a great guy my

brother I will totally vouch for him I have a lot of respect for him." See Exh. 12 at box 10. It is

clear in context that the defendant is a supplicant, flattering Oseguera Gonzalez and pleading for

the release of the victim:

> Thanks bro' I know that you are a great man just as fair and honorable as your dad and
> that's why I love you guys and I admire you so much bro' and believe me the greatest
> pride I have in life is having your great friendship and your father's and your family's
> god bless you always bro'

Exhibit 13 at box 4.

Despite the overwrought praise, SA Pickard – in what again appears to be pre-scripted

testimony - concluded that these blackberry messages somehow established that the defendant

had some authority over Oseguera Gonzalez. SA Pickard testified as follows:

> Q. And do you know from your review of the intercepts what Ruben Oseguera-Gonzalez
> decided to do with the kidnapped person?
> A. The defendant was able to convince the release of this person, and Ruben did release
> this kidnapped person.

Tr. at 49. Moreover, SA Pickard testified that after his release, the "engineer" continued

"working for the CJNG cartel." Tr. at p. 50. These conclusions are contrary to other evidence

obtained during the investigation of this case.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████

**ABOUZAID-EL BAYEH stated that he was using all kinds of tactics to prevent
Salvador from getting killed. ABOUZAID-EL BAYEH created a fictitious wife in**

**order to humanize Salvador. He also tried to boast Salvador's skills as a chemist and engineer, and telling Menchito that Salvador could be useful in producing methamphetamine. ABOUZAID-EL BAYEH also mentioned the use of oxycodone and ecstasy because a lot of people used them at parties in 2013. ABOUZAID-EL BAYEH stated that Salvador was released but later on he was never heard from again (emphasis added).**

As previously noted, ███████████████████████████████████████

████████████████████████████████████  ███████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████  This would include the defendant's

statement that the "engineer" did not go to work for the CJNG. SA Pickard testified that he had

read the DEA report of the proffer session, but nonetheless incorrectly testified – without basis –

that the engineer continued to work for the cartel. This is yet another reason for the Court to

reject SA Pickard's unsupported conclusions about the defendant's alleged ability to "influence"

other cartel members.

Finally, it defies common sense that Abouzaid would have to lie to Oseguera Gonzalez if

he had any actual authority over him. Rather than showing that Juan Manuel Abouzaid was a

leader, the blackberry messages establish that he was a decent, compassionate person pleading

for the life of someone that he actually did not know and was willing to lie to the second in

command of the CJNG to accomplish that laudable goal.

## CONCLUSION

For these reasons, the defense respectfully asks this Court to conclude that the

Government failed to establish that the defendant was a leader in the charged conspiracy and

reject the Government's effort to impose an upward adjustment under the sentencing guidelines.

Respectfully submitted,

*Robert Feitel*

_____

Robert Feitel
1300 Pennsylvania Avenue, N.W
#190-515
Washington, D.C. 20004
202 255 6637 (cellular)
District of Columbia Bar 366673
RF@RFeitelLaw.com

*Sandi S. Rhee*

_____

Sandi S. Rhee
10001 Georgetown Pike
#63
Great Falls, Virginia 22066
DC Bar No. 501416
(202) 285-8366 (cellular)
SandiRheeLaw@gmail.com

**CERTIFICATE OF SERVICE**

I certify that I served a copy of the defense Motion To Strike, via ECF, this 5th day of August, 2025, to NDDS attorneys Douglas Meisel and Colleen King Trial Attorneys, Narcotic and Dangerous Drug Section, Department of Justice, Washington, D.C.

*Robert Feitel*

_____

Robert Feitel

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES | : | |
| v. | : | 1:17 CR 00094 (BAH) |
| JUAN MANUEL ABOUZAID EL BAYEH | : | **UNDER SEAL** |
| Defendant. | : | |

## DEFENDANT'S POST CONTESTED
## <u>SENTENCING HEARING REPLY MEMORANDUM</u>

### INTRODUCTION

The Government's "Supplemental" sentencing memorandum and its so-called "re-evaluation" of the defendant's sentencing guideline calculation to support a leadership enhancement should be rejected by this Court. As explained herein, the prosecution failed to establish even by a preponderance of the evidence that the adjustment applies. During the contested sentencing hearing, the Government did not introduce a single witness with personal knowledge that Juan Manuel Abouzaid exercised any control over another person in the conspiracy. Rather, the prosecutors were forced to rely upon the impoverished hearsay testimony of a DEA special agent with a singular lack of knowledge about the CJNG investigation, because their own lead case agent (and the most knowledgeable person about the investigation) opined that Abouzaid was not a leader in the conspiracy. The Government likewise failed to identify a single instance in which the defendant exercised control over someone else in the conspiracy or name such a person. The Government did not establish that the defendant had a right to a larger share of the profits in the conspiracy, that he recruited members, or that he possessed any of the required attributes of leadership.

Instead, the Government wants to engage in semantic gamesmanship, claiming that

1

Abouzaid was a "trusted confidant and advisor" because he exchanged blackberry messages with other leaders in the conspiracy.

The Government's post-hearing memorandum offers no explanation as to why a leadership enhancement was not included in the original plea agreement, which was negotiated by the trial team that prosecuted Ruben Oseguera Gonzalez and is presumptively consistent with Department of Justice guidelines. No new facts were presented to this court that were not known to the Government when the defendant pled guilty. In the final analysis, the Government's revisionist history is akin to a disco re-make of a classic Beatles song; it simply makes you remember that the original version needed no changing.

## ANALYSIS

### 1. Leadership Requires Control Over Another Participant In The Conspiracy

As the Government's own memorandum makes clear, under the Federal Sentencing Guidelines, the factors for evaluating whether a defendant occupied a leadership position are as follows:

> the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. 3B1.1. Moreover, it is clear that the

> gravamen of this enhancement is control, organization, and responsibility for the actions of others." The enhancement is not triggered simply because a defendant is an "important" or "essential" member of the conspiracy.

United States v. Allen, 364 F. Supp. 3d 1234, 1250 (D. Kan. 2019). Thus, in order to impose a leadership enhancement, the Government must prove that defendant Abouzaid exercised hierarchical control over someone else in the conspiracy:

> Mere control over a scheme rather than over a *participant* in a scheme" is not enough to

warrant an aggravating role enhancement. *Bapack*, 129 F.3d at 1324 (internal quotation marks omitted). Instead, the guidelines require that "the defendant must have been the organizer, leader, manager or supervisor of one or more *participants*" in the criminal scheme.

United States v. Vega, 826 F.3d 514, 538 (D.C. Cir. 2016).

As the following makes clear, the Government failed to establish leadership by even a preponderance of the evidence.

**2. Juan Manuel Abouzaid Was Not A Leader In The Charged Conspiracy And Giving Him The Title Of "Trusted Confidant" Does Not Change The Underlying Facts**

The gravamen of the Government's argument is that the Defendant "served a unique leadership role by being a trusted confidant and advisor to multiple top leaders of CJNG and Los Cuinis." Gov. Supp. Memo at p. 13. The theory is: (1) analytically flawed; and (2) unsupported by the evidence adduced by the prosecution during the contested sentencing hearing.

As an initial matter, the Government's position that a "trusted confidant and advisor" is a leader in a conspiracy finds no textual support in the sentencing guidelines or relevant caselaw. For good reason. Titles "such as kingpin or boss are not controlling" in the leadership analysis. See U.S.S.G. 3B1.1 Commentary n.4 (internal quotations omitted). United States v. Taylor, 339 F.3d 973, 979 (D.C. Cir. 2003). Accord United States v. Barnett, 643 F. App'x 495, 497 (6th Cir. 2016).

Moreover, an advisor is defined as "someone who gives advice." https://www.merriam-webster.com/dictionary/adviser. Someone who is an advisor or confidant would not – without additional proof – automatically possess the decision-making power that is a requirement for leadership. Nor would the status of advisor necessarily include: (1) obtaining a larger share of profits; (2) decision making authority in the conspiracy; or (3) any of the other identifiable factors for leadership. The prosecutors attempt to "label" the defendant a trusted advisor is not a

valid substitute for adducing facts to support the leadership enhancement, which the Government failed to present.

This conclusion is readily apparent from a review of the blackberry text messages involving the defendant.

### 3. *The Blackberry Messages Do Not Establish The Requirements Of Leadership*

The Title III wiretap against the CJNG and Los Cuinis involved the interception of thirty-nine target devices, lasted from April 2013 to January 2014, and involved the interception of tens of thousands of blackberry messages. Tr. at p. 19. In this case, the Government relied upon eighteen (18) conversations involving defendant Abouzaid in support of its leadership claim.

To that end, there is not a single conversation in which the defendant ordered another person in the conspiracy to do take (or not take) any action. The Government did not identify anyone that the defendant recruited into the conspiracy, or any evidence that he received a larger share (or indeed, any share) of the profits from the cartel's activities. The blackberry messages do not demonstrate the defendant organizing a drug shipment or exercising any authority in the conspiracy. The blackberry messages relied upon by the prosecution do not establish by anywhere near a preponderance the elements of leadership. Even a cursory review of the communications and the Government's evidence at trial reveals that that the Government's evidence was wholly inadequate. The following responds section by section to the prosecution's arguments.

***The Defendant Used The BBM Screen Name "El Escorpion"***: The Government argued that the defendant was in "frequent" communication with top leaders of the CJNG and Los Cuinis and such conversations "would only be fitting if the Defendant himself had a leadership role within these criminal organizations." Gov. Memo at pp. 4-5. The argument is entirely without a

basis in the record before the Court because the Government did not even attempt to establish: (1) how frequent the defendant's contact was; (2) compare the frequency of the defendant's contact with any other alleged member of the conspiracy or (3) establish that only other "leaders" in the conspiracy communicated with each other. Moreover, the argument is nothing more than an improper attempt to establish "guilt by association alone." See, e.g., Healy v. James, 408 U.S. 169, 186 (1972). The Government did not cite to a single case – and the defense is not aware of any jurisprudence – which even remotely suggests that the defendant's alleged contacts would make him a leader in the conspiracy.

***Communications With Abigael Gonzalez Valencia***: the Government notes that the defendant and Abigael Gonzalez Valencia "communicated about a debt that the Defendant's brother-in-law owed to Gonzalez Valencia for a real estate transaction. Gov. Memo. at p. 5. The debt was ultimately paid off when the defendant's brother-in-law provided Gonzalez Valencia with six kilograms of cocaine. Gov. Memo at p.5. During the contested sentencing hearing, SA Pickard agreed that cocaine was not provided by the defendant, that the defendant was attempting to protect his brother-in-law and that the debt had "nothing to do with drugs." Tr. at pp. 67-68. Likewise, the communications have nothing to do with leadership.

***Communications With Jose Gonzalez Valencia:*** the Government noted that the defendant exchanged blackberry communications with Jose Gonzalez Valencia concerning the alleged sale of cocaine. Gov. Memo at p. 7. The Government's memorandum did not even attempt to connect the conversation with the issue of leadership, and the defense does not believe that the Court should give the message any consideration in its assessment of the issue of leadership.

***Communications With Ruben Oseguera Gonzalez***: the Government relies on communications between the defendant and Ruben Oseguera concerning the fate of a kidnapping victim named

"Salvador" (and others) as part of its argument in support of a leadership enhancement. Gov.

Memo. at p. 8. The testimony adduced at the sentencing hearing, however, clearly established

that the event had nothing to do with drug trafficking. Rather, SA Pickard agreed as follows:

> Q. But you do know to a certainty that the version of events surrounding the kidnapping was that Mr. Abouzaid was desperate, as a favor to someone, to try to get these hostages released; isn't that the case?
>
> A.  Yes.

Tr. at p. 72.

The defendant's effort to secure the release of the hostages was discussed during a proffer

session with the Government prior to the entry of the guilty plea. SA Pickard acknowledged that

he read the DEA Report of the interview and that:

> Q. And didn't Mr. Abouzaid also tell the government that in connection with his efforts to try to save the life of this person and the other kidnapping victims, he invented facts about the person who he referred to as the engineer? Do you remember reading that in the report?
> A. Yes.
> Q. So basically Mr. Abouzaid tried to do a good deed by keeping Ruben's cartel from killing some innocent people, correct?
> A. Yes, but at the same time –

Tr. at pp. 70-71.

The Government does not acknowledge in its post-hearing memorandum that the

defendant helped saved the lives of the hostages and that he did so at some risk to himself.

Rather, the prosecution appears to be arguing that this event somehow establishes that the

defendant was a leader in the conspiracy – although the logic of the position eludes undersigned

defense counsel. In the defense view, any review of the blackberry messages reveals that the

defendant was begging to save the lives of the kidnapping victims and no reasonable argument to

the contrary exists. The defendant was told by one of the original prosecutors on the case that he

was a "hero" after his proffer session and that conclusion is equally valid today.

***Additional Relevant Conversations***: the Government also argued that blackberry messages with someone named "Mime" were relevant to "drug trafficking activities." Gov. Memo at p. 9. Since the defendant is not challenging the drug quantities contained in the Plea Agreement in this case, the entirety of the testimony appears to be irrelevant. Moreover, SA Pickard's interpretation of the messages contained in Government's exhibit 11 and 18 were based upon what can fairly be described as imperfect knowledge of the investigation.

Thus, SA Pickard did not know that the defendant's sister Salime Abouzaid used the blackberry name "Mime." Nor did he know that the defendant has a brother who was known by the nickname "Josan." Tr. at pp. 73-74. Indeed, Pickard said he would be "surprised" to learn that the defendant had a brother with that nickname and that such information might cause him to re-evaluate the meaning of the conversations:

> Q. Okay. And so now you're left sitting here, and if it's true that it's Mime, his sister, and that Josan is his brother, this conversation looks a lot different than it does in terms of whether -- if Mime and Josan were some other big drug traffickers in the cartel, right?
> A. I can only answer that question by saying possibly.

Tr. at p. 77.

The defendant's post hearing memorandum included a signed Declaration from the defendant's sister Salime Abouzaid el Bayeh, which declared under oath that she used the blackberry screen name "Mime" and that her brother Juan Antonio Abouzaid was known by the nickname "Josan." SA Pickard's interpretation of the messages as relating to a drug trafficking debt was thus debunked.

The special agent's testimony, however, is emblematic of the Government's failure in this case. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ The defendant would be

subject to a guideline range of 262-327 months – a sentence which would be exponentially

greater than warranted by his conduct in the conspiracy.

## CONCLUSION

For these reasons, the defense respectfully asks this Court to conclude that the

Government failed to establish that the defendant was a leader in the charged conspiracy and

reject the Government's effort to impose an upward adjustment under the sentencing guidelines.

Respectfully submitted,

*Robert Feitel*

_____

Robert Feitel
1300 Pennsylvania Avenue, N.W
#190-515
Washington, D.C. 20004
202 255 6637 (cellular)
District of Columbia Bar 366673
RF@RFeitelLaw.com

*Sandi S. Rhee*

_____

Sandi S. Rhee
10001 Georgetown Pike
#63
Great Falls, Virginia 22066
DC Bar No. 501416
(202) 285-8366 (cellular)
SandiRheeLaw@gmail.com

**CERTIFICATE OF SERVICE**

I certify that I served a copy of the defense Post Hearing Reply Memorandum was filed under seal on the Court's ECF docket and sent via email, this 12th day of September, 2025, to NDDS attorneys Douglas Meisel and Colleen King Trial Attorneys, Narcotic and Dangerous Drug Section, Department of Justice, Washington, D.C.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES                                  :

v.                                             :        1:17 CR 00094 (BAH)

JUAN MANUEL ABOUZAID EL BAYEH      :        **UNDER SEAL**

Defendant.                                     :

## DEFENDANT'S SENTENCING MEMORANDUM

## INTRODUCTION

Defendant Juan Manuel El Bayeh is pending sentencing before this Court after pleading guilty to Count One of the Indictment, charging him with Conspiracy To Distribute Five Kilograms Or More Of Cocaine, Knowing Or Intending That It Would Be Unlawfully Imported Into The United States. The defendant entered into a written plea agreement which calculated his Total Offense Level as 33, which corresponds to a guideline range of 135-168 months. ███████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ The prosecution thereafter moved this Court to find that the defendant was a "leader" in the conspiracy and impose a two-level upward adjustment - which would result in the defendant's loss of the "safety valve" reduction, ████████████████████████████████████████████████████████ ███████████████████. The defense also moved the Court to conclude that a two-level upward enhancement for the importation of methamphetamine was inapplicable because of the Rule of Specialty.

Depending upon the Court's rulings on the pending motions, the defendant's Total Offense level could be as low as 31 $(108 - 135$ months) or as high as 37 $(210 - 262$ months). After careful consideration of the totality of circumstances present in this case, the defense asks

this Court to impose a sentence of 78 months. The defendant had only limited contact with the Jalisco Cartel and his primary contact involved helping individual members of the group purchase properties. His involvement with drugs was of limited scope and duration and in large measure resulted from circumstances beyond his control. Moreover, the defendant took an extraordinary risk to help a young man (and others) that had been kidnapped by drug traffickers, by personally contacting Ruben Oseguera Gonzalez, pleading for their lives, and lying to the cartel's second in command in the process. ███████████████████████

████████████████████████████████████████████

█████████████████████████████

      As explained herein, the defendant is far more than his criminal conduct in this case. He comes from a large, loving Lebanese family and is devoted to his son Tannus, who he raised from childhood by himself. Prior to his arrest the defendant was a real estate agent and upon his release from custody will be deported back to Mexico, where he intends to work and live a life of solitude, surrounded by the friends and family he has spent so much time away from. The defendant has written a letter to the Court acknowledging his guilt and explaining the circumstances that led to his involvement in this case and promising that he will never again be involved in any way with such matters.

      ███████████████████████████████████████████

██████████████████████████████████. As the Court knows, since that trial, the CJNG has retaliated by: (1) killing a Mexican police officer who testified at the trial; (2) killing the sister of a cooperating witness; and (3) planning to murder other family members of witnesses against Menchito. During the Ruben Oseguera Gonzalez trial, the United States introduced text messages between defendant Abouzaid and "Menchito," which was

reported in the Mexican press. ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████ In the final analysis, the defense believes that 78 months of incarceration would more than satisfy the paramount consideration that the sentence imposed be "sufficient, but no greater than necessary" to punish. <u>Kimbrough v. United States</u>, 552 U.S. 85, 101 (2007).

### FACTUAL BACKGROUND AND DEFNEDANT'S ROLE IN THE CONSPIRACY

**1. The Jalisco New Generation Cartel (CJNG)/Defendant's Role In Offense**

The Court knows from prior cases that the CJNG is a sprawling, international drug trafficking conspiracy that is responsible for importing huge quantities of cocaine and methamphetamine. Members of the cartel's upper leadership have been involved in weapons trafficking and violence. This Court imposed life sentences against two of its members: Gerardo Gonzalez Valencia and Ruben Oseguera Valencia.

In contrast, as the agreed upon Statement of Facts in this case makes clear, defendant Abouzaid was involved in only three discreet drug transactions:

1. The Defendant personally arranged or attempted to arrange the sale of at least 74 kilograms of cocaine within Mexico for importation to the United States. The Defendant successfully negotiated the trade of six kilograms of cocaine between his brother-in-law and Abigael Gonzalez Valencia, a leader of the Los Cuinis drug trafficking organization, in order to satisfy a debt owed by his brother-in-law for property purchased from Gonzalez Valencia. owed by his brother-in-law for property purchased from Gonzalez Valencia.

2. The Defendant assisted other drug traffickers with negotiating and transporting cocaine shipments, including assisting one trafficker who was attempting to recover 392 kilograms of cocaine that had been stolen and putting another trafficker in contact with someone who could transport 60 kilograms of cocaine in a car with a hidden compartment.

3.  The Defendant also arranged or attempted to arrange the sale or trade of methamphetamine and the chemicals used to manufacture methamphetamine, including attempting to arrange the trade of a house for $90,000 worth of methamphetamine.  The Defendant acknowledges that $90,000 worth of methamphetamine in Mexico, at the time, would have been more than 45 kilograms of methamphetamine.

With respect to the first transaction, the defendant became involved in a six-kilogram drug sale that was initiated by his brother-in-law, who owed money to a member of the Cartel. The Court will recall that during the contested sentencing hearing, the Government introduced text messages memorializing the defendant asking Abigael Gonzalez Valencia to give his brother-in-law additional time to pay back the debt. The defendant admitted to this conduct, but the totality of the circumstances provides context – and an explanation – for his actions. Undersigned counsel (who entered their appearance after the entry of the guilty plea in this case) are not aware of any information contained in the discovery provided in this case that relates to the allegation concerning the seventy-four (74) kilograms of cocaine transaction.

With respect to the second transaction, undersigned counsel are likewise not aware of any independent evidence to support the factual assertions contained therein. Finally, with respect to the allegation that the defendant attempted to arrange the trade of a home for $90,000.00 worth of methamphetamine, there are text messages with two persons in which the defendant states that he knows someone who would be willing to sell their home in exchange for, *inter alia*, "ice" (a code reference to methamphetamine), but counsel are not aware of any additional evidence that relates those text messages to the alleged importation of methamphetamine to the United Staes.

## THE SENTENCING GUIDELINES

With respect to the sentencing in this case, the court begins its analysis with consideration of the relevant guideline range and then it "should" entertain arguments from the parties as to whether a non-guidelines sentence is appropriate. Rita v. United States, 551 U.S. 338, 351 (2007). In making this decision, the trial court will generally consider the sentencing factors set forth in 18 U.S.C. Section

4

3553(a). <u>Kimbrough v. United States</u>, 552 U.S. 85, 109 (2007). Without doubt the district courts have the discretion to impose a non-guideline sentence based upon their assessment of each individual case. <u>See Gall v. United States</u>, 552 U.S. 38, 47-48 (2007)(abuse of discretion standard applies to review of sentence outside guideline range and there is no mathematical test for reasonableness of sentence).

That analysis thus begins with the calculation of the sentence guideline in this case.

## Sentencing Guidelines Calculation

### *Plea Agreement*

In this case the written Plea Agreement entered into between the parties computed the defendant's guideline calculation as follows (including the subsequently enacted "zero-point offender" reduction):

| | |
|---|---|
| Base Offense Level (450 kgs of more of cocaine) | 38 |
| Importation of Methamphetamine | +2 |
| Acceptance of Responsibility | -3 |
| Safety Valve | -2 |
| Zero Point Offender | -2 |
| | _____ |
| Adjusted Total Offense Level | 33 |
| | (135 − 168 months) |

***Defendant's Position:*** The defense submitted a motion asking this Court to strike the methamphetamine enhancement because it violates the Rule of Specialty. That would reduce his guideline level to 31 (108-135 months)

***Government's Position:*** The Government alleges that the Court should impose a two-level upward adjustment for leadership, which would result in a guideline level 35, but would also result in the loss of safety valve and zero-point offender status and result in a Total Offense Level of 37 (210 − 262 months).

## Sentencing Guideline Factors

Once the adjusted guideline offense level has been calculated, the Court then turns to a consideration of the following statutory sentencing factors: (1) the nature and circumstances of the offense and history and characteristics of the defendant; (2) the need for the sentencing to

reflect the seriousness of the offense, to promote respect for law, and to provide just punishment; (3) specific and general deterrence; (4) the need to provide the defendant with training, medical care, or treatment; available sentencing alternatives; (5) consistency in sentencing among similarly-situated defendants; and (6) the need to provide restitution. 18 U.S.C. § 3553(a).

The following sections address those considerations.

### Defendant's Personal Characteristics/Role In Offense

The rules of conduct that govern the American justice system do not permit the sentencing judge in a criminal case to really "get to know" a defendant. There is no opportunity for conversation or a personal exchange between sentencing judge and defendant. In this case, the only time the Court has seen the defendant is during a few court appearances – and the change of plea hearing - where he appeared from the cell block behind the courtroom and then was led away by the U.S. Marshals at the conclusion of the proceeding.

But Juan Manuel Absouzaid El Bayeh is more than just a criminal defendant. He is a hard-working and decent human being who is extraordinarily close with his extended family and is the proud father of an adult son who works as a computer engineer for Google. (Letters of support from his family will be submitted to the Court prior to the sentencing).

This defendant is a college graduate and served for one year in Mexico's armed forces, before honorably leaving the military. He led a normal, uneventful life and for nine years resided lawfully in the United States, living in Laredo, Texas. This case is the defendant's only contact with the criminal justice system. He has no history of drug or alcohol abuse. By sad coincidence, he will turn fifty-three years old on the day of his scheduled sentencing. This is a photograph of the defendant and his extended family in happier times:



The defendant worked as a realtor in Mexico prior to his arrest and that work is what led to his involvement in this case. The defendant met Abigael Gonzalez through a restaurant owned by (a now deceased) friend his sister. He believed that Abigael was a legitimate businessman and helped him purchase properties and a friendship of sorts developed. By the time that the defendant realized who his benefactor actually was, it was not possible to end their contact.

### 1. Six Kilograms of Cocaine From The Defendant's Brother-In-Law

One of the specific allegations in the Statement of Facts in this case concerns the "trade" of six kilograms of cocaine with the *Cuinis*. ████████████████████████ the defendant explained how – through no fault of his own and without any intention to become involved in drug trafficking - the relationship changed between them. ████████████

████████████

> ABOUZAID-EL BAYEH stated his first involvement with narcotics trafficking started when Abigael was trying to sell a piece of property in Cancun worth approximately $1,000,000. Abigael asked ABOUZAID-EL BAYEH if anyone was interested.

ABOUZAID-EL BAYEH stated that his brother-in-law was interested in it, even though his intention was for his brother-in-law to find other people who were interested. ABOUZAID-EL BAYEH attempted to dissuade his brother-in-law but his brother-in-law still met with Abigael about the property. Although there were a lot of problems and ABOUZAID-EL BAYEH never received a commission for it, the deal was made. . . . ABOUZAID-EL BAYEH's brother-in-law bought [the company that owned the property] and received power of attorney. Power of attorney allows you to move the company in other people's names. However, ABOUZAID-EL BAYEH's brother-in-law could not pay the remaining amount for the property. He made partial payments until there was about $150,000 in debt. In order to pay off the debt, ABOUZAID-EL BAYEH stated he had to use cocaine from another deal that was occurring. **His brother-in-law had sold some cars to people in Mexico City and the buyers wanted to pay for the cars with a few kilograms of cocaine.** ABOUZAID-EL BAYEH had never approached the topic of cocaine with Abigael but due to the debt he had no choice (emphasis added).

As the Court will recall, during the contested sentencing hearing, the Government introduced text messages during which the defendant attempted to obtain additional time for his brother-in-law to pay off the debt. In a sad twist of fate, the defendant's brother-in-law was never charged by the United States but instead was an affiant in the extradition proceeding against defendant Abouzaid. ██████████████████████████████████████

████████████████████████████████████████

### 2. *Methamphetamine Importation*

The Statement of Facts also notes that the defendant conspired to import forty-five (45) kilograms of methamphetamine to the United States. During the contested sentencing hearing, the Government presented a blackberry message that appears to bear on the issue of methamphetamine. The defendant texted as follows:

How are you brother? A friend is exchanging this house for pure k of ice in case you have any and you're interested in teh house its ready to sign over the deed immediately. I'm sending you photos its in the Esmeralda residential neighborhood in Colima. It's the best neighborhood there.

Gov. X15 (Contested Sentencing Hearing). Undersigned counsel are not aware of any other independent evidence that relates to the offer to trade a house for methamphetamine. Likewise,

defense counsel are not aware of any other independent evidence that relates to a conspiracy to import any methamphetamine connected to this event into the United States.

### 3. The Defendant's Efforts To Save Kidnapping Victims

The Court also heard testimony that the defendant was involved in an effort to free the victims of a kidnapping by a drug trafficking organization. The events concerning the kidnapping ██████████████████████████████████:

> ABOUZAID-EL BAYEH identified the user of "El Scorpion" as himself and the user of "Billy the kid" as Menchito. ABOUZAID-EL BAYEH stated the series of conversation pertained to ABOUZAID-EL BAYEH attempting to discover who kidnapped his friend, Salvador. ABOUZAID-EL BAYEH met Salvador through one of Menchito's sisters. According to ABOUZAID-EL BAYEH, he was told to reach out to Menchito because Menchito had the best resources and knew everyone in the underworld. ABOUZAID-EL BAYEH did not believe Menchito ordered the kidnapping but could figure out who did. . . . . Menchito confirmed that Salvador was kidnapped along with 12 other individuals. **ABOUZAID-EL BAYEH stated that he was using all kinds of tactics to prevent Salvador from getting killed. ABOUZAID-EL BAYEH created a fictitious wife in order to humanize Salvador. He also tried to boast Salvador's skills as a chemist and engineer, and telling Menchito that Salvador could be useful in producing methamphetamine.** ABOUZAID-EL BAYEH also mentioned the use of oxycodone and ecstasy because a lot of people used them at parties in 2013. ABOUZAID-EL BAYEH stated that Salvador was released but later on he was never heard from again (emphasis added).

████████████████████████████████████████████

████████████████████████████ That appellation has now changed and the Government is attempting to use the defendant's extraordinary efforts to save the victims as evidence that he was a "leader" in the conspiracy. The defense believes that the facts demonstrate otherwise.

### Seriousness of the Offense/Promote Respect for the Law/Just Punishment

There is no doubt that the crime for which defendant Juan Manuel Abouzaid El Bayeh admitted his guilt is a serious matter. The defendant knows that he violated the law and has done all that is within his power to acknowledge responsibility for his actions. ███████████████

███████████████████████████████████████████████

██████████████████████████████████ He entered a timely guilty plea in the case and has

obviated the need for a trial of the charges against him.

The task of fashioning a sentence to promote respect for the law and to reflect the

seriousness of the offense is in some respects an existential quest. But as at least one district

court judge has noted "it is not always necessary to incarcerate a defendant to promote such

respect and demonstrate the seriousness of the crime." <u>United States v. Smith</u>, 2009 WL 24917

(N.D. Ohio). What promotes respect for the law is a fair sentence and under the totality of the

circumstances in this case, the defense believes that the requested seventy-eight month sentence

is fair for this defendant.

### Immigration Consequences Of Status As Foreign National/Deportation

The defense also believes that the sentence imposed by this Court should account for the

consequences of the defendant's status as a foreign national. First, because he is a foreign

national, defendant Abouzaid is not eligible for to work in BOP prison industries, nor be sent to a

"camp" managed by the BOP. Moreover, his status prevents the defendant from being sent to a

halfway house which would allow him to spend up to the last six months of his jail sentence

under less restrictive conditions of confinement.

In addition, because Juan Manuel is subject to deportation upon the completion of

sentence in the federal BOP, he will not qualify for application of the First Step Act pursuant to

18 U.S.C. §3632(a).  Thus, he will not eligible to receive a sentence reduction of up to twelve

months because he will not be permitted to take classes or enroll in programs offered by the BOP

to those federal inmates with status in the United States.

Finally, it is almost certain that the defendant will spend additional time incarcerated in the United States following the conclusion of his criminal sentence. After his sentence is completed, the defendant will be transferred to an immigration jail somewhere in the United States. He will be there until the United States Marshals Service organizes his return flight to Mexico. The Marshals ordinarily wait until there are sufficient persons to be returned to their country of origin to make the flight cost effective. Thus, there is no principled way to determine how long the defendant will remain in immigration custody until he is actually deported, which could take months.

The Court of Appeals has recognized that ineligibility for halfway house treatment and the additional period of incarceration pending deportation is a basis for a downward sentence variance. In United States v. Smith, 27 F.3d 649 (D.C. Cir. 1994), the district court gave the defendant a six-month downward variance for these reasons. We ask that this Court do the same here.

***Specific and General Deterrence/Prevent Future Crimes***

The factor of specific deterrence also supports a below guidelines sentence in this case. The defendant has admitted his involvement in the case and the entry of his guilty plea to demonstrate that he will never again be involved in a future drug conspiracy. ███████

████████████████████████████████████████████

████████████████████████████████ As the Court knows, the cartel has all the time in the world to wait for Juan Manuel to return to Mexico and then slaughter him and his family. They know who the other members of his family are and all that Mencho and his ruthless hitmen can hunt them down. Moreover, specific deterrence does not warrant a greater sentence than requested by the defense because the rate of recidivism among defendants

11

extradited to the United States is almost zero because the potential consequences of re-arrest and extradition back to the United States after a drug conviction would be disastrous.

As to general deterrence, it is abundantly clear to Mexican cartel members that the United States will indict, locate, and then prosecute their members to the fullest extent of the law and that forceful sentences will be imposed. In recent month, Mexico has summarily expelled various cartel leaders to the United States. No additional punishment is needed to be imposed against Juan Manual in order to send an additional message to other international drug traffickers.

## CONCLUSION

The sentencing of another person to jail time is a complex task for the Court. Through the submission of this memorandum the defense has tried to provide context to assist the Court in imposing a sentence that satisfies that requirements of the law and our notions of justice. For all the reasons set forth in this memorandum, the defense respectfully requests that the Court sentence defendant Juan Manuel Abouzaid El Bayen to seventy-eight months of incarceration with credit for time served since the date of his arrest in Mexico on March 10, 2021.

Respectfully submitted,

*Robert Feitel*

_____
Robert Feitel, Esquire
Law Office of Robert Feitel
1300 Pennsylvania Avenue, N.W.
Washington, D.C.  20008
D.C. Bar No. 366673
202-255-6637 (cellular)
RF@RFeitelLaw.com

*Sandi S. Rhee*

_____

12

Sandi S. Rhee, Esquire
Law Office of Sandi S. Rhee
10001 Georgetown Pike, #63
Great Falls, Virginia 22066
D.C. Bar No. 502417
202-285-8366 (cellular)
SandiRheeLaw@Gmail.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing motion was electronically sent via email to government counsel of record, this 16th day of October 2025.

*Robert Feitel*

_____

Robert Feitel